1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3   UNITED STATES OF AMERICA          )
                                      )
4                                     )
    vs.                               )   CR No. 11-30017-NMG
5                                     )
                                      )
6   EVRIPIDES GEORGIADIS              )

7

8   BEFORE:  THE HONORABLE NATHANIEL M. GORTON

9

10                   DAY FOUR OF JURY TRIAL

11

12

13

14       John Joseph Moakley United States Courthouse
                      Courtroom No. 4
15                    One Courthouse Way
                      Boston, MA 02210
16               Friday, April 25, 2014
                         9:11 a.m.
17

18

19

20           Marcia G. Patrisso, RMR, CRR
             Cheryl Dahlstrom, RMR, CRR
                  Official Court Reporters
21       John Joseph Moakley United States Courthouse
                One Courthouse Way, Room 3209
22                    Boston, MA 02210
            Mechanical Steno - Transcript by Computer
23

24

25

APPEARANCES:

    OFFICE OF THE UNITED STATES ATTORNEY
    By:  Alex Grant, AUSA, and
        Karen L. Goodwin, AUSA
    300 State Street
    Springfield, Massachusetts 01105.
    On behalf of the Government.


    BULKLEY, RICHARDSON & GELINAS
    By:  Andrew Levchuk, Esq., and
        Carol Kamm, Esq.
    1500 Main Street, 27th Floor
    Springfield, Massachusetts 01115.
    On behalf of the Defendant.

1          <u>I N D E X</u>

2                              <u>Direct</u>  <u>Cross</u>  <u>Redirect</u>  <u>Recross</u>
   WITNESSES FOR THE
3     <u>GOVERNMENT:</u>

4  GREGORY T. DICKER

5       By Ms. Goodwin (cont'd) 6              66, 70
        By Ms. Kamm                    45                    68
6
   GINA CHAMPION-CAIN
7
        By Ms. Goodwin           72              122
8
        By Ms. Kamm                   105
9
   RODNEY KREIE
10
        By Mr. Grant             123
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E X H I B I T S

| Exhibit | Description | In Evd. |
|---------|-------------|---------|
| 865 | 11/24/08 email - Condo to Dicker | 8 |
| 870 | 2/18/09 - DIA signed by all | 14 |
| 871 | 2/24/09 Lloyds SBLC | 17 |
| 872 | 3/26/09 CCL signed by all parties | 19 |
| 878 | 1/15/10 investment agreement | 20 |
| 879 | 2/17/10 Condo letter re: minor funding delays | 22 |
| 881 | 3/4/10 letter from Condo re 5/18/10 closing | 24 |
| 135 | 3/8/10 Century website printout | 27 |
| 869 | 1/6/09 Century screenshot re: 1 million euro guarantee | 31 |
| 884 | 6/28/10 Century screenshot re: transactions and balance | 32 |
| 885 | 6/28/10 Century screenshot with message re: wire transfer | 33 |
| 886 | 8/23/10 Century screenshot re: transactions and balance | 33 |
| 890 | 11/3/10 Century screenshot with message re: 6/28/10 transfer | 33 |
| 891 | 11/3/10 Century screenshot with message re: alteration to funding | 34 |
| 892 | 11/3/10 Century screenshot with message re: Silverberg transfer | 34 |
| 893 | 11/3/10 Century screenshot with 10/15/10 message to contact BBDA | 35 |
| 894 | 11/3/10 Century screenshot re: 6/1/09 guarantee 1 million euro | 35 |
| 895 | 11/3/10 Century screenshot re: 3/6/10 transfer of 10.2 million euro | 35 |

| | | | |
|---|---|---|---|
| 1 | 936 | Recording of telephone call with Zanetti | 42 |
| 2 | 556 | Screenshot:  Welcome to DAC Global | 75 |
| 3 | 944 | Email exchange between Champion-Cain and Dr. Eric, 2/18/10 - 10/9/10 | 92 |
| 4 5 | 1061 | Email from Champion-Cain dated 11/4/09 re Greek article | 111 |
| 6 | 123 | Screenshot of Dupont Alliance website, 11/2/09 | 130 |
| 7 8 | 556 | Screenshot of DAC Global website, 3/30/09 | 133 |
| 9 | 923 | Photograph of DFI site | 152 |
| 10 | 924 | Photograph of DFI site showing two gentlemen | 153 |
| 11 | 925 | Photograph of port site near DFI | 154 |
| 12 | 392 | Report of Cala site visit, 11/30/09 | 157 |
| 13 | 393 | Report of Snowy Pines/Lavaca site visit, 11/30/09 | 158 |
| 14 | 391 | Interoffice memo re Brandon Energy Park project | 159 |
| 15 | 926 | Photograph of group of people at PetroAlgae site | 163 |
| 16 | 927 | Photograph of group of people at PetroAlgae site | 164 |
| 17 | 928 | Photograph of group of people at PetroAlgae site | 165 |
| 18 | 931 | Photograph of California racetrack area | 168 |
| 19 | 932 | Photograph of California racetrack | 169 |
| 20 | 398 | List of projects, Zanetti to Kreie | 173 |
| 21 | 399 | List of Century accountholders, Zanetti to Kreie | 174 |
| 22 | 394 | Century screenshot for Asian World Marketplace, 3/29/10 | 178 |
| 23 24 | 395 | Century screenshot, unidentified, dated 3/29/10 | 179 |
| 25 | | | |

1                    P R O C E E D I N G S

2              THE CLERK:  All rise for the Court and the jury.

3              (The Court and jury enter the courtroom at 9:11 a.m.)

4              THE CLERK:  Thank you.  You may be seated.  Court is

5     it now in session.

6              THE COURT:  Good morning, jurors.

7              THE JURORS:  Good morning.

8              THE COURT:  We're going to resume.  Mr. Dicker will

9     retake the witness stand, please.

10             (Mr. Dicker resumes the witness stand.)

11             Good morning, Mr. Dicker.  You're reminded that you

12    remain under oath.  Please be seated.

13             And Ms. Goodwin may continue with direct examination.

14             MS. GOODWIN:  Thank you, your Honor.

15                    GREGORY DICKER, resumed

16                 CONTINUED DIRECT EXAMINATION

17    BY MS. GOODWIN:

18    Q.   Good morning, Mr. Dicker.

19    A.   Good morning.

20    Q.   Before I pick up from where I left off yesterday, I wanted

21    to ask you:  Back in 1997 were you convicted of

22    misappropriation of fiduciary property more than $10,000 but

23    less than $100,000?

24    A.   No, I wasn't convicted.

25    Q.   Were you given a term of probation for that charge?

1   A.   With the settlement, yes.

2   Q.   When we left off yesterday, I believe we had left

3   off -- you just had had lunch with some of the individuals from

4   BBDA -- and I'm going to bring us back to where we were -- and

5   the discussion had been about a million dollar deposit.  Do you

6   recall that, Mr. Dicker?

7   A.   Yes, I do.

8   Q.   Sometime after that visit did -- let me --

9        MS. GOODWIN:  May I approach, your Honor, with an

10  exhibit?

11       THE COURT:  Yes.

12       MS. GOODWIN:  Exhibit 865.

13  BY MS. GOODWIN:

14  Q.   Mr. Dicker, I'd just ask you to take a look at that

15  exhibit and review it sufficiently so -- I'm going to ask you

16  if you can identify that -- those documents.

17  A.   (Witness complies.)

18  Q.   Mr. Dicker, can you identify what you have in front of

19  you, beginning with the first page?

20  A.   Yes.  This was a document that was sent to us in

21  conjunction with Dupont Alliance.  It was sent by one of their

22  representatives.  It shows "Dan Claycamp" at the top of this.

23  Q.   If you look down below "Dan Claycamp" --

24  A.   I see "Dupont Alliance."

25  Q.   -- do you see where it -- does it appear to be an email?

1    A.    Yes, it does.

2    Q.    And who is the email from?

3    A.    Dupont Alliance, from John Condo.

4    Q.    And who is the email to?

5    A.    To myself.

6    Q.    Can you provide us with the date?

7    A.    November 21, 2008.

8    Q.    And does the email contain a number of attachments that

9    are listed underneath the subject?

10    A.    Yes, it does.

11    Q.    And the documents that follow this email, are they the

12    attachments that are referenced on the email?

13    A.    Yes.

14    Q.    And I don't know if I asked you this.  Who is the email

15    to?

16    A.    To myself.

17              MS. GOODWIN:  I would move the admission of Exhibit

18    865.

19              THE COURT:  It will be admitted.

20              (Exhibit No. 865 received into evidence.)

21              MS. GOODWIN:  May I publish it to the jury?

22              THE COURT:  It may be published.

23    BY MS. GOODWIN:

24    Q.    Just start with the first page so we could see the email.

25    A.    What do you want me to -- I'm sorry.

1    Q.   There's no question.  We're trying to get it up on the

2    screen so we could see what you're looking at, Mr. Dicker.

3    A.   Oh, I'm sorry.

4    Q.   Here we go.  So this email attaches a number of things.

5    It says "BBDA letter regarding Texanol, SBLC, Welcome to DAC."

6    And were these issues that you had discussed with Mr. Condo?

7    A.   Yes, they were.

8    Q.   And with respect to the BBDA letter to Texanol, which

9    is -- let me see if I can direct your attention to it.  It's --

10    I think it's the third page from the back.  So in other words,

11    it's Bates --

12    A.   It's the last page of mine.

13    Q.   Oh, the last page of yours?  I got it mixed up.

14    While we're getting it on the screen, do you recognize

15    that letter?

16    A.   Yes, I do.

17    Q.   And what is that letter?

18    A.   It's a letter stating that they wanted to go ahead and

19    proceed with the project.  There were certain things that we

20    had to do.  This is basically spelling out what we'd need to do

21    in order to get the project put together under these

22    guidelines.

23    Q.   And Mr. Condo had sent you a number of documents.  One of

24    them is -- I think it's the number on the -- is this document

25    that's now on the screen now.  And it's towards the back of

1  your package.  But perhaps if you could look on the screen,
2  Mr. Dicker, it might be easier than trying to leaf through.
3  A.   Yes, I see it.
4  Q.   Do you recognize that document?
5  A.   Yes, I do.
6  Q.   Was that something you had had discussions with Mr. Condo
7  about?
8  A.   Yes, I did.
9  Q.   And can you tell us about those discussions with
10  Mr. Condo?
11  A.   This came about during the time that they were obviously
12  wanting the million dollar deposit from us, and this was the
13  standby letter of credit that they were saying was -- it was
14  issued to them in the amount of $12 million.  And this we would
15  get an assignment in for the million dollars we put up as
16  additional security that those funds would be in safekeeping.
17  Q.   And you had wanted to see it before you moved forward?
18  A.   Yes, I did.  And in this instance, if you notice, it was
19  redacted, quite a bit of it.
20  Q.   If we could just scroll up a little bit to the top of the
21  document, is this the Lloyds that you were referring to in your
22  testimony on -- on -- yesterday?
23  A.   Yes, it is.
24  Q.   And then I'd just like to go to the second page of the
25  document.  And did Mr. Condo also send you printouts of the DAC

1    Global website?

2    A.    Yes.

3    Q.    And before you decided to go forward with the project, did

4    you look at this printout?

5    A.    Yes.

6    Q.    Did you also go on the web yourself and take a look at the

7    DAC Global website?

8    A.    Yes.

9    Q.    And what was your impression of the website?

10   A.    It was impressive to the extent that they were trying to

11   show, I guess to the world, that they were a financial -- they

12   had financial capability and that these were the projects that

13   they were involved in, the financing, and in some cases

14   construction of.  And that's basically the propaganda, not

15   using it in a bad term, that they had put together to show, I

16   guess, the potential opportunities, their capabilities.

17   Q.    And if you -- did they use logos of the number of

18   different institutions, banks and companies on their website?

19   A.    Yes, they did.

20          MS. GOODWIN:  And if you're able to scroll to the

21   number 7253.

22   A.    Okay.

23   Q.    I'm talking to the person handling the online view.

24          Let me see if I could put this on the screen.

25          MS. GOODWIN:  Can we switch from the computer to the

```
 1   presenter?
 2            THE COURT:  Okay.
 3            MS. GOODWIN:  Thank you.
 4   BY MS. GOODWIN:
 5   Q.   Do you see what's on the screen there as part of this
 6   Exhibit 865?
 7   A.   Yes, I do.
 8   Q.   Are these -- did you see these logos both in the materials
 9   that Mr. Condo sent you and in the materials that when you went
10   on the website you saw?
11   A.   Yes.
12   Q.   Ultimately, did you decide to go forward and make your
13   deposit?
14   A.   Ultimately, yes.
15   Q.   And was your deposit in any way tied to another project
16   that had been presented to BBDA, specifically, Indian Rocks?
17   A.   Yes.
18   Q.   Could you describe how your deposit of a million dollars
19   was tied -- connected as presented to you by Mr. Condo to
20   Indian Rocks?
21   A.   Indian Rocks had put up a $600,000 deposit with Condo.
22   And at that time the money that Indian Rocks borrowed to put up
23   their deposit came from a gentleman by the name of Ron Fagen.
24   And Ron Fagen had put the money up for a short-term loan
25   because they were supposedly going to get the money back.  But
```

prior to that happening, a few weeks after he'd given John the money, Ron Fagen opted to -- he wanted his money back, and that put Dan Claycamp in a bad position because --

Q. Let me just stop you there for one moment because that's a new name for us. Dan Claycamp. Who was Dan Claycamp?

A. He was the chief officer of Indian Rocks.

Q. And what did Mr. Condo indicate with respect to your one -- as I understand what you're saying, Mr. Fagen wanted his $600,000 back?

A. That's correct.

Q. Indian Rocks wanted to go forward?

A. That's correct.

Q. And what did Mr. Condo present to you about your deposit, how it was connected?

A. He felt like we should join the projects together to take advantage of their upcoming funding because that was a very few weeks away, as compared to ours being a couple of months away. And if we were to go ahead and deposit our million dollars, then he would return the funds back to Claycamp IRR, which in turn, of course, Claycamp would give back to Ron Fagen.

Q. Did you have an understanding of whether or not your $1 million was going to be used to pay back Mr. Fagen?

A. No.

Q. What was -- that was not your understanding?

A. No, it was not.

1  Q.   And who is Mr. Fagen?  Is Mr. Fagen someone who's known to

2  you?

3  A.   Yes.  He's a contractor.  He goes in different arenas, but

4  he's also one of the larger contractors in the United States

5  for ethanol projects.

6       MS. GOODWIN:  May I approach, your Honor?

7       THE COURT:  Yes.

8  BY MS. GOODWIN:

9  Q.   I'd like to show you Exhibit 870.  If you could just take

10 a look at it sufficient so that you can identify it, if you're

11 able to.

12      (Pause.)

13 A.   Okay.

14 Q.   Mr. Dicker, can you identify that document?

15 A.   Yes.  This is a deposit for investment agreement.

16 Q.   And was it signed by you, sir?

17 A.   Myself and my son.

18 Q.   You and your son?

19 A.   Yes.

20      MS. GOODWIN:  I'd offer this as an exhibit.

21      THE COURT:  It will be admitted.

22      (Exhibit No. 870 received into evidence.)

23      MS. GOODWIN:  May I publish it to the jury?

24      THE COURT:  It may be published.

25      MS. GOODWIN:  Could we switch to the screen?  Thank

1    you.

2            It's Exhibit 870.  And if we could just hone it

3    quickly to the Paragraph II(A) on the front page.

4    BY MS. GOODWIN:

5    Q.   And you could look at your paper copy or on the screen and

6    we'll highlight the section I want to refer to.  Do you see

7    where it says that it's the fund of -- the BBDA Global

8    Investment Fund is a specialized investment fund of Luxembourg?

9    A.   Yes.

10   Q.   And is that what had been represented to you about the

11   fund, where it was cited?

12   A.   Yes.

13   Q.   And going to page 7 of the exhibit, Section E and F.  Does

14   it talk about the "refundability" of the deposit in Section E?

15   It will be on your screen in a moment.

16   A.   Yes.

17   Q.   And what is -- does it say it's completely refundable?

18   A.   Yes, it does.

19   Q.   And was that your understanding, that it was completely

20   refundable based on what Mr. Condo told you, except for a

21   certain situation, if you backed out at a late date?

22   A.   That is correct.

23   Q.   Were there time frames set forth in Subparagraph F?  And

24   what I'm looking at is the closing date and the -- the 90 days

25   and the closing date in Paragraph F towards the end of the

1    paragraph.

2    A.    That's correct.

3    Q.    And what was your understanding of the relationship

4    between the -- how long -- how far out the closing date was

5    going to be from the date of your deposit?

6    A.    At that time it was 90 days.

7    Q.    And I take it that 90-day time period was not met, in your

8    experience?

9    A.    That's correct.

10          MS. GOODWIN:  May I approach, your Honor?

11          THE COURT:  Yes.

12   BY MS. GOODWIN:

13   Q.    I'd like to show you Exhibit 871.  Do you recognize

14   Exhibit 871?

15   A.    Yes, I do.

16   Q.    And what is it?

17   A.    It's the standby letter of credit or the

18   assignment -- partial assignment of the standby letter of

19   credit from Lloyds.

20   Q.    And is it addressed to your company?

21   A.    Yes, it is.

22   Q.    And is this something that you received?

23   A.    This is what I received.

24          MS. GOODWIN:  I'd offer this 871 into evidence.

25          THE COURT:  So admitted, 871.

1          (Exhibit No. 871 received into evidence.)

2          MS. GOODWIN:  May I publish it to the jury?

3          THE COURT:  It may be published.

4  BY MS. GOODWIN:

5  Q.    So this is -- what -- can you explain what role receiving

6  this letter of credit had in your decision to make the deposit?

7  A.    When we made our deposit, under the deposit agreement

8  there was a lag time of two or three days.  So before we would

9  receive a notice of safekeeping of our deposit by, at that

10  time, BBDA, and this document would be presented as further

11  security for a million dollars.  So this, along with the

12  safekeeping of our million dollars at Suntrust, we felt

13  comfortable enough to enter into the transaction.

14  Q.    Shortly after you sent -- wired your -- did you wire the

15  funds to Suntrust, the million dollars?

16  A.    Yes, we did.

17  Q.    And shortly after that occurred, did you get the -- go

18  down -- take the next step, which was a conditional commitment

19  letter?

20  A.    Yes, we did.

21          MS. GOODWIN:  May I approach with Exhibit 872?

22          THE COURT:  Yes.

23  BY MS. GOODWIN:

24  Q.    I'm showing you 872, and I'd ask you to take a look at it

25  so you could identify it.  If you want, the signature pages are

1   at the end of the document, if that will assist you in

2   reviewing it.

3   A.   What page do you want me to look at?  I do recognize this

4   document.

5   Q.   You may look at as much as you need to in order to

6   identify it.  I just wanted to let you know that the signature

7   pages were towards the end.

8   A.   Okay.  I'm ready.  Yes, I do --

9   Q.   Are you familiar with Exhibit 872?

10  A.   Yes.

11  Q.   And what is that document?

12  A.   This is the conditional -- basically, it's an approval of

13  the project with conditions.  And this -- the conditions that

14  were --

15  Q.   I'm just going to stop you there because right now we

16  have -- I just want you to tell me what the document is and

17  whether it's familiar to you.

18  A.   It's familiar to me.  It's a conditional commitment.

19  Q.   And was it signed by you and your son at the back?

20  A.   Yes.

21  Q.   And was it also signed by Mr. Condo?

22  A.   Yes, it was.

23  Q.   And is there a date on the cover page?

24  A.   March 26th.

25  Q.   Of what year?

```
1   A.    2009.
2              MS. GOODWIN:  I'd offer Exhibit 872.
3              THE COURT:  It will be admitted.
4              (Exhibit No. 872 received into evidence.)
5   BY MS. GOODWIN:
6   Q.    When I interrupted you, and pardon me for that, you were
7   talking about conditions.  Did this letter set forth certain
8   things that Texanol needed to do?
9   A.    Yes, it did.
10  Q.    And what type -- if you can -- can you describe generally
11  what types of conditions there were, what things you needed to
12  do to move to the next step?
13  A.    The conditions were primarily tied to the -- that we had
14  to provide them -- were tied to our project.  They wanted to
15  see that we had an off-take agreement.
16  Q.    What is an off-take agreement, sir?
17  A.    That's an agreement by which we enter into with a
18  prospective -- not a prospective buyer, but a buyer that will
19  take our ethanol at the time that we commence production.  And
20  we did secure that from Shell.
21  Q.    And were there other -- were there a number of other
22  conditions you had to meet?
23  A.    Yes, there were.
24  Q.    And did that require any expenditure of time or money?
25  A.    Every condition.
```

```
 1   Q.   And did you meet those conditions?

 2   A.   Yes, we did.

 3   Q.   And after meeting those conditions, what was the next

 4   step?

 5   A.   The next step would have moved us directly on to the

 6   master investment agreement.

 7          MS. GOODWIN:  May I approach, your Honor?

 8          THE COURT:  Yes.

 9   BY MS. GOODWIN:

10   Q.   I'd like to show you Exhibit 878 and ask you if you

11   recognize that.  If you could take a look at 878.  And when

12   you're finished looking at it, look up and I'm going to ask you

13   what it is.

14          (Pause.)

15   A.   I recognize it.  It's the master investment agreement.

16   Q.   And was that signed by you and your son?

17   A.   Yes, it was.

18   Q.   And was it also signed by individuals on behalf of BBDA?

19   A.   Yes, it was.

20          MS. GOODWIN:  I would offer Exhibit 878.

21          THE COURT:  It will be admitted.

22          (Exhibit No. 878 received into evidence.)

23   BY MS. GOODWIN:

24   Q.   What is the date of this master investment agreement?

25   A.   January 15, 2010.
```

1  Q.   And after having this agreement executed, what did you

2  anticipate -- or what had you been told by Mr. Condo was going

3  to happen next?

4  A.   That we would receive from our prepared draw sheets which

5  we put together and everything -- but that we would be funded

6  for our project.

7  Q.   And when you say "draw sheets," could you explain what

8  that is?

9  A.   That is a document -- a document, a draw, that lists the

10  various different items that you're going to do or that you

11  need to pay in that certain month, and that comprises the draw.

12  And that's for -- and then it has a total amount that that draw

13  would be for.

14  Q.   And had you fulfilled all the conditions from your end

15  necessary to get that first draw?

16  A.   Yes, we had.

17        MS. GOODWIN:  May I approach, your Honor?

18        THE COURT:  Yes.

19  BY MS. GOODWIN:

20  Q.   I'd like to show you Exhibit 879.  Do you recognize

21  Exhibit 879?

22  A.   Yes, I do.

23  Q.   And what is it?

24  A.   This is a letter from John Condo to myself as well as the

25  various other people that had projects with him that was

1  extending the closing date another 30 days.  So in other words,

2  we weren't going to close within that original date that we

3  were given, and now we're closing 30 days later.

4  Q.   And what is the date on that letter?

5  A.   This is February 17th, 2010.

6  Q.   And did you receive that letter, sir?

7  A.   Yes, I did.

8         MS. GOODWIN:  I'd offer 879.

9         THE COURT:  It will be admitted.

10        (Exhibit No. 879 received into evidence.)

11        MS. GOODWIN:  And may I publish it to the jury?

12        THE COURT:  It may be published.

13 BY MS. GOODWIN:

14 Q.   So this was roughly about a month after your master

15 investment agreement was signed?

16 A.   That is correct.

17 Q.   Did it cause you any concern?

18 A.   Yes, it did.

19 Q.   What concerns did you have after you received this letter?

20 A.   Realizing that we're dealing in a country, not the U.S.,

21 but down in Belize, we had quite a number of different things

22 going on on a daily basis in order to have our project ready to

23 go upon the delivery of our first draw.  And with that being

24 said, we were scheduled to start certain things in Belize based

25 upon our original funding date.  This caused us a bit of a

```
1   problem because it was 30 days, asking us -- telling us it was
2   going to be 30 days later.  So that meant that we were going to
3   have to either scale back, stop, or continue to pay ourselves
4   to keep these processes moving forward.
5        So it put us into a little bit of dilemma at that time.
6   Q.   Do you see in the letter where it indicates that "the
7   significant changes are to your benefit"?
8   A.   Yes, I do.
9   Q.   Did you see any way that these -- did you see any changes
10  at that point that were working towards your benefit?
11  A.   Not at all.
12            MS. GOODWIN:  May I have just a moment?
13            THE COURT:  Yes.
14            (Pause.)
15            MS. GOODWIN:  May I approach, your Honor?
16            THE COURT:  Yes.
17            MS. GOODWIN:  I would like to show the witness Exhibit
18  881.
19  BY MS. GOODWIN:
20  Q.   And have you looked at it in order to identify it?
21  A.   Yes, I have.
22  Q.   Could you identify this document, please?
23  A.   This letter was basically stating that they're prepared to
24  release our funds, that --
25  Q.   Without going into the substance of it, was it a letter
```

1    that you received?

2    A.   Yes, it was.

3    Q.   And could you tell us the date of the letter?

4    A.   March 4, 2010.

5    Q.   And who was the letter from?

6    A.   John Condo.

7          MS. GOODWIN:  I'd offer 881.

8          THE COURT:  It will be admitted.

9          (Exhibit No. 881 received into evidence.)

10         MS. GOODWIN:  And may I publish it?

11         THE COURT:  It will be published.

12   BY MS. GOODWIN:

13   Q.   If we look -- if we hone in to the big paragraph in the

14   middle, does this letter give you a funding date?

15   A.   Yes.

16   Q.   And what is that date?

17   A.   May 18th, 2010.

18   Q.   Was that within the time periods that had been represented

19   to you by Mr. Condo that you would receive funding?

20   A.   No, it was not.

21   Q.   When you got this letter, did you have any conversation

22   with Mr. Condo or anyone at BBDA about the date?

23   A.   Yes, I did.

24   Q.   And who did you speak with?

25   A.   I spoke with Michael Zanetti and John Condo.

1   Q.   And what were you told?

2   A.   I was told that this was the procedure that they're having

3   to go through.  Since the accounts were set up at Century

4   Bancorp., they were having to do other things to perfect this,

5   and it would take at least this time but not any further than

6   the May 18th date.

7   Q.   Did they express any doubt that you would ultimately get

8   funded?

9   A.   No.

10  Q.   You mentioned Century Bancorp.  What was Century

11  Bancorp. -- what role did it play, to your knowledge, in this

12  process of getting funding?

13  A.   We were asked -- my son and I were asked to open

14  up -- excuse me.  We were asked to provide our personal data in

15  order for BBDA to perfect the opening of an account for Texanol

16  at Century Bancorp., and Century Bancorp. would then be

17  the -- both the clearinghouse for funds being sent to us as

18  well as the custodial account for all the transactions.  This

19  would be the main account.

20  Q.   And did -- did Mr. Condo or Mr. Zanetti tell you where

21  Century Bancorp. was located?

22  A.   Not at first.  Actually, they had banking

23  relations -- what I was told is that they had banking

24  relationships at several major banks.  In mind right now it was

25  Chase, Bank of America, Barclay's, and I believe a few others,

1    but I cannot remember those at this time.

2    Q.    With respect to Century Bancorp., did you have an

3    understanding from Mr. Zanetti or Mr. Condo whether that was a

4    bank in the United States?

5    A.    It was my understanding that it was a bank that had been

6    purchased by BBDA Global and that this worked out with their

7    philosophy, whatever that might have been.  And that while it

8    was not a U.S. bank -- and actually, it was out of New Zealand.

9    They had offices in New Zealand -- they had corresponding

10   offices or correspondent offices, I can't remember how they put

11   it, in London --

12   Q.    Let me stop you there, Mr. Dicker, and ask you a different

13   question.  Did you do any research yourself?  When you opened

14   your account, were you given the ability to go online?

15   A.    We were able to go online and go to the Century Bancorp.

16   website, and through that website we were able to access our

17   account.  And it showed, at the time that we went through this

18   procedure, that a million one thousand euros had been deposited

19   into that account.

20   Q.    Let me -- did you go -- did you look at the website itself

21   as apart from looking at -- or in addition to looking at your

22   own account?

23   A.    Yes.  It was hard to get to.  I think we looked at it

24   initially, the first time, and it was more or less their -- the

25   Century Bancorp. coal and grain.  That's all I can remember of

1    that.

2    Q.   Let me show you, Mr. Dicker -- let me approach with an

3    exhibit and I'll see if that will help you recognize it.  I

4    would like to approach with Exhibit 135.

5        And I direct your attention not to the front page but to

6    all of the pages that are behind the front page.

7    A.   Yes, I remember this now.

8    Q.   Do you recognize the document, sir?

9    A.   Yes, I do.

10   Q.   And could you identify what it is?

11   A.   It was the website itself stating -- and --

12   Q.   Without going into the content, just tell me generally.

13   A.   It was a Century Bancorp. website and what it showed.

14   Q.   Does it look -- does this printout look substantially the

15   same as what you saw when you logged on to it back in the time

16   period that you were dealing with BBDA?

17   A.   Yes, it does, except it was in color.  This is in black

18   and white.

19           MS. GOODWIN:  I would like to offer this as an

20   exhibit, your Honor.

21           THE COURT:  It will be admitted, 135.

22           (Exhibit No. 135 received into evidence.)

23           MS. GOODWIN:  And may I publish it to the jury?

24           THE COURT:  Yes.

25   BY MS. GOODWIN:

1  Q.   And I would just like to go to the second page of the
2  exhibit.  And with respect to the website here where it says
3  "We provide an exclusive service to high net-worth clients,"
4  was that in color when you looked at it on the computer?
5  A.   Yes, it was.
6  Q.   You talked about logging on to the website.  What was that
7  process?  What did that process entail?
8  A.   We were given, by Frank Barecich -- and I believe that's
9  how he pronounces his name -- but how to do this.  If you went
10 on to try and do this just from your knowledge of a Century
11 Bancorp., you would get a listing of different -- of the same
12 name in many different countries.  And there were several of
13 them; it was not an exclusive name.  However, when we got the
14 proper way to get into Century Bancorp. that was
15 involved -- that was owned by BBDA Global or John Condo and
16 everybody else that was with BBDA, then we were able to log
17 into the internet, and then that would take us -- with a
18 certain code number which we were given for our account, that
19 would pull up that account directly.  Not any more information
20 on the bank, such as a profit and loss statement or any of that
21 kind of information.  This was the information that you'd get
22 that I'm looking at right now.
23 Q.   Specific to you.  So you would be able to see information
24 specific to your account?
25 A.   Yes.

1      MS. GOODWIN:  May I have one moment, your Honor?

2      THE COURT:  Yes.

3      (Pause.)

4      MS. GOODWIN:  May I approach the witness?

5      THE COURT:  Yes.

6  BY MS. GOODWIN:

7  Q.   I'm going to show you a series of pages, Exhibit 869, 884,

8  885, 886, 890 --

9  A.   I'm sorry.  From this document?

10 Q.   No.  You don't need to look at that, sir.  I'm bringing

11 things over to you.  For the record, I'm listing all of the

12 documents.  They're just one page each.

13      -- 891, 892, 893, 894 and 895.  And I'll be bringing them

14 your way.

15      If you could take a look at those, Mr. Dicker, and look up

16 when you've finished looking through them?

17 A.   (Witness complies.)

18 Q.   And can you identify -- is there some similarity between

19 all of those documents that I've shown you?

20 A.   Say that again?  I'm sorry.

21 Q.   Are you able to -- is there enough similarity between all

22 those various exhibits that you can describe them as a group?

23 A.   Yes.

24 Q.   And as a group what do those -- what are those exhibits?

25 A.   This was the Texanol bank account at Century Bancorp.

1   where transactions -- deposits were being made and withdrawals
2   were being made by BBDA.
3   Q.   And did you go on periodically to your account and look at
4   those -- look at what was in it and make a printout of what it
5   showed?
6   A.   That is correct.
7        MS. GOODWIN:  I'd like to offer these as an
8   exhibit -- as exhibits.  Multiple exhibits.
9        THE COURT:  Well, they need to be differentiated.
10  There are, what, about ten exhibits?  I need to have more
11  information than --
12       MS. GOODWIN:  A group package?  Okay.
13  BY MS. GOODWIN:
14  Q.   With respect to the first exhibit, 8- --
15       MS. GOODWIN:  Excuse me, your Honor.  May I have a
16  moment to retrieve my copies?
17  Q.   Is the first exhibit you have 882?
18  A.   No, it is not.  It's 869.
19  Q.   And 869, what is the -- what is -- is there a date of the
20  printout at the bottom of that exhibit?
21  A.   It shows 6/1/2009.
22       MS. GOODWIN:  Your Honor, would you like me to do
23  these separately -- each one separately?
24       THE COURT:  So this is a printout dated June 1st of
25  '09.  And what else?

1  BY MS. GOODWIN:

2  Q.   And what does it show, sir?

3  A.   It shows that this -- I'm not going to read it, but it

4  shows that Century Bancorp. had issued from the irrevocable

5  standby letter of credit the $1 million euros in favor of

6  Texanol to this account.

7            MS. GOODWIN:  May I offer this as a full exhibit?

8            THE COURT:  869 will be admitted.

9            (Exhibit No. 869 received into evidence.)

10 BY MS. GOODWIN:

11 Q.   And is there a print-off date on the next document?  And

12 what is the exhibit number?

13 A.   6/28/2010.  It's --

14           THE COURT:  We need to know what number we're talking

15 about.

16 Q.   And do you see the sticker at the bottom?

17 A.   Yes; 884.

18 Q.   And the printout date on 884 is --

19 A.   6/28.

20           THE COURT:  Of '09?

21           THE WITNESS:  I'm sorry, sir.  Yes -- no, of 2010.

22 Q.   And is the --

23           THE COURT:  Was the first one '09?

24           THE WITNESS:  Yes, sir, it was.

25           THE COURT:  Okay.

1  Q.   And is the next exhibit in your group 885?

2  A.   Yes, it is.

3  Q.   And what is the printout date on 885?

4  A.   6/28/2010.

5  Q.   Thank you.  Let me go back to 884.

6       MS. GOODWIN:  I apologize, your Honor.  I would like

7  to move the admission of 884.

8       THE COURT:  Yes, it will be admitted.

9       (Exhibit No. 884 received into evidence.)

10 BY MS. GOODWIN:

11 Q.   And 885, does that have a printout date?

12 A.   6/28/2010.

13      THE COURT:  How does it differ from 884?

14      THE WITNESS:  This deals with the transfer of funds

15 via an instrument called an MT-103 from the Century Bancorp.

16 Texanol account to -- and it's transitional -- from that

17 account through Barclay's Bank to eventually the beneficiary

18 bank of Texanol, which was Bank of America.

19 Q.   And is that different information than what you see on

20 Exhibit 884?

21 A.   Yes, it is.

22 Q.   And what -- in summary fashion, what's the information on

23 Exhibit 884?

24 A.   884 is a transactional sheet showing funds going in and

25 out of the Bancorp. -- Century Bancorp. account for Texanol.

```
 1            MS. GOODWIN:  I would like to offer both 884 and 885,
 2    your Honor.
 3            THE COURT:  They're admitted.
 4            (Exhibit No. 885 received into evidence.)
 5    BY MS. GOODWIN:
 6    Q.   With respect to 886, does that show a printout date?
 7    A.   Yes, it does.  8/23/2010.
 8    Q.   And does that show a number of transactions including an
 9    outgoing wire transfer on the first draw of 9,844,800?
10    A.   That is correct.
11            MS. GOODWIN:  I would like to offer 886, your Honor.
12            THE COURT:  It will be admitted.
13            (Exhibit No. 886 received into evidence.)
14    BY MS. GOODWIN:
15    Q.   Turning to 890.
16    A.   Yes.
17    Q.   Is there a printout date on that?
18    A.   11/3/2010.
19    Q.   And does that show information towards the bottom relating
20    to the first draw payment?
21    A.   Yes, it does.
22            MS. GOODWIN:  I would offer 890.
23            THE COURT:  It will be admitted.
24            (Exhibit No. 890 received into evidence.)
25    BY MS. GOODWIN:
```

1   Q.   Turning to 891, could you tell us the printout date at the
2   bottom?
3   A.   11/3/2010.
4   Q.   And does that indicate cancellation of certain
5   transactions with Century Bancorp.?
6   A.   Yes, it does.
7           MS. GOODWIN:  I would offer 891.
8           THE COURT:  It will be admitted.
9           (Exhibit No. 891 received into evidence.)
10  BY MS. GOODWIN:
11  Q.   892 is printed out on what date, sir?
12  A.   11/3/2010.
13  Q.   And does that show something relating to Silverberg?
14  A.   Yes, it does.
15          MS. GOODWIN:  May I offer 892?
16          THE COURT:  It will be admitted.
17          (Exhibit No. 892 received into evidence.)
18  BY MS. GOODWIN:
19  Q.   893.  Can you indicate the printout date of that?
20  A.   11/3/2010.
21  Q.   And does that direct in any individual logging on to the
22  account to do something in particular when they log on?  To go
23  look -- get information elsewhere?
24  A.   Yes, it does.
25          MS. GOODWIN:  I would offer 893.

```
1              THE COURT:  It will be admitted.
2              (Exhibit No. 893 received into evidence.)
3    BY MS. GOODWIN:
4    Q.   894 was printed off on what date?
5    A.   11/3/2010.
6    Q.   And does this reference something with respect to the
7    letter of credit?
8    A.   Yes, it does.
9    Q.   And finally --
10             MS. GOODWIN:  I'd offer Exhibit 894.
11             THE COURT:  It's admitted.
12             (Exhibit No. 894 received into evidence.)
13   BY MS. GOODWIN:
14   Q.   And 895, what is the printout date of that?
15   A.   11/3/2010.
16   Q.   And does that indicate that there had been some
17   instructions given to Century Bank?
18   A.   Yes, it does.
19             MS. GOODWIN:  May I publish just certain of these to
20   the jury?
21             THE COURT:  Are you offering 895?
22             MS. GOODWIN:  Yes.  I'm sorry.  I would like to offer
23   895.
24             THE COURT:  It's admitted.
25             (Exhibit No. 895 received into evidence.)
```

```
 1   BY MS. GOODWIN:
 2   Q.   I'd like to publish --
 3           MS. GOODWIN:  May I publish certain of these exhibits?
 4           THE COURT:  Yes.
 5           MS. GOODWIN:  I would like to publish 869.
 6   BY MS. GOODWIN:
 7   Q.   And could you -- let me see if we could make it a little
 8   bit smaller.  Are you able to see that on the paper, sir, or on
 9   the screen?
10   A.   On the paper is fine.
11   Q.   And what does that indicate?  Does it indicate anything
12   relating to your deposit and its guaranty?
13   A.   Yes, it does.
14   Q.   What does it tell you?
15   A.   It basically shows that the $1 million -- that there was
16   $1 million deposited from the irrevocable standby letter of
17   credit in favor of Texanol LLC to the Century Bancorp.
18   account.
19   Q.   And may we turn to 882?
20   A.   882?
21   Q.   It should appear on your screen if you're having trouble
22   finding it.
23   A.   I don't have it.
24   Q.   You may look at it on the screen, sir.  Are you able to
25   see it there?
```

1   A.   Excuse me.  I'm sorry.  I'm kind of blind.  Yes, I do see
2   it.
3   Q.   And what does that reflect?
4   A.   It reflects the account being debited for a million
5   dollars to the Texanol account that was set up by Nathan and
6   Greg Dicker.
7   Q.   And does that represent your deposit, that $1 million?
8   A.   It represents the deposit that was transferred into this
9   account from the standby letter of credit.
10  Q.   Did you have any understanding -- did Mr. Condo or
11  Mr. Zanetti ever tell you that the money that you deposited in
12  the Suntrust account was going to go anywhere else outside of
13  Suntrust?
14  A.   No; at this time I was told it was still in Suntrust.
15          MS. KAMM:  Your Honor, may I ask for clarification?
16          I believe you're on 882, correct?
17          THE COURT:  882 hasn't been admitted.
18          MS. GOODWIN:  My apologies, sir -- your Honor.  I beg
19  your pardon.
20          If we could take that off the screen.
21  BY MS. GOODWIN:
22  Q.   Were you able to look on your account at times and see at
23  Century Bank that there was something that represented your
24  deposit in there of a million dollars?
25  A.   Yes; a deposit from the standby letter of credit.

1   Q.   And with respect to the deposit sitting in Suntrust, did

2   you ever get any bank statements from Suntrust showing your

3   deposit there?

4   A.   Not at this time, no.

5         MS. GOODWIN:  May I have just one moment, your Honor?

6         THE COURT:  Yes.

7         (Pause.)

8         MS. GOODWIN:  May I publish 884?

9         THE COURT:  Yes.

10  BY MS. GOODWIN:

11  Q.   And do you have 884 in front of you, sir?

12  A.   Yes, I do.

13  Q.   And do you see the amount of money of $9,844,650?

14  A.   Yes, I do.

15  Q.   Does that amount mean anything to you?  It indicates, if

16  you look at the outgoing wire transfer, "first draw payment"?

17  A.   No, I see that.  I can only -- I don't know where the

18  9-million-some-odd number comes from.  I know where it shows

19  that we were supposed to be getting a draw of a million.

20  $687,000 is stated here, and that would have been from the draw

21  submission that we had put in.  And this was showing that --

22  that particular outgoing transaction.

23  Q.   And did you ever receive that outgoing transaction?

24  A.   Never.

25         MS. GOODWIN:  May I publish 891?

1      THE COURT:  Yes.

2  BY MS. GOODWIN:

3  Q.   Do you remember at some point in time when you logged on

4  to your Century account you were no longer able to see any

5  representation of funds in that account?

6  A.   Yes.

7  Q.   And do you recall seeing this particular information on

8  your account indicating that the funding procedures that had

9  been issued by Century were cancelled?

10  A.   Yes.

11  Q.   During the summer and fall of 2010 were you in contact

12  with individuals at BBDA about both your funding and your

13  deposit?

14  A.   Yes, I was.

15  Q.   And what were they telling you about your funding?  And

16  let me ask you first who you were speaking with.

17  A.   I spoke with John Condo at the beginning of the time

18  period, and he said that they -- again, they were working out

19  different procedures in order to get this to happen because of

20  the Patriot Act, I believe.  And so consequently, there was

21  additional paperwork that was going to have to be perfected to

22  get the funds from outside the United States into the United

23  States and then having them marked as good funds, you know, not

24  coming from some other strange source.  And that's what they

25  were going through now.

1    Then later on, after not hearing or not seeing or not

2  getting any information whatsoever concerning our deposit, our

3  draws or anything else, I spoke with Zanetti.  And I don't know

4  if this was the time or not, but to my recollection, I believe

5  that at that time when I talked to him that the offices were

6  being shut down, for all intents and purposes, while the

7  federal government -- they were removing their servers.  And

8  that once -- that there was nothing wrong.  This was just from

9  some complaint.  And then as soon as they got them back, then

10  they would be able to get back up online and be able to

11  complete the transaction.

12  Q.   At some point --

13  A.   Something like that.

14  Q.   At some point did your conversations with Mr. Zanetti and

15  Mr. Condo shift from, "Where is my funding?" to "Where is my

16  deposit?"

17  A.   Shortly thereafter; yes, ma'am.

18  Q.   And what did they tell you about your ability to get your

19  deposit back?

20  A.   Our funds were protected, just give them about a period of

21  30 days or something like that, if I remember correctly, and

22  that they would be returned to you; that there had been some

23  other major glitches but that they would provide -- they would

24  provide the funds, the deposit -- the deposit that was

25  on -- the million dollars in Suntrust via, I believe, an

1  attorney or something like that.

2  Q.   You were getting information that there were attorneys --

3  one or more attorneys who were going to be involved in helping

4  you -- in funneling the money back to you?

5  A.   Yes.

6  Q.   Did you at some point get your lawyer involved with this

7  situation?

8  A.   Yes.

9  Q.   And did you and your lawyer place a call to Mr. Zanetti to

10  ask a number of questions about what was going on?

11  A.   Yes, we did.

12  Q.   Did you make -- did your lawyer make a recording of that

13  telephone call?

14  A.   Yes, he did.

15  Q.   And did you have an opportunity to listen to that

16  recording the day before yesterday in our office?

17  A.   Yes, I did.

18        MS. GOODWIN:  May I approach?

19        THE COURT:  Yes.

20  BY MS. GOODWIN:

21  Q.   I'm showing you what's been marked as Exhibit 936.  Do you

22  see your initials on 936?

23  A.   Yes, I do.

24  Q.   And what is 936, just physically?

25  A.   It's a recording of the conversation that you're referring

1  to between Michael Zanetti; Mitch Little, our attorney; and I

2  think you hear me a couple of times on this.

3  Q.   And did you put your initials on it after you listened to

4  it at our office two days ago?

5  A.   Yes, I did.

6          MS. GOODWIN:  May I offer 936?

7          THE COURT:  It will be admitted, 936.

8          (Exhibit No. 936 received into evidence.)

9          BY MS. GOODWIN:  And may I play just a couple of

10  portions of 936?

11          THE COURT:  Yes.

12          MS. KAMM:  Your Honor, can we have the date -- is

13  there a date of that conversation?

14  BY MS. GOODWIN:

15  Q.   Do you remember the date of that conversation,

16  approximately, or the time frame?

17  A.   It would have been -- it was in 2010.  I would think

18  somewhere in the summer.

19  Q.   Was it after your funding date had passed?

20  A.   Oh, yes.

21  Q.   Was it during the time that there was discussion of

22  refunding the deposit?

23  A.   Yes.

24  Q.   And you place that somewhere in approximately the summer

25  of 2010?

1  A.   Yes.  Yes.

2        MS. GOODWIN:  I would again offer 936.

3        THE COURT:  It's already been admitted.

4        MS. GOODWIN:  May I publish it to the jury, the

5  sections that I mentioned?  And I would like to play --

6        THE WITNESS:  It may have been a little before the

7  summer.  I'm sorry.  I just can't remember exactly when.  I

8  remember this like it was yesterday, I just don't remember when

9  it was done.

10 BY MS. GOODWIN:

11 Q.   And I'd like to just start playing it, and I'll stop it in

12 a minute and ask you if you can identify some of the voices

13 that we're hearing.

14 A.   Me?

15 Q.   No, you don't need to play it.  We're going to play it for

16 you.

17 A.   Okay.

18 Q.   All you need to do is tell us who's talking.

19 A.   Okay.

20      (Audio recording played.)

21 Q.   Let me stop that right here.  You heard two voices in that

22 part of the recording?

23 A.   Yes.

24 Q.   Are you able to recognize the first voice?

25 A.   Yes, I am.

1    Q.   And who was that?

2    A.   Mitch Little.

3    Q.   And who is Mitch Little?

4    A.   Our attorney.  One of our attorneys.

5    Q.   And were you able to recognize the second voice?

6    A.   Yes, I did.

7    Q.   And who was that?

8    A.   Michael Zanetti.

9         MS. GOODWIN:  And may we continue playing it now?

10        (Audio recording played.)

11   Q.   And throughout the portion that we just listened to, was

12   that your lawyer and Mr. Zanetti talking?

13   A.   Yes, it is.

14   Q.   Fast-forward just a little bit, did you ever get your

15   deposit back?

16   A.   No, I did not.

17   Q.   Did you ever get funding from BBDA Global?

18   A.   No, I did not.

19   Q.   Did your project ever get funding and move forward?

20   A.   From BBDA?

21   Q.   Yes.

22   A.   No.

23        MS. GOODWIN:  I have no further questions.

24        THE COURT:  Cross-examination, Ms. Kamm?

25        MS. KAMM:  Your Honor, may we have a sidebar before

1  cross-examination?

2          THE COURT:  Yes.

3          (Discussion at sidebar and out of the hearing of the

4  jury:)

5          MS. KAMM:  Your Honor, with regard to the recording

6  that we just heard, it was my understanding that most of the

7  first 14 minutes were going to be played.

8          THE COURT:  Most of the 14?

9          MS. KAMM:  Most of the first 14 minutes, with the

10  exception of part of minutes 3 to 4.  I listened to minutes 3

11  to 4.  They didn't matter to me.  But the first two and a half

12  minutes I did expect to be played and I do want them played.  I

13  don't have a means to play them because I understood they were

14  going to be played.

15          I would ask that the government be asked to play those

16  minutes.

17          MS. GOODWIN:  We don't have a problem playing it.  We

18  were just trying to move things along, your Honor.

19          THE COURT:  Then during cross-examination your

20  technician will be under her instruction as to when to play it

21  and how much to play it.

22          MS. KAMM:  Okay.

23          MS. GOODWIN:  No problem.

24          (In open court:)

25                          CROSS-EXAMINATION

1    BY MS. KAMM:

2    Q.    Good morning, Mr. Dicker.

3    A.    Good morning.

4    Q.    Welcome to Massachusetts.

5    A.    Thank you.

6    Q.    My name is Carol Kamm.  I'm an attorney for

7    Mr. Georgiadis.

8          Now, you've testified regarding a number of letters,

9    documents that you've signed, emails -- a lot of communications

10   with a number of people regarding the whole BBDA deal.  Is that

11   correct?

12   A.    Yes.

13   Q.    Were any of those communications with people who were in

14   Massachusetts?

15   A.    No.

16   Q.    To your knowledge is there any connection between your

17   deal with BBDA and Massachusetts?

18   A.    Not that I'm aware of.

19   Q.    All right.  So you testified that you first learned about

20   BBDA as a result of going to an ethanol convention in the

21   summer of 2008 where you met Lynn Knox, right?

22   A.    That's correct.

23   Q.    Okay.  And other than having met Lynn Knox, you would not

24   know about BBDA.  Is that fair to say?

25   A.    Yes.

1  Q.  You'd been looking for funding, he brought you the source,

2  right?

3  A.  He brought us the source after meeting him in Florida for

4  that convention, yes.

5  Q.  That's right.  So the initial communication -- with Dupont

6  Alliance, I think you said it was at first, right?

7  A.  Yes.

8  Q.  Under the umbrella of BBDA and the fund, they're -- we'll

9  use those names interchangeably for our purposes here today?

10  A.  We can.

11  Q.  Okay.  So the initial communications with BBDA were

12  through Mr. Knox communicating directly with BBDA, right?

13  A.  Through Mr. Knox, through Sturtevant --

14  Q.  His partner?

15  A.  -- through BBDA.

16  Q.  All right.  And you provided the project summary to them

17  and then you had the meeting in November of 2008, right?

18  A.  I provided them the Texanol business plan, not a summary.

19  Q.  All right.  The Texanol business plan.

20  So your first communication with anyone from BBDA was at

21  the meeting in November of 2008?

22  A.  That's correct.

23  Q.  All right.  And we'll leave aside for the time being a

24  discussion of that meeting, but is it fair to say that

25  Mr. Condo was the one who spoke on behalf of BBDA at that

1  meeting?

2  A.   Yes.

3  Q.   All right.  And the lunch that happened after the meeting,

4  that was primarily a social event, wasn't it?

5  A.   I would look at it that way.

6  Q.   There were a fair number of bottles of wine consumed?

7  A.   No.

8  Q.   No wine?

9  A.   No, I didn't say that.  John Condo ordered a couple of

10  bottles of wine.  My son doesn't drink, and I had what would be

11  considered, I guess, maybe about a half a glass just to be

12  sociable with the people there at the table.

13  Q.   But it was a social situation at which there was alcohol?

14  A.   It was an extension of the business meeting.  And, yes, it

15  was social to that extent, that it was taking place in a

16  restaurant.  The conversation was "Texanol believes" --

17  something about the Greek food, just a bunch of chitchat, and

18  then John Condo and several people with BBDA talking about the

19  project to the extent that they were going to be funding this

20  project and excited about the project.  And beyond that I guess

21  you could say it was social.

22  Q.   All right.  After this initial meeting -- after the

23  lunch the meeting was essentially over, correct?

24  A.   We went back to the offices and finished up the

25  conversations with what needs to take place now.  And we had a

1   bunch of different papers that were examples of how this would

2   work and that they would be getting back to us.  And we -- I

3   guess at that point we packed up and left.

4   Q.   And this conversation after the lunch was with Michael

5   Zanetti and John Condo?

6   A.   I don't know who all was in there.  It was extremely

7   informal at that particular period of time.  We were basically

8   disconnecting the computers and -- I can't tell you -- it

9   wasn't just Zanetti; I think everybody who had been at lunch I

10  believe I said good-bye to and shook their hand, and then my

11  son and I went on our way.

12  Q.   All right.  And after this initial meeting, is it fair to

13  say that you had many emails and many telephone calls with

14  people at BBDA?

15  A.   Yes, I did.

16  Q.   And those were with Michael Zanetti and John Condo, right?

17  A.   Primarily.

18  Q.   Frank Barecich also?

19  A.   Yes.

20  Q.   Did you have any telephone conversations, emails, any

21  communication with Mr. Georgiadis, or Dr. Eric?

22  A.   Other than that first meeting I didn't have any more -- I

23  didn't attempt to contact Dr. Eric, and I certainly didn't have

24  any communication from him to me.

25  Q.   All right.  Thank you.

1      Now, you testified regarding the process that you went

2  through and the number of documents that you signed.  Without

3  going through each of those documents, the signature on those

4  documents was John Condo's, right?

5  A.   Yes, it was.

6  Q.   Did you ever see Mr. Georgiadis' signature on any of those

7  documents?

8  A.   No, I did not.

9  Q.   And you were shown a number of Century Bancorp.

10 documents that indicated wire transfers going in and out of the

11 Century Bancorp. account, right?

12 A.   That's correct.

13 Q.   Did you ever have any communication with Mr. Georgiadis,

14 or Dr. Eric, regarding the Century Bancorp. account?

15 A.   No, I did not.

16 Q.   Your conversations were entirely with -- somewhat Frank

17 Barecich, Michael Zanetti and John Condo, right?

18 A.   That is correct.

19 Q.   Now, at some point before you made your deposit there was

20 a meeting in Florida at which a joint venture was discussed,

21 right, with Indian Rocks?

22 A.   Yes.

23 Q.   All right.  And was this John Condo's idea to have that

24 meeting?

25 A.   I believe so, because he had assembled all the people

1    there.  So I would assume that that was part of -- yes.

2    Q.   But John Condo talked to you about it.  He thought this

3    was a good idea, right?

4    A.   Yes.

5    Q.   All right.  So you had this meeting.  And Dan Claycamp was

6    at this meeting.  He's the president of the Indian Rocks

7    project, right?

8    A.   Yes.

9    Q.   All right.  And is it fair to say that both of them were

10   pushing you to make your deposit at this meeting and then to do

11   the joint venture?

12   A.   Not at that meeting, per se.  Not the Indian Rocks side of

13   it.  From the BBDA or DAC Global or whatever name you want to

14   use there was a feeling that this was a deal that they wanted

15   to do, and, consequently, to get that deal done they wanted our

16   money.

17   Q.   Okay.  But --

18   A.   Let me put it that way.

19   Q.   But nobody told you, including the people from Indian

20   Rocks, at this meeting that your deposit, or part of your

21   deposit, was going to be used to refund the Indian Rocks'

22   deposit?

23   A.   That's correct.

24   Q.   So you felt like they were not being honest with you at

25   this meeting as to what was going to happen with your deposit,

1  right?

2  A.   No, I didn't make that assumption at that meeting.

3  Q.   Do you feel that's something they should have told you?

4  A.   I think there were a lot of things they should have told

5  me.

6  Q.   But nobody told you that at that meeting.

7  A.   Well, just to be fair to the whole deal here, if it was

8  mentioned -- it was only mentioned in the -- not that our

9  million dollars was going to go to the $600,000 payback of

10 Indian Rocks, but it would be -- show the credibility of

11 Texanol to move forward with the project.  And if Indian Rocks

12 was involved with Texanol, that would afford us the capability

13 to slide in on their particular bundle of funds.  To go ahead

14 and fund us, we went in and put up our million dollars.  I

15 guess that's the best way to state it.

16 Q.   The most fair way to state it for Indian Rocks?

17 A.   For the situation.

18 Q.   All right.  So you went through this period from the

19 deposit investment agreement being signed in January of 2009,

20 right?  We saw that document.  And then you made your deposit

21 in, when, February of 2009?

22 A.   February, yes.

23 Q.   Before you received the partial assignment that we also

24 saw, which was Exhibit 871, right?

25 A.   Yes; that came on the heels of that.

1    Q.   Okay.  And, again, up to this point all of your

2    communications were with Michael Zanetti, Frank Barecich, John

3    Condo, correct?

4    A.   (No verbal response.)

5    Q.   Is that a yes?

6    A.   Up to that point of where we put up our deposit -- are you

7    going back to the original meeting or are you just saying in

8    general after that meeting those were the main characters?

9    Q.   After that meeting.

10   A.   Yes.

11   Q.   All right.  And then you continued with receiving the

12   conditional commitment letter in March of 2009, again, signed

13   by John Condo, correct?

14   A.   That is correct.

15   Q.   All right.  And then there's quite a lapse of time before

16   you got the master investment agreement in January of 2010,

17   correct?

18   A.   That is correct.

19   Q.   And, again, through all this time your communication is

20   only with Frank Barecich, Michael Zanetti and John Condo,

21   right?

22   A.   That's correct.

23   Q.   No communications with Dr. Eric, or Mr. Georgiadis?

24   A.   No.

25   Q.   "No," meaning you had no communication with him?

1   A.   That's correct.

2   Q.   Okay.  Now, it sounds like you became quite frustrated

3   with the process at some point?

4   A.   That's fair to say.

5   Q.   For an extended period of time, perhaps?

6   A.   That's correct.

7   Q.   To the point where you got your lawyer involved.  And we

8   listened to part of that recording.

9         MS. KAMM:  And now if I could ask the government to

10   play the first two and a half minutes -- almost two and a half

11   minutes of that?

12         (Audio recording played.)

13   Q.   Could you identify who's speaking right now?

14   A.   I think that was me.

15   Q.   All right.

16   A.   I believe.  It was very short, but it sounded like it was

17   me.

18   Q.   Let's continue and see if we could hear.

19         (Audio recording played.)

20         MS. KAMM:  All right.  Let's stop again.

21   Q.   Is that your voice, Mr. Dicker?

22   A.   I believe so.

23         MS. KAMM:  Okay.  Let's continue.

24         (Audio recording played.)

25         MS. KAMM:  Stop, please?

1  Q.   Can you identify that voice?

2  A.   Michael Zanetti.

3        MS. KAMM:  All right.  Let's continue.

4        (Audio recording played.)

5        MS. KAMM:  You can stop now.

6  Q.   All right.  So just to put a little context in this

7  recording, this was an hour-long conversation, right?

8  A.   That's correct.

9  Q.   Is it fair to say that your lawyer grilled Mr. Zanetti for

10 that full hour?

11 A.   That's correct.

12 Q.   He asked pointed questions and he didn't let Mr. Zanetti

13 weasel out of answering them.  Is that right?

14 A.   I would say so.

15 Q.   All right.  And for the most part, Mr. Zanetti did answer

16 them.  He gave -- he can be a pretty convincing person, can't

17 he?

18 A.   Yes.

19 Q.   He's articulate like Mr. Condo.  Mr. Condo can be a very

20 persuasive person, right?

21 A.   It depends --

22 Q.   He can make you believe --

23 A.   -- on what it is.  But in this particular instance where

24 he was supposed to have money, that's pretty persuasive.

25 Q.   I understand.  But Mr. Zanetti was also quite persuasive?

1  A.   He was very articulate.

2  Q.   And for the entire hour he answered questions -- he didn't

3  dodge, actually, your attorney's questions -- and attempted to

4  provide information in response -- perhaps without actually

5  providing information, but he attempted to answer the

6  questions, right?

7  A.   I believe that he did dodge some issues, and his answers

8  to the questions were the ones that he felt like needed to be

9  said by him to try and placate my attorney, which was not

10  working.

11  Q.   All right.  But he was able to diffuse the questions and

12  provide some response --

13  A.   Well, you can only ask questions a certain way so many

14  times, and you keep getting back the same answer, you know it's

15  not going to be what you --

16  Q.   Without playing the entire recording -- your lawyer

17  continued to ask questions, Mr. Zanetti continued to answer

18  them, right?

19  A.   Yes.

20  Q.   All right.  And the questions were about the fund and

21  where the money was and how you could get the deposit.  They

22  were very specific questions, right?

23  A.   They were specific questions and very elusive answers.

24  Q.   All right.  And there were also questions about

25  Mr. Zanetti himself.  What his background was?

1  A.   That's correct.

2  Q.   Your lawyer really wanted to know who this guy was.

3  A.   That's correct.

4  Q.   And you actually had some -- not a relationship with

5  Mr. Zanetti, but you knew of him before because your son had

6  gone to Brown and Mr. Zanetti went to Brown, correct?

7  A.   No.  No, that's incorrect.  We didn't know Zanetti until

8  we went to that meeting.  Upon meeting Zanetti, my son and he

9  started talking because they're around the same age and it

10 became -- or Nathan became aware of the fact that Michael

11 Zanetti and my son knew some of the same people from Dallas,

12 and that one of the people that had gone to school at Brown,

13 Michael Zanetti knew.  And consequently, there was an

14 interaction between them concerning that.  And because of it,

15 there was a little bit of comfort level because these people

16 knew him.  And we called them to verify that, and they did know

17 of him.

18 Q.   And that made you feel more comfortable with this deal?

19 A.   Well, we could put a name and a face together and a little

20 bit of background through some people that we knew.  It wasn't

21 a business background; it was more of a social background.

22 Q.   Right.  And Mr. Zanetti and your lawyer made that

23 connection, to some extent, over Harvard and Brown football

24 during their telephone conversation, didn't they?

25 A.   Well, I don't believe they made any connection.  I believe

1  my attorney was probably trying to make him feel a little more

2  comfortable and trying to get him to say something or tell us

3  some pertinent information.

4  Q.   And it could have been the other way around.  Mr. Zanetti

5  was explaining how he went to Brown to play football as a

6  quarterback and ate too much pizza and ended up as a

7  linebacker, right?

8  A.   Yes.

9  Q.   So -- and he was effective at that, wasn't he?

10  A.   Yes, he was.

11  Q.   So you said that this recording -- this conversation took

12  place sometime in early summer -- or summer of 2010.  You got

13  some information or didn't get information.  You were still

14  concerned about it but you -- you continued to wait to see what

15  was going to happen?

16  A.   I'm sorry.  Say that again?  I'm sorry.  I interrupted.

17  Q.   But you were hoping that this project was still going to

18  come to fruition and the funding was going to come through,

19  right?

20  A.   Yes.  And that's why I believe it was probably earlier

21  than the summer, I don't know how much earlier, or the

22  beginning of summer.  I'm sorry.  I don't remember that.  But

23  the reason for the questioning that my attorney was doing was

24  only the fear about our million dollars and the fact that this

25  is becoming very protracted, but to get a sense on what our

1  next step would be concerning these people.  And in weighing

2  the conversation after that call finished, it was quite clear

3  that we had a problem.  We had a problem not only here, but

4  wherever it was overseas, either known or not known, as part of

5  this whole scam.

6  Q.   Thank you.  Now, going back to the initial meeting, you

7  testified yesterday that during the initial meeting, Dr. Eric,

8  I believe you called him, right, came into the meeting?

9  A.   That's how he was introduced.  He didn't say he wasn't

10  Dr. Eric.  He had -- when he was addressed, it was as

11  "Dr. Eric."  He acknowledged it so --

12  Q.   John Condo referred to him --

13  A.   -- that's all I knew, yes.

14  Q.   All right.  But you're saying he came in in the middle of

15  the initial meeting, right?

16  A.   He came in during.  I'm not sure I said the middle.  But

17  he came in during the meeting.

18  Q.   All right.  He came in during the meeting.  And you

19  testified yesterday that at some point he and Mr. Condo went

20  out and then came back in, and Mr. Condo announced that the

21  deposit was now going to be a million dollars.  Was that your

22  testimony?

23  A.   Yes.

24  Q.   Okay.  Now, do you recall testifying before a grand jury

25  in the federal courthouse in Springfield, Massachusetts?

1    A.   Yes, I do.

2    Q.   And that was in November of 2010, correct?

3    A.   That's correct.

4    Q.   All right.  And do you recall raising your right hand and

5    swearing to tell the truth before a court reporter?

6    A.   I certainly did.

7    Q.   And Mr. Grant, who's here on behalf of the government, was

8    asking you questions before the grand jury, right?

9    A.   That's correct.

10   Q.   And did you testify truthfully?

11   A.   To the best of my knowledge.

12       MS. KAMM:  All right.  So if I could show from the

13  ELMO just to the witness --

14   Q.   I would like to read parts of two pages of your

15  testimony -- it's page 11 -- from line 5 through line 11.

16       MS. GOODWIN:  Objection.

17       THE COURT:  Do you have an objection?  Sustained.

18  BY MS. KAMM:

19   Q.   All right.  Mr. Dicker --

20   A.   Yes, ma'am?

21   Q.   -- you were asked about a criminal conviction?

22   A.   That's correct.

23   Q.   And you testified that there was a settlement?

24   A.   That's correct.

25   Q.   All right.  That's not actually the case, is it?  You --

```
 1   A.   No, that is the case.

 2   Q.   -- pled guilty, or nolo contendere, to a felony charge of

 3   misappropriation of fiduciary property.  Isn't that true?

 4   A.   Let me tell you the situation.

 5   Q.   Just answer my question.  Is that true?

 6   A.   Yes, that's true.

 7   Q.   All right.  And as a result of that plea, you were ordered

 8   to carry out certain conditions by the court, which included

 9   restitution, paying back the money.  Is that accurate?

10   A.   That's accurate.

11   Q.   All right.  But you didn't comply with those conditions,

12   did you?

13   A.   Yes, I did.

14   Q.   You were brought back into court in 1999, weren't you,

15   because you did not?

16   A.   No, I was not.

17        MS. KAMM:  Your Honor, if I may show him -- your

18   Honor, if I may show just the witness --

19        MS. GOODWIN:  Your Honor, may I see what's being shown

20   to the witness?

21        THE COURT:  Yes.  Show counsel first.

22        (Pause.)

23        MS. GOODWIN:  And, your Honor, this is just being

24   shown to the witness, correct?

25        THE COURT:  Yes, this is just being shown to the
```

1    witness.

2    BY MS. KAMM:

3    Q.   Mr. Dicker, I'm showing you a document entitled "Order

4    Continuing Defendant on Deferred Adjudication - Plea of Guilty

5    or Nolo Contendere - Jury Waived."  And it's dated July 1st of

6    1999?

7    A.   That is correct.

8    Q.   All right.  It states that you entered a plea of --

9         MS. GOODWIN:  Objection, your Honor.

10        THE COURT:  You can't read the document.

11   BY MS. KAMM:

12   Q.   All right.  After looking at this document, Mr. Dicker, do

13   you agree that you came back into court and --

14   A.   Can I see the whole document?

15        MS. GOODWIN:  Objection.  Objection.

16        THE COURT:  Wait.  Wait.  Ms. Kamm, show him the

17   document.  If it refreshes his memory, take the document down

18   and ask him a question about it.

19        MS. KAMM:  And, your Honor, I will do so.

20        (There is a pause.)

21        THE WITNESS:  Thank you.

22   BY MS. KAMM:

23   Q.   I put a document in front of you.  If you could let me

24   know when you are finished looking at it.  Just look up.

25        (Pause.)

1    A.   I see this document and I'm --

2         THE COURT:  No, there's no question before you.

3         MS. GOODWIN:  Objection, your Honor.

4         THE WITNESS:  Go ahead.

5         THE COURT:  Has this been shown to the witness to

6    refresh his memory?

7         MS. KAMM:  Yes, your Honor.

8         THE COURT:  Then remove the document.

9    BY MS. KAMM:

10   Q.   Mr. Dicker, does the document that I showed you refresh

11   your memory as to whether or not you were brought back into

12   court?

13   A.   Yes, it does.

14   Q.   For having violated the conditions of your plea?

15   A.   No, I had not violated the conditions.

16   Q.   You had been brought back into court because you had not

17   made restitution.  Is that fair to say?

18   A.   No, that's not fair to say.

19   Q.   And, Mr. Dicker, going back to the grand jury testimony --

20   and you've already testified that you appeared before the grand

21   jury, were sworn under oath, you testified truthfully, correct?

22   A.   Yes.

23   Q.   All right.  So again referring back to page 11, were you

24   asked the question initially -- excuse me -- "So who was at

25   this meeting in Clearwater, Florida?"  Were you asked that

1    question?

2    A.   Yes.

3    Q.   And did you give the answer, "Initially it was John Condo,

4    Mike Zanetti, James Koutsoubos" -- I believe that's the way you

5    pronounce it -- "Bill Sturtevant, and I think Richard P. Avis,

6    an attorney, came in and out of that particular morning meeting

7    prior to lunch.  I think that's who was at the initial

8    meeting."

9         Do you recall that answer?

10   A.   I do recall that answer.

11   Q.   Were you asked the question, "Now, was there a Dr. Eric

12   there"?

13   A.   Yes.

14   Q.   And do you recall answering, "He came during the lunch

15   break that we took"?

16   A.   Yes.

17   Q.   All right.  And then on page 15, do you recall -- just a

18   minute, please.

19        Do you recall being asked the question, "Now" -- this is

20   on line 14.  "Now, this meeting, how long did it last?"  Do you

21   recall being asked that question?

22   A.   At the grand jury?

23   Q.   Yes.

24   A.   I don't recall what it said.

25   Q.   Well, do you recall being asked that question?

1  A.   I recall that I was asked the question of the duration of

2  the meeting.  Yes, I do remember that.

3  Q.   All right.  And do you recall answering, "The initial

4  meeting lasted -- going on, I guess, about two hours, and then

5  we broke for lunch.  And then John Condo took us to a Greek

6  restaurant where -- that's where Dr. Eric came on to the scene

7  and joined the group there"?

8  A.   That's correct.

9  Q.   All right.

10  A.   I misidentified --

11  Q.   There's no question.

12       Now, you're out a lot of money from this deal, aren't you,

13  a million dollars?

14  A.   Over, yes.

15  Q.   All right.  And you put up a million dollars by mortgaging

16  a piece of property that you owned, right?

17  A.   Yes.

18  Q.   And you need to pay that mortgage back, correct?

19  A.   Yes.

20  Q.   So you're looking to get money in recovery in order to pay

21  that -- the mortgage back, aren't you?

22  A.   I'm not sure what you're asking.  Are you talking about

23  before I wanted my money back, now I want my money back?

24  Q.   Now, at this point.

25  A.   Well, of course I would like to get my money back.

1   Q.   All right.  Have you initiated any civil action to recover
2   any funds against any person or any entity?
3   A.   I'm prepared to.  I mean, we, Texanol, has not as of yet.
4   We have hired counsel, we've spoken with counsel, they have
5   been doing their investigative work.  We were at one point
6   involved with a whole group of people that were scammed like I
7   was, that we splintered off from them to see what direction
8   they were going before we decided which was best for us.  And
9   that's where we are today.
10  Q.   All right.  Are you hopeful that a conviction, a criminal
11  conviction, would help you recover funds?
12  A.   No, actually --
13  Q.   You're not hopeful?
14  A.   No, I'm not hopeful.  But I am hopeful for a criminal
15  conviction.
16          MS. KAMM:  All right.  No further questions.
17          THE COURT:  Any redirect?
18          MS. GOODWIN:  Just briefly, your Honor.
19                    REDIRECT EXAMINATION
20  BY MS. GOODWIN:
21  Q.   Mr. Dicker, Attorney Kamm was asking you some questions
22  about your grand jury testimony.  Do you recall that?
23  A.   Yes, I do.
24  Q.   And your testimony concerning when Dr. Eric came -- when
25  you first saw Dr. Eric during your trip down to Clearwater?

1   A.   That's correct.

2   Q.   I believe you tried to explain something at the end of the

3   testimony concerning what your grand jury testimony was and why

4   you testified that way there.  Could you -- were you about to

5   say something concerning that?

6   A.   In the portion where I was stating the number of people

7   that were in the meeting, and I said James Koutsoubos, he was

8   never in that meeting.  That should have been Dr. Eric.  I

9   should have said Dr. Eric.

10  Q.   Is that during your grand jury testimony?

11  A.   In my grand jury testimony I used the name "James

12  Koutsoubos," or however you pronounce it.  I should have said

13  "Dr. Eric."

14  Q.   And why should you have said "Dr. Eric"?

15  A.   Because he was at that meeting.

16  Q.   And how are you sure that he was at that meeting?

17  A.   Because I -- that's who I was referring to when I said

18  James Koutsoubos.  I had -- for some reason I was confusing the

19  names at that time.  I can get into the reason of why that's a

20  possibility of that happening if you'd like, but --

21  Q.   No, that's okay.  And now as you're sitting here today, do

22  you have in your mind who Dr. Eric is and what he looks like?

23  A.   I know him, yes.

24          MS. GOODWIN:  No further questions.

25          THE COURT:  Any recross?

1      MS. KAMM:  Thank you, your Honor.

2                    RECROSS-EXAMINATION

3  BY MS. KAMM:

4  Q.   Mr. Dicker, were you shown your grand jury testimony

5  before you came into court today?  Have you seen your grand

6  jury testimony?

7  A.   Yes, I was shown that.

8  Q.   And did you reaffirm the accuracy of your testimony?

9  A.   No.

10               MS. GOODWIN:  Objection.

11               THE COURT:  Overruled.

12  BY MS. KAMM:

13  Q.   Now, your testimony before the grand jury was in November

14  of 2010.  That's three and a half years ago, right?

15  A.   That is correct.

16  Q.   So it's significantly closer to the events that you were

17  testifying about than today, right?

18  A.   Yes, it was.

19  Q.   All right.  And you just -- and you testified twice that

20  Dr. Eric came in at the lunchtime, right, for lunch?  You

21  testified twice?

22  A.   Here and then.

23  Q.   You testified twice before the grand jury that Dr. Eric

24  came in at lunch.  Is that -- yes or no, please?

25  A.   I don't know.

1  Q.   Well, I read you the testimony.  And was that accurate?

2  A.   I didn't believe you read the testimony that he came in

3  twice.

4  Q.   I read twice that you testified twice that he came in at

5  the lunch.

6  A.   I think you only brought it up one time.

7  Q.   And you just said that you were confusing James Koutsoubos

8  with Dr. Georgiadis.  But how could you have known of a James

9  Koutsoubos if he wasn't there?

10 A.   Because he was in an office down.  And when we were

11 originally there at the office we walked back, and there were

12 about two offices down, and here was this guy playing video

13 games on the computer.  His name was "Koutsoubos."  It was a

14 Greek name.  I assume that's Greek.  I didn't know the

15 difference between Greek or -- it was very -- I couldn't get

16 the -- my hand around the names of the parties.  I was trying

17 to, but it just -- you know, I finally started putting the

18 faces, but I put the face with the wrong name in that

19 particular instance.  That's the way it came out.

20 Q.   You met him -- he was at the BBDA offices that day,

21 correct?

22 A.   That is correct.

23       MS. KAMM:  All right.  No further questions, your

24 Honor.

25       THE COURT:  Any re-redirect?

1    MS. GOODWIN:  Just briefly, your Honor.

2                  REDIRECT EXAMINATION

3    BY MS. GOODWIN:

4    Q.  Mr. Dicker, do you see in the courtroom today the

5    individual who you recall as being Dr. Eric and being at the

6    meeting at that time in Clearwater?

7    A.  Yes, I do.

8    Q.  And could you indicate who you see by indicating --

9    A.  Dr. Eric.

10   Q.  And where is the individual you believe to be Dr. Eric?

11   A.  With the headphones on.  Sitting right here.

12             MS. GOODWIN:  No further questions.

13             THE COURT:  Any re-recross?

14             MS. KAMM:  No, your Honor.

15             THE COURT:  Thank you, Mr. Dicker.  You may step down.

16             THE WITNESS:  Thank you.

17             (The witness is excused.)

18             THE COURT:  I think we'll take the morning recess a

19   little early today between witnesses.  We'll be in recess for

20   15 minutes.

21             THE CLERK:  All rise for the jury.

22             (The jury exits the courtroom at 11:00 a.m.)

23             THE COURT:  Sit done, counsel.

24             Are we expecting Ms. Cain?

25             MS. GOODWIN:  Yes.  She will be the next witness, your

1    Honor.

2          THE COURT:  And your direct will be a little less than

3    an hour, you think?

4          MS. GOODWIN:  It's probably going to be substantially

5    less than an hour.  I would say between a half an hour and 45

6    minutes.

7          THE COURT:  And the cross?

8          MS. KAMM:  Fifteen minutes, your Honor.

9          THE COURT:  And then it will be Mr. Kreie?

10         MR. GRANT:  Yes, your Honor.

11         THE COURT:  And his direct?

12         MR. GRANT:  I would say an hour and 15 to an hour and

13   30.

14         THE COURT:  And his cross?

15         MR. LEVCHUK:  Twenty minutes, 25 minutes.

16         THE COURT:  And then if we get to the next witness, it

17   would be Ms. Katherine Sweet, right?

18         MS. GOODWIN:  Yes, your Honor.

19         THE COURT:  And her direct is about an hour?

20         MS. GOODWIN:  Roughly, yes.

21         THE COURT:  And your cross, we don't know yet?

22         MR. LEVCHUK:  Twenty, 25 minutes.

23         THE COURT:  Okay.  We're in recess for 15 minutes.

24         THE CLERK:  All rise.

25         (The Court exits the courtroom and there is a recess

1   at 11:02 a.m.)

2           THE COURT:  Good morning again, jurors.  We're ready

3   to resume.  The government will call its next witness.

4           MS. GOODWIN:  The government calls Gina Champion-Cain.

5           GINA CHAMPION-CAIN, Sworn

6           THE CLERK:  Thank you.  You may be seated.

7           Would you please state your name for the record,

8   spelling your last name.

9           THE WITNESS:  Gina Champion-Cain, C-h-a-m-p-i-o-n -

10  C-a-i-n.

11  DIRECT EXAMINATION BY MS. GOODWIN:

12  Q.   Good morning, Miss Cain.  Where are you from?  Where do

13  you live currently?

14  A.   I live in San Diego, California.

15  Q.   What do you do in San Diego?

16  A.   I own my own business.

17  Q.   What type of business do you own?

18  A.   I own a real estate development company, and I also own a

19  hospitality company.

20  Q.   Back in 2008, did you become involved in a project called

21  Cosmopolitan Square?

22  A.   I did.

23  Q.   Did you work with other individuals on that project?

24  A.   I did.

25  Q.   Could you just identify who those individuals were?

1   A.   Mr. Peter Boermeester and Mr. Steve Corrington.

2   Q.   Did you form a group to work together on that project?

3   A.   We did.

4   Q.   Did the group have a name?

5   A.   It did.

6   Q.   What was the name of the group?

7   A.   Westlink Development Company.

8   Q.   Just very briefly, what was the project?

9   A.   The project was $325 million mixed use redevelopment

10 project in downtown San Diego contiguous to the knew San Diego

11 ballpark.

12   Q.   What you say "mixed use," what do you mean?

13   A.   We had hotel, high-end residential condominiums, some

14 office space, retail restaurant office space.

15   Q.   At some time in early 2009, did the project apply for

16 funding from BBDA Global Investment Funds?

17   A.   It did.

18   Q.   Did your partner, Steve Corrington, handle the paperwork

19 and the interactions with individuals in Florida with respect

20 to the project?

21   A.   He did.

22   Q.   As you were exploring the potential for funding -- were

23 you involved in the process of considering getting funding from

24 BBDA Global Investment Funds?

25   A.   Well, I was involved in the sense that I put all the

1    documentation together and did all the work on putting the

2    project details in order.

3    Q.    Did you participate in telephone conferences, for example,

4    with individuals in Florida?

5    A.    I did.

6    Q.    Was the decision to go forward with the funding -- was

7    that made by the group, including you?

8    A.    It was.

9    Q.    As you were looking -- did you know BBDA Global Investment

10   Funds also by the name DAC Global?  Did that name --

11   A.    Yes.

12   Q.    While you were considering using BBDA, or DAC Global, as

13   an investment opportunity, did you do some research on the

14   internet with respect to the company?

15   A.    We did.

16   Q.    Did you find their web page?

17   A.    Oh, yes.

18   Q.    Did you look at the web page during periods of time --

19   during the period of time of March of 2009?

20   A.    Yes.  We periodically reviewed the website all through the

21   year.

22          MS. GOODWIN:  May I approach, your Honor?

23          THE COURT:  Yes.

24          MS. GOODWIN:  Approaching to show the witness Exhibit

25   556.

 1    Q.   I'll ask you if you can just look at it, and when you're

 2    finished, I'm going to ask you if you can identify it.

 3         What is Exhibit 556?

 4    A.   It appears to be the homepage of the DAC Global website.

 5    Q.   Does that printout of the homepage look like it -- have

 6    the same appearance and appear to be substantially similar to

 7    what you saw when you researched DAC Global on the internet?

 8    A.   Yes.

 9         MS. GOODWIN:  I would offer that as a full exhibit,

10    556.

11         THE COURT:  It will be admitted.

12    (Exhibit No. 556 received into evidence.)

13         MS. GOODWIN:  May I publish it to the jury?

14         THE COURT:  Yes.

15    Q.   Did you get an impression of DAC Global from researching

16    it on the web?

17    A.   Yes.

18    Q.   What impression did its website give to you?

19    A.   It appeared as though it was a very sophisticated group of

20    individuals or company that was able to finance a substantial

21    project such as ours.

22    Q.   Were you aware that during the course of the interactions

23    with DAC Global that there was some connection -- that Century

24    Bank came into the picture?

25    A.   Yes.

1    Q.   Did you and your partner, Mr. Corrington, open an account

2    -- or fill out an application for an account at Century Bank?

3    A.   Actually, all the partners had to.  Yes, we did.

4    Q.   Did you do any research -- did you have occasion to look

5    at Century Bank's website as you were -- during this time

6    period of 2009 to 2010?

7    A.   Yes.

8         MS. GOODWIN:  May I approach?

9         THE COURT:  Yes.

10        MS. GOODWIN:  Actually, this exhibit is already an

11   exhibit, but I'd like to show the paper copy to the witness if

12   I may.

13        THE COURT:  Yes.

14   Q.   I'm showing you Exhibit 135, which has been previously

15   admitted into evidence.  If you could just take a minute and

16   look at that.

17        Does that look substantially similar to the website that

18   you looked at when you did -- looked at Century Bancorp.'s

19   internet website?

20   A.   Yes.

21   Q.   At some point in the process with BBDA, did BBDA agree to

22   fund Cosmopolitan Square?

23   A.   Yes.

24   Q.   Do you recall the time frame that that took place, the

25   agreement to fund?

1  A.   It was in 2009, I believe.

2        MS. GOODWIN:  May I approach, your Honor, with an

3  exhibit that's been previously admitted?

4  Q.   I'm showing you Exhibit 278.  And can you identify what

5  that exhibit is?

6  A.   Yes.  This was the letter that told us that we were

7  approved and we were going to be financed.

8  Q.   When did you -- when did your group get that letter?

9  A.   This letter we received in October.  It was late October

10  2009.

11  Q.   Also in late October of 2009, did you get a visit from

12  individuals from the funding source, DAC Global/BBDA?

13  A.   We did.

14  Q.   Who -- what was the purpose of the visit?

15  A.   It was a celebration dinner.

16  Q.   What were you celebrating?

17  A.   We were celebrating the fact that our project appeared to

18  have been financed and we were ecstatic.  And so the managing

19  partners of the fund were going to come out and celebrate with

20  us.

21  Q.   In addition to having a dinner, were there other plans for

22  the trip -- for the visit of the folks from BBDA?

23  A.   Yes.

24  Q.   What else was in the plan?

25  A.   We were going to walk the site, walk buildings around the

1    site to get a view of what the views would look like; went to

2    the architect's office, met with all the engineering staff and

3    the architects and all the other subcontractors.

4    Q.    Did you set up a place for people to meet the night for

5    the celebratory dinner?

6    A.    Yes.

7    Q.    Where did that take place?

8    A.    We met at a restaurant in downtown San Diego called Ocean

9    Air.

10   Q.    Who came over to San Diego from BBDA?

11   A.    John Condo, Dr. Eric, and John Condo's son.

12   Q.    Had you met any of those individuals before?

13   A.    I had not personally, no.

14   Q.    Where did you first met with them?

15   A.    At the restaurant, in the lobby of the restaurant.

16   Q.    Did they come as a group of three, or did they come in

17   separate groups?

18   A.    Separate groups.

19   Q.    Who arrived first?

20   A.    Mr. Condo and his son.

21   Q.    And who came later?

22   A.    Dr. Eric.

23   Q.    When Dr. Eric arrived, were you already seated at the

24   table?

25   A.    We were.

1    Q.   Did Mr. Condo introduce the individual who arrived a

2    little bit later to the group of the Westlink partners?

3    A.   He did.

4    Q.   How did he introduce this individual?

5    A.   "This is Dr. Eric."

6    Q.   And had you heard the name Dr. Eric before?

7    A.   Yes.

8    Q.   Who had you heard the name from?

9    A.   Michael Zanetti and Frank Barecich.

10   Q.   When Mr. Condo introduced Dr. Eric to the group at the

11  table, did he say anything about what Dr. Eric's role was, if

12  any, with respect to BBDA?

13  A.   He introduced him as his partner.

14  Q.   Did you make any observations about Dr. Eric during the

15  dinnertime?

16  A.   He seemed very tired.

17  Q.   Were you told by Mr. Condo or by Dr. Eric as to an

18  explanation for why he was so tired?

19  A.   He had been traveling extensively and had just taken a

20  red-eye or something similar to that into San Diego for this

21  dinner.

22  Q.   And you said that -- who did most of the talking during

23  the dinner from the BBDA side of things?

24  A.   Mr. Condo.

25  Q.   What was Mr. Condo talking about?

1  A.   The project and his love for the project and his

2  understanding of it and how wonderful it would be for downtown

3  San Diego.  It was truly an iconic project for San Diego.  He

4  also talked about his love for San Diego.  He had traveled

5  extensively there, he said.  He also talked about how happy he

6  was to see how vibrant downtown was doing at that time.  It was

7  a Monday night, and I remember that only because he made that

8  very specific comment, that he was surprised how lively and

9  energized the downtown restaurants and bars appeared to be on a

10  Monday night in San Diego, which tends to be a little sleepy

11  town.

12  Q.   Did you observe anything in terms of the dynamics, the

13  personal dynamics, between Mr. Condo and Dr. Eric during the

14  dinner?

15  A.   Yes.  I remember watching Mr. Condo is almost like a young

16  kid around Dr. Eric.  He very much wanted him to be happy and

17  was -- kept looking for him -- for approval.  Isn't this great

18  and isn't this wonderful?  It was an interesting dynamic, I

19  thought.

20  Q.   That was during the time that Mr. Condo was describing the

21  project?

22  A.   Yes.

23  Q.   And did Dr. Eric say much that night?

24  A.   Not that night.

25  Q.   The next day, where did you meet?  Well, did you meet Dr.

1  Eric, Mr. Condo -- John Condo and John Condo's son somewhere
2  that next day?
3  A.   We did.
4  Q.   Where did you meet?
5  A.   At our architect's office.
6  Q.   Is that in downtown San Diego?
7  A.   It is.
8  Q.   What occurred in the architect's office?
9  A.   It was -- all the plans were laid out, the construction
10 plans, and all the engineering reports.  And for a project that
11 size, it's quite extensive in terms of the paperwork and the
12 amount of work and detail there is to go over.  And Mr. Condo
13 and Dr. Eric were asking a lot of questions and seemed to be
14 very excited and very interested in the specific aspects of
15 this project.
16 Q.   Do you recall both Mr. Condo and Dr. Eric asking questions
17 about the project?
18 A.   I do.
19 Q.   Were they both engaged in the process with the architect?
20 A.   They were.
21 Q.   Did Dr. Eric speak English during this tour of the project
22 and meeting at the architect's office?
23 A.   He did.
24 Q.   Did you also tour the site after you left the architect's
25 office?

1    A.    We did.

2    Q.    Where did you go?

3    A.    We went down to the site itself, which is in downtown San

4    Diego, in a neighborhood called East Village.  We walked around

5    the site, talked about the different dynamics.  It's a full

6    city block in downtown Dan Diego.  We went to a building

7    contiguous to it, across the street, to go up to the top floor.

8    We had arranged for the property manager to allow us in there

9    so we could go out on the exterior deck and look at the views

10    that the building would have.  Our building was going to be the

11    tallest building in downtown San Diego.  So, obviously, it

12    wouldn't have been exact, but it would have given a pretty good

13    idea, indication, of how spectacular the views would have been.

14    Q.   Do you recall any discussion with Dr. Eric about the

15    views?

16    A.    Oh, yeah.  All I remember is Dr. Eric and Mr. Condo went

17    on and on about how truly incredible this project would be for

18    the skyline of San Diego.

19    Q.   Do you remember there being something about a project

20    concerning -- that was nearby or potential for an energy and

21    trash project nearby to your site?

22    A.    Yes.

23    Q.   What do you recall about -- how do you recall that coming

24    up during the tour of your project that day with Mr. Condo and

25    Dr. Eric?

1    A.    That started in the architect's office.  Part of the

2    drawings that you look at also show the surrounding lots, real

3    estate lots.  And it was actually Dr. Eric -- I recall this --

4    that he specifically asked about this one lot that appeared to

5    be vacant.  And he had asked if it was vacant, and we said yes.

6    And the question was -- he was very interested renewable energy

7    sources.  And I guess, according to Mr. Condo, they had been

8    working on some alternative energy sources in Europe that they

9    wanted to bring to the United States, and that was part of

10   their money source, was that new program.  And they were

11   talking about perhaps implementing a similar type of renewable

12   source for this particular project because it would carry such

13   a burden on the grid and that they had this off-grid idea or

14   project that they had been working on that they thought would

15   work quite well at this location.  But they needed more land,

16   and the site that was across the street would have worked

17   pretty well.

18   Q.    And did they look to you as to whether that would be a

19   potential option for this promising?

20   A.    They did.

21   Q.    And what did you say to them?

22   A.    My knowledge of that area was that I had believed it was

23   owned by the City of San Diego for parking of its public

24   transportation buses and did not believe it would be available

25   but that I would look into it further.

1    Q.   How long did this visit, the combination of the meeting at

2    the architect's office and then the site visit -- how long did

3    this last?

4    A.   I don't recall.

5    Q.   Was it a matter of -- was it less than an hour, more than

6    an hour?

7    A.   It was more than an hour.

8    Q.   Were Dr. Eric and Mr. Condo there the entire time?

9    A.   Yes.

10   Q.   And at the end, did you part ways at that project site?

11   Is that when you each went your own way?

12   A.   Yes.

13   Q.   Do you remember what was said as you were separating and

14   they were going to the airport and you were going back to your

15   job?

16   A.   That we were all very ecstatic, and we couldn't wait to

17   celebrate again for the groundbreaking, which would be when we

18   received the initial draw, which was called draw zero, which

19   was anticipated for February.

20   Q.   Do you recall the term "family" coming up in any way?

21   A.   Yes.  It was something that we had all used quite often.

22   It was Mr. Condo's -- he used to always say that we were a

23   family.  His partners, his real estate partners, which were all

24   of the groups that they were financing, not just us, were his

25   family, his extended family.  That's why he brought his son to

1  this meeting.  He wanted us to know what a family person he was

2  and how he considered his business partners, again, whether in

3  the fund or as his developers, they were all family to him.

4  Q.   So this meeting took place in October.  The letter that we

5  just looked at a few moments ago indicated your funding was

6  coming in February of 2010.  Did you get your funding in

7  February of 2010?

8  A.   No.

9  Q.   Did you get any explanations from individuals at BBDA as

10  to what was going on?

11  A.   Yes.

12  Q.   Do you recall any of the explanations that you received?

13  A.   We were told that there are some issues of money being

14  brought into the United States from overseas and something

15  about the Patriot Act being in the way of bringing in money

16  from overseas and that it was coming and it was just held up

17  coming in.

18  Q.   Was that -- does this explanation -- is it an explanation

19  you heard one time or did you hear multiple times?

20  A.   Multiple times.

21  Q.   Do you remember discussion among your group -- withdraw

22  that question.

23      Were you concerned about the project funding?

24  A.   I was very concerned about the project funding.

25  Q.   Why were you -- what was raising your concern?

1  A.   I just felt very uneasy that the -- first of all, I've

2  never heard of the federal government holding up money coming

3  into the country except maybe if it was on a boat or something.

4  I never heard that coming through the banking system, that that

5  would be an issue.  I asked my friends in the banking world if

6  that made any sense, and they said absolutely not.

7  Q.   I'll just stop you there rather than have you talk about

8  what your friends told you.

9       With respect to your group, did your group come up with

10  some strategies to try to ensure that you would get funding in

11  terms of talking to different people at BBDA?

12  A.   Yes.

13  Q.   What was Mr. Corrington doing in that vein in order to try

14  to find out what was happening and encourage funding?

15  A.   Well, Mr. Corrington was in charge of John Condo.  Another

16  way to put that, he was the one that wanted to have direct

17  contact with John Condo at all times.  At the celebratory

18  dinner, Mr. Condo actually gave Steve Corrington his cell phone

19  number and told him that he can call him and/or text him at any

20  time.

21  Q.   And did the group look to you to do anything to help

22  facilitate getting the funding for this project?

23  A.   Well, my role was to put all the subcontractors together

24  and get the project approved.  We call it "entitled" in the

25  development business.  And I got that.  So that was my role.

1   But when it appeared as though our funding may be on shaky

2   ground, they asked me to try to work with Dr. Eric via the

3   internet, to make contact with him to try to push him along,

4   that, hopefully, he would like our project the best and finance

5   our project.

6   Q.   What was the reason that they put you in charge of dealing

7   with Dr. Eric on the internet?

8   A.   Because neither one of my partners had Facebook accounts

9   or used Twitter or liked the internet very much.  So -- and I

10  did.  I used that a lot to promote the business, my business,

11  so I was familiar.

12  Q.   Were you connected with Dr. Eric on Facebook?

13  A.   I became connected with Dr. Eric through a gentleman name

14  Rod Kreie who also worked at BBDA.

15  Q.   Can you explain how that happened?  I take it you have a

16  Facebook page or at the time you had a Facebook page, is that

17  right?

18  A.   I did and I do still.

19  Q.   How did it come about that you got connected with Dr. Eric

20  on Facebook through Mr. Kreie?

21  A.   Mr. Kreie was a member of Facebook and very active, very

22  social, and was connected with Michael Zanetti and Frank

23  Barecich.  We all had Facebook accounts.  And so he recommended

24  -- there's a way on Facebook that you can say, I see that you

25  may have a connection with so and so.  You should ask them to

1  be your friend or accept their friend request, and that's what

2  Rod Kreie did.  He said, You should be friends with Dr. Eric

3  and Michael Zanetti.  They're both on -- and Frank Barecich.

4  They're all on Facebook.

5  Q.    Who is Rod Kreie?

6  A.    Rod Kreie was brought in to BBDA to really spearhead the

7  whole renewable energy and that segment of the BBDA business.

8  Q.    Had you had dealings with Rod Kreie during the course of

9  the interactions between Westlink and BBDA?

10  A.    Yes.

11  Q.    Were you friends with Rod Kreie on Facebook?

12  A.    Yes.

13  Q.    Were you friends with Michael Zanetti on Facebook?

14  A.    Yes.

15  Q.    Do you recall whether you asked Dr. Eric to be your friend

16  or he asked you to be his friend?  Do you remember how that

17  came about?

18  A.    I don't really remember.  I do remember it was initiated

19  through Rod Kreie recommending that we connect on Facebook.

20  Q.    Did you communicate with Dr. Eric on Facebook?

21  A.    I did.

22  Q.    What methods of communication did you use -- are there

23  various methods you can use for communicating with individuals

24  on Facebook?

25  A.    There are.

1   Q.   What are the different ways?

2   A.   You can post something on somebody's wall, which is --

3   think of it like a homepage on a website.  You can respond to

4   postings that they do on their wall.  You can send personal

5   messages.  And you can do a live chat.

6   Q.   Did you use any of those methods when you were

7   communicating with Dr. Eric?

8   A.   I used two of the three.

9   Q.   Which two?

10  A.   I'm sorry.  I stipulated four in a sense, but I used the

11  publications on the wall, the public -- so I would respond to

12  things that he would post publicly and then -- or I'd post a

13  comment on the wall, his homepage essentially.  And then I

14  would do private conversations.  No chat.

15  Q.   Did you see photographs on -- did you look at Dr. Eric's

16  Facebook page on his wall?

17  A.   I did, yes.

18  Q.   Did you see photographs of Dr. Eric on his Facebook page?

19  A.   I did.

20  Q.   And do you recognize -- did you recognize the photographs

21  that you saw on the Facebook page as the Dr. Eric you had met

22  at the celebratory dinner and tour of your project?

23  A.   Yes.

24  Q.   Did you see photographs on Dr. Eric's Facebook of other

25  individuals associated with BBDA?

1  A.   Yes.

2  Q.   Can you tell us what you saw there?

3  A.   I saw photos of very fun parties, it appeared, lavish

4  parties on boats and nice condos with Dr. -- with Mr. John

5  Condo and Michael Zanetti.  And Rod Kreie, actually, and Frank

6  Parker were in a few of those photos.

7  Q.   What was your goal in communicating with Dr. Eric on

8  Facebook?

9  A.   What it appeared -- when we didn't get the first round of

10 funding, and it appeared that maybe there was an issue of them

11 being able to raise all the finances that they had told us that

12 they were able to raise in a large fund, my partners and I

13 wanted to make sure that our project was at the front of their

14 list.  And to keep up the relationship-building as the family

15 relationship that Mr. Condo talked about, playful, whimsical,

16 trying to always flatter, Mr. Corrington was doing it in his

17 way with Mr. Condo, and I was doing -- I was communicating with

18 Dr. Eric, again, just really trying to pump us up, pump him up,

19 so he would feel good about himself in turn.  If there was a

20 limited amount of funds available, that they would look to

21 finance our project before anybody else's.

22 Q.   Would you mention your project in some of your

23 communications with Dr. Eric?

24 A.   We would.  I would, yes.

25 Q.   Before coming to court here today, did you have an

1  opportunity to look at some printouts of some of the messages

2  back and forth between you and Dr. Eric on Facebook?

3  A.   I did.

4       MS. GOODWIN:  May I approach with Exhibit 944?

5       THE COURT:  Yes.

6  Q.   Showing you Exhibit 944, can you take a minute to look

7  through it and just look up when you're done?

8       Do you recognize Exhibit 944?

9  A.   I do.

10 Q.   Can you describe generally what it is?

11 A.   They are various communications between Dr. Eric and I on

12 Facebook.

13 Q.   Can you tell from looking at the top what the date range

14 is of those communications, from the date on the first one

15 through the date on the last one?

16 A.   Yes.

17 Q.   What is the date on the first communication that's in that

18 packet?

19 A.   It's February 18 of 2010.

20 Q.   How does that relate to the date of your funding?

21 A.   It's a day later than when we were supposed to be funded.

22 Q.   What's the date on the last page?

23 A.   October 9, 2010.

24      MS. GOODWIN:  I'd like to offer 944 as a full exhibit.

25      THE COURT:  It will be admitted.

1  (Exhibit No. 944 received into evidence.)

2       MS. GOODWIN:  May I publish it to the jury?

3       THE COURT:  It may be published.

4  Q.   This should appear in a minute on your screen, but feel

5  free to look at the paper if that's easier for you.

6       Do you see the first paragraph where you indicate that you

7  were very worried about the Cosmos deal here in Southern

8  California?  Do you see that?

9  A.   I do.

10 Q.   What was your intention of -- what were you intending to

11 communicate to Dr. Eric here?

12 A.   That we had very good news on the project, again, trying

13 to pump him up and make him feel good about us and this

14 project.  The Mandarin Hotel had written an offer letter to be

15 our partners in this project, which was a huge coup for us and

16 thought that that would be very exciting for him to know, all

17 the while understanding that we didn't get our money yet so

18 kind of pushing and having him not forget about who we are and

19 to continue to be excited about, again, the project and us.

20 Q.   You talk here in this message about the concern with the

21 seller of the property that you were going to be buying for the

22 Cosmopolitan Square.  What was happening at this time with

23 respect to that land?

24 A.   Well, we were under a land contract, and we had paid a

25 significant amount of money to the seller already, pass-through

1    money that had been nonrefundable in order for us to keep this

2    project alive because of the extensions of the financing source

3    had requested that everything kept getting delayed.  When I say

4    "everything," the agreements leading up to the financing date

5    were supposed to happen a lot sooner than they did, not from

6    our delay at all but from BBDA's delay.  And so we kept pouring

7    more money into the land deal to keep it alive, and the seller

8    was getting antsy.  He was not sure that this was going to

9    happen.

10   Q.   Just looking briefly to the second-to-last paragraph when

11   you say, "I think together we can build the most beautiful

12   award winning project," what were you referring to when --

13   who's the "together"?

14   A.    It's the family that Mr. Condo always referred to.  My

15   partners and I were very close, and me being a Midwesterner,

16   really loving and caring, and we talk about family.  We talk

17   about this stuff a lot.  Mr. Condo mirrored that sentiment to

18   us.  We always talked about how he, again, viewed his partners,

19   whether they're his money partners or his development partners,

20   as part of this family.  We just thought that Dr. Eric was part

21   of our family too.

22   Q.   When you said "money partners," who were you referring to

23   with respect to money partners?

24   A.    Mr. Condo and Michael Zanetti always told us that Dr. Eric

25   was the lead in terms of gathering the money sources in Europe,

1  that he had money himself from family money.  He had great

2  contacts in Europe that were very high net-worth individuals

3  and companies and that he was really spearheading the

4  attraction of the money into the United States for these energy

5  sustainable projects.

6  Q.   I'd like to turn to the second one in this exchange.  In

7  this messaging back and forth, what are you conveying to Mr. --

8  to Dr. Eric?

9  A.   That the landowner was fed up with us delaying the

10  closing, and I was very worried.  It was a very stressful time.

11  Part of the draw zero, as we call it, that first initial

12  funding, was supposed to come directly into the landowner's

13  account, which would have closed escrow on the piece of land.

14  And that was the first source of funding.  It would not have

15  gone to us.  It would have gone directly to the landowner.  The

16  landowner was very upset that that money was not in his account

17  even though we personally, my partners and I, had passed

18  through a lot of money ourselves to try to keep the project

19  alive.

20  Q.   How much of your own money did you put into the project?

21  A.   Well over 150,000.

22  Q.   At the bottom of your message to Dr. Eric, you say,

23  "Tuscany after SD!"  Can you indicate what that means in terms

24  of your communications with Dr. Eric?

25  A.   Yes.  Peter Boermeester, one of our partners, was in

1    Tuscany around that time and kept texting us saying that, We
2    have to have our celebration.  When we break ground, we all
3    have to go back together to Tuscany because John Condo, I
4    guess, talked a lot about -- he did talk a lot about it at our
5    dinner.  He loved Tuscany.  I had never been.  So we all talked
6    about all of us would go back together and celebrate the
7    beginning of this great iconic project and go celebrate in
8    Tuscany.
9    Q.   What did Dr. Eric say back to you?  I guess that message
10   came back to you the same day?
11   A.   He said, "Don't worry.  Have patience."  And he was very
12   positive and lifting, to have patience.  "We will see the
13   fruits of paradise very soon," which it --
14   Q.   What did you take that to mean, "paradise"?
15   A.   Paradise was -- he loved to work.  He loved to play hard
16   and he loved to work.  And these were all through Facebook,
17   postings that he would do on his own site.  Whether I responded
18   or not, he was always talking about -- in fact, his motto, I
19   believe, on his Facebook page said, "You work hard to live
20   hard."
21   Q.   Can we turn to the next exchange of messages?  Is this
22   message what you talk about a posting on a wall in response to
23   something?
24   A.   Yes.
25   Q.   Do you see your posting at the bottom where you say --

1  it's, like, six lines up -- "just amazing and hearts and

2  hearts"?

3  A.   Yes.   There was a bunch of us responding, it appears, to a

4  sunset.   I was responding that it was an amazing sunset.

5  Q.   Why were you -- I take it this particular exchange doesn't

6  talk about the Cosmo project?

7  A.   No.

8  Q.   What was the -- what was your intent in having this

9  exchange over a photograph of a sunset?

10  A.   Oh, I'm keeping up a personal relationship with Dr. Eric,

11  again, trying to keep in front of him because we never see him.

12  We met him that one time -- or at least I only met him that one

13  time in San Diego over the dinner and then the next day.   So

14  it's, again, keeping our group and our names in front of him at

15  all times because Mr. Condo told us he was in charge of the

16  money, and we wanted to make sure that he didn't lose track of

17  getting our project funded.

18  Q.   Did Dr. Eric respond to your posting on his wall?

19  A.   He did.

20  Q.   And his response to you, was that -- in point of time, are

21  you able to tell by looking at that how close in time his

22  response was to your posting?

23  A.   It appears to be minutes, separated just by the 14:55 and

24  the 14:22.

25  Q.   Can we turn to the next one in the message exchange

1    series.  And where it says, "User, Gina Champion-Cain," and

2    then it says "text."  Is that text what you were conveying to

3    him?

4    A.   Yes.

5    Q.   And when you're referring to "hoping to see you very soon

6    when your San Diego family can celebrate with you the fruits of

7    all your labor and commitment," what are you talking about?

8    A.   I'm talking about, again, when we break ground and have

9    our celebratory dinner with all of us.  And the family wasn't

10   even just the partners of Westlink.  It was the architects and

11   the engineers and everybody that extended themselves over and

12   beyond on this project.  So it was quite bit of people.

13   Q.   What's the time frame between your initial message and

14   then Dr. Eric's response below?

15   A.   Again, it appears to be minutes.

16   Q.   Was it at least on the same day as well, 3/25?  Were they

17   both on 3/25/2010?

18   A.   Yes, they were.

19   Q.   What is Dr. Eric saying to you in his response?

20   A.   He says, "Hard work goes a long way."

21   Q.   When he says at the end, "I can't wait to celebrate," what

22   do you -- how do you interpret that?

23   A.   He said he can't wait to celebrate all, and I think it's

24   the success of this project and -- that's how I interpreted it.

25   Q.   Did the two of you have anything else that you would be

1  celebrating other than the project?

2  A.    Nothing.

3  Q.    Did you have anything else in common other than the

4  project?

5  A.    Nothing, except for maybe -- I looked at pages of his

6  website of, you know, he liked to have a good time, so I guess

7  --

8        MS. KAMM:  Objection.

9        THE COURT:  Overruled.

10 Q.    Turning to the next one in the series, the first message

11 here is from Dr. Eric.  What is he saying to you?

12 A.    He's telling me that he's going to be in Los Angeles.

13 Q.    And he is inviting you to come over?

14 A.    He was.

15 Q.    If we can see the whole message string again, did you

16 respond to him the same day?

17 A.    Yes, I did.

18 Q.    Are you on Facebook often?

19 A.    Oh, yes.  I use it for business all the time, and

20 personal, of course.

21 Q.    What did you say as to his invitation to come see him?

22 A.    I could not.

23 Q.    Did he respond to your declining to come visit him?

24 A.    He did.

25 Q.    What did he say?

1    A.    He just wanted to know when I was coming back to

2    California.

3    Q.    Again, this exchange here doesn't deal with the project,

4    does it, specifically?

5    A.    Well, it does in a sense because on the next page I talk

6    about another potential project in Portland, Oregon, that I

7    thought the sustainability aspects of what I knew he was

8    interested in and Condo was interested in would work very well.

9    Q.    Let's turn to the next page then so we can see what it

10   says.

11        So you're talking here about a potential project in

12   Portland.  Why are you mentioning that to Dr. Eric?

13   A.    Because, again, I'm trying to -- and my partners really

14   wanted me to do this, and Steve Corrington was doing this to

15   John Condo at the same time.  But we wanted to let them know

16   that we had a lot of other resources and a lot of other

17   potential deals, that this wouldn't just be a one-off deal

18   although it was a big deal.  But there was quite a bit of

19   opportunity to explore and really take on this sustainability

20   and building iconic projects in wonderful cities.

21   Q.    In the middle -- at the end of the second paragraph, it

22   says, "Frankie and Rod will be able to do their magic with

23   sustainability, etc, for not only our Cosmo project but for the

24   Charger deal as well."  Who are Frankie and Rod that you're

25   referring to?

1   A.   That's Frank Parker and Rod Kreie.

2   Q.   Is there another exchange in this series that you have in

3   front of you?  And could we turn to the next one?

4       This page here, what's happening on this page that we're

5   looking at?  We don't see any actual communications.  What are

6   we seeing?

7   A.   In Facebook, these are photos.  They're images that have

8   been posted on Dr. Eric's Facebook page.

9   Q.   If we could turn to the next page, is there some

10   discussion back and forth between you and Dr. Eric?

11   A.   Well, there's discussion between a few people and Dr.

12   Eric.  This would be a publication in response to public photos

13   that he has placed on or -- he has placed on his homepage.

14   Q.   There's another individual who's in this string of

15   postings?

16   A.   Yes.  There's a few individuals.

17   Q.   The user Rod Kreie, who is user Rod Kreie?

18   A.   That's Rod Kreie of -- I call it Frank and Rod Kreie.

19   They were always together, the energy guys from BBDA.

20   Q.   Your reference to celebration, "Soon we will celebrate,"

21   what are you referring to there?

22   A.   Again, the celebration of accomplishing the financing of a

23   fantastic project in downtown San Diego.

24   Q.   I'm sorry.  I don't have the paper copy in front of me.

25   Are there any more pages in front of you?

1   A.   There are.

2        MS. GOODWIN:  Can we go to the next page?

3   Q.   This is just a continuation with the same string, talking

4   back and forth with you, Rod Kreie, and actually someone else

5   here is in the loop?

6   A.   Yes.  It's talking about food.  The whole thing was the

7   Easter -- it was a Greek Easter feast.  These pictures had

8   great food and pictures of that.  We remember that.  That's all

9   what we were all commenting on, about how good it looked.

10       MS. GOODWIN:  Can we have the next page?

11  Q.   Here you're telling Dr. Eric you hope to see him soon, and

12  you call him Sweet Prince.  Where does that come from?

13  A.   It was on one of his Facebook pages that he was called the

14  Prince, and it was from a lady that was posting, and we all

15  started calling him that.  So he was the Prince.  So we call --

16  I added "sweet," but he was called the Prince frequently on his

17  Facebook page.

18  Q.   Do you refer to your project at all in this exchange with

19  Dr. Eric?

20  A.   I do.

21  Q.   You say, "Thank you for making our Cosmo project come true

22  and now to even see your energy biz take over in California,"

23  what are you talking about there?

24  A.   Well, they -- we had been told by Mr. Zanetti that -- and

25  John Condo that our project was, in fact -- that they were, in

1  fact, not able to raise all the funds that they had originally

2  hoped for and that they were only able to fund a few.  And our

3  project was going to be the first one that they financed and

4  that they were very sorry about the continued delay.  But it

5  appeared now that the funds were able to be accepted into the

6  United States and that we would be able to go online and look

7  at your Century Bancorp. site and see the funds actually in our

8  bank account so that we were -- so funding -- the draw zero, it

9  was any day now.

10  Q.   What time frame?  Can you read the date here on this

11  exchange?

12  A.   This is May 17 of 2010.

13  Q.   Do we still have just a couple more to go here?

14  A.   We do.

15  Q.   How many more pages do we have if you wouldn't mind?

16  A.   Four.

17       MS. GOODWIN:  Could we have the next one, please?

18  Q.   Again, you're talking about visiting -- him coming to

19  visit San Diego.  What is his response to you?

20  A.   He says -- I'm asking him when he's coming to San Diego.

21  "Come visit your new empire" because we have all this

22  incredible stuff about to happen with the financing of this

23  project.  And he said, "When you live for a strong purpose,

24  then hard work isn't an option.  It's a necessity."  And then

25  he says, "I look forward to seeing you soon."

1   Q.   We're in August now of 2010.  What's happening with the

2   funding?

3   A.   It still has not hit.  We've been told that it's coming,

4   but I think -- we even looked online, and we could see there

5   was funding in our bank, but we weren't able to pull it out

6   yet.  And so right now, it's really just grasping at straws,

7   any positive thing that either Mr. Condo would text or call.

8   And we'd look at the text and hear the phone calls from Steve

9   Corrington or anything that Dr. Eric would respond on Facebook

10  that was seemingly positive, you know.  It's just -- we were

11  just grasping at, yes, it's going to happen.  We are going to

12  be the first project and maybe the only project financed.

13  Q.   Did you ever get any negative responses from Dr. Eric on

14  Facebook about your project?

15  A.   Never.

16       MS. GOODWIN:  Next page, please.

17  Q.   We're in October now.  You say, "Dr. E, let's get our

18  project going.  Can't wait."  Are you -- by October, are you

19  still holding out any hope that you're going to get funding?

20  A.   It was very much the last straw, getting very close to the

21  end.  But they had been telling us, Hey, it's coming.  It's

22  coming.

23  Q.   And you don't see a quick -- a response here to your

24  message?

25  A.   I don't see a response here on the paper, no.

1    MS. GOODWIN:  Next page, please.

2  Q.   Is this the last page we have now?

3  A.   It is.

4  Q.   Again, this is another message from you to Dr. Eric in

5  October.  What are you attempting to accomplish here with this

6  message?

7  A.   Again, I'm just absolutely trying to push him.  We are at

8  the brink of losing everything and just trying to push to get

9  some type of response that something positive is going to

10  happen.

11  Q.   Did responses from Dr. Eric begin to trail off towards the

12  end of 2010 with respect to your Facebook communications?

13  A.   Yes.

14  Q.   At some point did you stop communicating with him on

15  Facebook?

16  A.   Yes.

17  Q.   What happened to the project?

18  A.   It failed.  It never got off the ground.

19  Q.   Did you -- we hadn't talked about deposits.  But was there

20  a deposit made to get funding from BBDA, made by the Westlink

21  group?

22  A.   Yes.

23  Q.   Was there an effort to get the deposit back?

24  A.   Yes.

25  Q.   And what happened?

1  A.   We never received it.

2       MS. GOODWIN:  No further questions.

3       THE COURT:  Cross-examination.

4       MS. GOODWIN:  May I retrieve the exhibits from the

5  witness for defense counsel?

6       THE COURT:  Yes.

7  CROSS-EXAMINATION BY MS. KAMM:

8  Q.   Good afternoon.  How are you?

9  A.   Hi.

10 Q.   My name is Carol Kamm.  I'm an attorney for Mr.

11 Georgiadis.

12      So you testified that you met Dr. Eric one time, right?

13 A.   Well, I actually met with him twice, but I only met him

14 in --

15 Q.   One trip?

16 A.   Yes.

17 Q.   In a two-day span?

18 A.   Yes.

19 Q.   The first day, he came into a dinner late because he had

20 flown overnight, right?

21 A.   That's what I was told, but, yes, he came into the dinner

22 late.

23 Q.   And you had no conversation with him during that dinner,

24 right?

25 A.   Just bits and pieces across the table.

1   Q.   Okay.  He was primarily sitting with John Condo and

2   speaking with John Condo?

3   A.   Yes.

4   Q.   Now, after dinner, you asked Dr. Eric to go out for

5   another drink, didn't you?

6   A.   I do not recall.  I doubt it.

7   Q.   And you asked him which hotel he stayed at, didn't you?

8   A.   No.  Actually, John Condo was telling us at dinner which

9   hotel he stayed at because it was in La Jolla, and John Condo

10   knew the gentleman who had built that hotel.  The guy is a

11   pretty popular guy in San Diego, and he owns a couple

12   restaurants.  And so John Condo was very excited that Dr. Eric

13   was staying there because he was dying to see the hotel.  It's

14   in La Jolla, California.

15   Q.   So prior to -- prior this celebratory dinner that was

16   happening -- can you give us a time frame for that dinner?

17   A.   A time frame?  Be specific on your question.

18   Q.   When this dinner took place in California.

19   A.   It took place sometime in October of 2009.

20   Q.   Okay.  Prior to that, you had conversations with Mr. Condo

21   and Mr. Zanetti, correct, many conversations with Mr. Zanetti

22   and Mr. Condo?

23   A.   I had many conversations with my partners on conference

24   calls with Mr. Zanetti.  I never had any one-on-one

25   conversations with Mr. Condo.

1  Q.  At some point during these conversations, Mr. Zanetti told

2  you that Mr. -- Dr. Eric was -- let's see how exactly you put

3  it -- was a major funder of the fund; is that the way they put

4  it?

5  A.  They put it such that Dr. Eric had a lot of money

6  connections in Europe, that his family came from money, that he

7  was responsible -- or his side of the agreement was to arrange

8  the financing for the fund itself.

9  Q.  And John Condo told you similar things?

10  A.  He did, on conference calls, yes.

11  Q.  And Dr. Eric was not on any of these calls, correct?

12  A.  Not to my knowledge.

13  Q.  And to your knowledge, was any of this ever said during

14  the time when you saw Dr. Eric out in California?

15  A.  It was said in the sense that John Condo said that this is

16  my business partner.

17  Q.  All right.  And it sounds from your testimony like John

18  Condo used "partner" and "family" in a large way.  It

19  encompassed a lot of people, right?  It encompassed his real

20  estate partners that he was looking to fund.  They were all --

21  everyone was part of the same family.  Is that a fair

22  characterization of how he used terms?

23  A.  He would call his family members of his staff, members of

24  his investment group, his development partners.

25  Q.  Right.  Of which you were one of them?

1  A.   We were hoping to be, yes.

2  Q.   So the next day you -- after this dinner -- the dinner

3  took place and the next day you had the site visit.  And during

4  the site visit, you said that you heard Dr. Eric speak --

5  A.   Yes.

6  Q.   -- correct?

7       And he speaks with an accent --

8  A.   Yes.

9  Q.   -- correct?

10      It can be difficult to understand?

11 A.   Yes.

12 Q.   Is it fair to say that most of Dr. Eric's conversation was

13 with John Condo?

14 A.   At that meeting?

15 Q.   Yes.

16 A.   Yes.

17 Q.   All right.  And that John Condo was really doing the

18 talking during the site visit and in all that ensued in the

19 second day?

20 A.   John Condo is quite a talker, so, yes.

21 Q.   Quite a talker.  Very persuasive talker, isn't he?

22 A.   He's a talker.

23 Q.   All right.

24      MS. KAMM:  Excuse me just a minute.  Your Honor, if I

25 may approach the witness?

```
 1              THE COURT:  Yes.
 2              MS. KAMM:  I'm going to show the witness two documents
 3     that have been marked as 1061 and 1062 for identification.
 4     Q.   I'm going to ask you to look at those documents and look
 5     up when you're done.
 6          Do you recognize these documents?
 7     A.   I do.
 8     Q.   What is 1061?
 9     A.   It's an email from me to Frank Parker and Rod Kreie.
10     Q.   What is it about?
11     A.   It's about an article that someone sent me from a Greek
12     newspaper.
13     Q.   What's the article about?
14     A.   It's about biomass.
15     Q.   Why were you interested in this article?
16     A.   I remember my partner, Peter Boermeester, found this
17     article, and I don't know how he found it.  But he found it and
18     thought that it had been related to BBDA.
19     Q.   All right.  So you had the article -- 1061 is actually an
20     article in Greek, correct?
21     A.   No, 1062 is.
22     Q.   1062 is the article in Greek?
23     A.   Yes.
24     Q.   And 1061 is an email from you which has something beyond
25     just your email to the people you identified, correct?  What
```

1    else does it have?

2    A.   It has some $CO_2$ production for gas, something that -- it

3    may as well be written in Greek to me because --

4    Q.   If you look at the first page --

5    A.   Yes.

6    Q.   -- what else is on the first page besides your email?

7    A.   Well, the first page I have is an email.  It's the email

8    itself.

9    Q.   Okay.  What is contained in the email?  What's the

10   substance of the email?

11        MS. GOODWIN:  I would object to discussion of the

12   substance of the email.

13        THE COURT:  It hasn't been entered yet.

14        MS. KAMM:  Okay.  I'd ask that this be admitted as an

15   exhibit.

16        THE COURT:  Do we have a date on this?

17   Q.   Do we have a date?

18   A.   The day of the email itself is November 4, 2009.

19        THE COURT:  Are you offering the email?

20        MS. KAMM:  I am offering the email, your Honor.

21        MS. GOODWIN:  And my objection is on the basis of

22   hearsay because what's contained in the email is not what Miss

23   Champion-Cain is saying, but it's a translation she obtained of

24   an article, and that article is hearsay.

25        THE COURT:  Well, is it being offered for the truth?

1    MS. KAMM:  No, your Honor, it's not.

2    THE COURT:  Then it will be admitted, Exhibit 1061.

3    (Exhibit No. 1061 received into evidence.)

4    MS. KAMM:  Your Honor, may I retrieve it and put it on

5    the ELMO?

6    THE COURT:  Yes.

7    MS. KAMM:  Thank you.  May I publish it to the jury,

8    your Honor?

9    THE COURT:  Yes.

10   Q.   All right.  So I'm showing you the email that has been

11   marked as 1061.  And on the bottom of the email it says, "Here

12   is your translation," correct?

13   A.   Correct.

14   Q.   So the bottom part of this email appears to be a

15   translation of the article.  Do you understand which article

16   this is that was translated?

17   A.   My understanding is the article that was in 1062.

18   MS. KAMM:  Your Honor, at this time I'd like to move

19   for 1062 to be admitted.

20   THE COURT:  It is the article that was attached to

21   1061?

22   MS. KAMM:  It is the article that is translated in

23   1061.

24   MS. GOODWIN:  Your Honor, I object.  This article is

25   in Greek.  There's really no way for us to tell whether what's

1  in the email --
2          THE COURT:  The objection is sustained.
3          MS. KAMM:  Very well.
4  Q.   So you had this article translated.  And what was the
5  reason that you had it translated?
6  A.   We are trying to find out as much information as possible
7  on BBDA.
8  Q.   All right.  And what did you find out after you saw the
9  translation?
10         MS. GOODWIN:  Objection.  This sounds like it's
11 hearsay.
12         THE COURT:  That's too broad.
13 Q.   All right.  I'd ask you to take a look at the article, the
14 translation that you have here.  Did the translation show you
15 that this project had a connection to BBDA?
16         MS. GOODWIN:  Your Honor, I'm going to object.  I know
17 that defense attorney said that the purpose was non-hearsay,
18 but the series of questions appear to be -- I do not see a
19 non-hearsay purpose other than trying to elicit these are facts
20 in the article.
21         THE COURT:  She can answer the question that's been
22 posed.  Overruled.
23 A.   Will you please repeat the question?
24 Q.   Did you learn after reading the translation that this
25 project had any connection with BBDA?

1   A.   Not after reading the translation, no.

2   Q.   So you testified regarding the celebratory dinner and then

3 the site visit the next day. Is that the only time that you

4 ever met Dr. Eric?

5   A.   At the dinner and the next day at the architect's office,

6 yes.

7   Q.   And at some point you started communicating with him on

8 Facebook, right?

9   A.   Yes.

10   Q.   Did you ever send him any emails?

11   A.   I don't think so. I don't know.

12   Q.   But in your mind, Dr. Eric was a business acquaintance,

13 right?

14   A.   Oh, yeah, business and now member of the family, as they

15 called it, and -- absolutely.

16   Q.   But he was a business acquaintance.

17      And being a Facebook friend, I think we can agree that

18 "friend" in the Facebook world is a very broad concept, right?

19   A.   Yes.

20   Q.   You're either a friend or you're nothing?

21   A.   Well, I don't know about that, but --

22   Q.   Fair enough. You're a friend or you're not able to

23 communicate with the person through Facebook, right?

24   A.   No, that's not true. Actually, you can communicate with

25 people that are not necessarily your friends on Facebook if, in

1    fact, you have not set up filters on Facebook which prevent

2    folks that aren't in your friend group to communicate with you.

3    Q.   But the common way for people to communicate on Facebook

4    is by being friended or friending somebody?

5    A.   That's one of the ways.

6    Q.   So you began sending emails to Mr. Georgiadis because

7    Michael Zanetti and John Condo had told you that he was

8    assembling the funding in Europe?

9    A.   You said "emails."  I don't recall sending emails.

10   Q.   I'm sorry, Facebook posts.

11   A.   Yes.

12   Q.   So let's turn to the first one that you testified about.

13   It's entitled, "Year of the snake."  And it says in the body,

14   "I knew you were also my spiritual man.  Love the year of the

15   snake.  And, yes, I agree, along with year of the dragon, it is

16   the best.  I wish you were back here in the States though,"

17   correct?  Did I read that correctly?

18   A.   Yes.

19   Q.   And it goes on to talk about the project.  And then you

20   sign off by saying, "Your team misses you more than you know

21   xoxoxo," a bunch of xo's, Gina, correct?

22   A.   Yes.

23   Q.   Is that a customary way for you to communicate with

24   business associates?

25   A.   It is for me.

1   Q.   You understood that Dr. Eric was from a different country,

2   right?

3   A.   Yes.

4   Q.   Did you have any idea whether he would understand the way

5   you were communicating with him on Facebook?

6   A.   I read all of his other posts that were public, and he had

7   kisses and hugs to everybody, including Rod Kreie.

8   Q.   All right.  But -- so you thought it was appropriate to

9   send him kisses and hugs?

10   A.   Oh, yeah.  He did it to men.  He did it to woman.  He

11   appeared to be a loving guy.

12         MS. KAMM:  Your Honor, move to strike.

13         THE COURT:  Overruled.

14   Q.   But you didn't get a response to this first email, did

15   you?  You talked about the project, but there's no response

16   from Dr. Eric?

17   A.   You know, I don't have the paper in front of me.  I'm not

18   sure --

19   Q.   It's on the screen.  I'll show you all the way down to the

20   bottom.  Do you see any response here?

21   A.   No.  It appears, according to this, I did not receive a

22   response.

23         MR. LEVCHUK:  Your Honor, if I may.  Carol, do you

24   know how to zoom in?

25         MS. KAMM:  Yes.

1        THE COURT:  One attorney acts at a time.

2        MR. LEVCHUK:  I just wanted to get so I could read it,

3    your Honor.

4        THE COURT:  Okay.

5    Q.   Now, this is the second email that you spoke about.  And,

6    again, you're talking about the project and also mentioning

7    celebrating in a villa in Tuscany that you may have access to,

8    right?

9    A.   Yes.

10   Q.   All right.  And focusing on Tuscany after San Diego.  And

11   Mr. -- Dr. Eric responds, "We hope we'll see the fruits of

12   paradise very soon."  That's a pretty generic term, isn't it?

13   A.   Yes.

14   Q.   There's no specific response to your project to any of the

15   concerns you're raising, any of the issues, that you're raising

16   regarding the landowner being fed up with the delay, no

17   response to that, right?

18   A.   Right.

19   Q.   He's saying have hope, have patience, is actually what he

20   says.  Stay happy and have a wonderful weekend.  He's

21   encouraging you, right?

22   A.   Yes.

23   Q.   And then let's turn to Page 4.  Page 4 is at the end of a

24   series of posts, I believe, right, on Facebook?

25   A.   Yes.

1  Q.   This is now March 25, 2010.  And you are talking about

2  wanting to see the -- wanting to celebrate the fruits of the

3  labor and commitment.  Again, general statements, wanting to

4  celebrate fruits of labor and commitment.  And Dr. Eric

5  responds, "These days a lot of people work hard so we have to

6  make sure we work harder and dedicate ourselves."  He's

7  encouraging you, right?

8  A.   Yes.

9  Q.   There's nothing regarding the project, nothing regarding

10  the funding.  He's offering you words of encouragement?

11  A.   Yes.

12  Q.   Turning to the next one -- and, again, you testified about

13  "my Sweet Prince."  But he tells you that he's coming to L.A.

14  and wants to know if you can meet him, correct?

15  A.   Yes.

16  Q.   Now, did you take that to mean that he thought -- that he

17  was interested in you?

18  A.   No, not necessarily.

19  Q.   You didn't take it that way?

20  A.   At the time I don't really recall how I took it.  I think

21  I was so fixated on my project, I didn't really think of

22  anything else.

23  Q.   You were -- I think you testified you were trying to

24  flatter him.  You were trying to make him feel good.  You were

25  flattering with him, perhaps flirting a bit with him?

1  A.    Yes.

2  Q.    Absolutely, because you wanted to get this money.  You

3  thought, if he could help you get the money, you'd flirt with

4  him, right?

5  A.    Yup.

6  Q.    So he's asking you if you want to come out and meet him in

7  L.A.  And you just -- you say, "My sweet, sweet Prince, I'm not

8  going to be there," right?  But at the very end of that post

9  you say, "I look forward to the day very, very soon" -- let me

10  point to it here.

11  A.    You need to move it up.

12  Q.    Yes, I am.  "Look forward to the day very, very soon that

13  we all celebrate our work and life" and many, many x's and o's

14  and hearts, right?

15  A.    That's right.

16  Q.    And then you talk about this other project that you have

17  and you want to have funding for and you're hoping that you

18  might entice him into being interested in this, correct?  Is

19  this one you already testified about, an opportunity --

20  A.    Yes.  But what I testified was that I was trying to entice

21  him, that we had an ability to bring him other projects, and

22  this could be perhaps another one that he would be interested

23  in looking at.

24  Q.    Right, right.  And you got no response to this?

25  A.    Again, I'm not looking at a paper, but it appears as

1  though I have not.

2  Q.   And then you testified regarding a series of posts, and

3  here I will slowly pan around them.  They concern an Easter

4  celebration, right?  These are purely social posts; is that

5  fair to say?

6  A.   Yes.

7  Q.   Nothing to do with the project.

8       Then in May of 2010, you tell him that you hope to see him

9  very soon, and you want to celebrate with lots of champagne.

10  You wish him, first of all, congratulations on his recent

11  engagement and birthday.  And then you talk about your project,

12  and you tell him that you want to see him soon with lots of

13  champagne, correct?

14  A.   "Can't wait to see you soon, hopefully really, really

15  soon, with lots of champagne" because I'm referencing the Cosmo

16  project.

17  Q.   Right.  But his response is about the engagement, wedding

18  engagement, right?

19  A.   Yes.

20  Q.   And then, "Let's work hard to make happen."  More words of

21  encouragement, right?

22  A.   Yes.

23  Q.   Nothing about your project?  Nothing about funding?

24  A.   Not specifically in those words, no.

25  Q.   There's no reference to your project in his response, is

1  there?

2  A.   Well, in my interpretation, it was.

3  Q.   Well, he's saying, Let's work hard to make everything

4  happen, darling"?

5  A.   And in my interpretation, that was in reference to my

6  project.

7  Q.   But he didn't say anything regarding your project, did he?

8  A.   He didn't specifically name Cosmo Square, no.

9  Q.   Then, again, you ask him when he's coming to San Diego.

10  You talk about your -- this is the next page, Page 11 here.

11  When is he coming?  You talk about your deal having tripled in

12  value, and you're looking forward -- I think your words are to

13  drink lots of wine and share many laughs and looking forward to

14  seeing him, correct?

15  A.   That's right.

16  Q.   And, again, his response is not to the project.  It is,

17  "When you live for a strong purpose, then hard work isn't an

18  option.  It's a necessity.  Looking forward to seeing you."

19  Words of encouragement, right?

20  A.   Yes.

21  Q.   Again, I think we can say that this is you again sending

22  him an email saying we're hoping to be able to celebrate soon.

23  Let's get the project going.  Did you get a response from him?

24  A.   This was not an email.  This was a Facebook message, just

25  to clarify.

1  Q.   My apologies.  You can see my focus.  I'm sorry.  This
2  post.
3  A.   Yes.
4  Q.   Again, another one where you're talking about "happy
5  Saturday."  "Let's get the deal done."  "Let's make some
6  money."  Many x's and o's.  Did you get a response to this one?
7  A.   No.
8  Q.   So in all of these Facebook posts, is it fair to say that
9  not once did Dr. Eric ever mention your project specifically?
10  A.   Right.
11  Q.   All right.  He offered many words of encouragement.  He's
12  enthusiastic.  He said hard work isn't an option.  Let's work
13  hard, generically, and offered you words of encouragement.  But
14  he never said anything about funding, correct?
15  A.   Correct.
16  Q.   Never said anything about the project.
17       Now, you have testified that you've put in, I think,
18  personally $150,000?
19  A.   A little bit more than that, yes.
20  Q.   Have you initiated any legal action to get the return of
21  that money?
22  A.   That's a very general statement so, yes, I have.
23  Q.   You have.  Have you succeeded in recovering any of that
24  money?
25  A.   We're still in litigation.

1  Q.   All right.  Are you hoping that a conviction in this

2  matter will help you recover that money?

3  A.   A conviction would not recover any money.  This is a

4  criminal proceeding, not a civil proceeding.

5  Q.   Are you hopeful that a criminal conviction could be used

6  in a civil proceeding to help you recover the money?

7  A.   Of course.

8         MS. KAMM:  No further questions.

9         THE COURT:  Any redirect?

10         MS. GOODWIN:  Just a few, your Honor.

11  REDIRECT EXAMINATION BY MS. GOODWIN:

12  Q.   With respect to your Facebook communications with Dr.

13  Eric, did the two of you have anything -- any shared --

14  anything in common other than the project?

15  A.   No.

16  Q.   Why did you -- is there a reason -- when he's giving you

17  words of encouragement, is there anything else that he is aware

18  of in your life other than the project?

19  A.   No.

20  Q.   When he's saying to have patience, is there anything that

21  you've communicated to him about your life other than the

22  project that would require patience?

23  A.   No.  That time -- that project was my life.

24  Q.   And just referring briefly to Exhibit 1061, which was that

25  email with the attached -- with the attached translation of the

article -- I'm not going to ask you specific questions about
it, but do you have any knowledge about whether anything in
this article is true?

A.   No.

Q.   And do you know whether or not that translation is
accurate?

A.   No.

Q.   Did the article -- was the article of any importance to
you in terms of your dealings with BBDA?

A.   No.

          MS. GOODWIN:  No further questions.

          THE COURT:  Any recross?

          MS. KAMM:  No, your Honor.

          THE COURT:  Thank you, Miss Champion-Cain.  You may
step down.

          MR. GRANT:  The government calls Rodney Kreie.  The
agent is asking him to step forward right now.

          RODNEY C. KREIE, Sworn

          THE CLERK:  Thank you.  You may be seated.

          Would you please state your name for the record,
spelling your last.

          THE WITNESS:  My name is Rodney C. Kreie, K-r-e-i-e.

          MR. GRANT:  May I inquire?

          THE COURT:  Yes.

DIRECT EXAMINATION BY MR. GRANT:

1  Q.   Good afternoon.  Could you please tell us what you do for

2  a living?

3  A.   I'm co-partners in an alternative energy company that

4  seeks out new ways for delivering energy-type products.

5  Q.   What's the name of that company?

6  A.   Great Plains Biosciences Group.

7  Q.   Who are you working with in that Great Plains entity?

8  A.   Who is my partner?

9  Q.   Yes.

10  A.   A man by the name of Frank Parker.

11  Q.   When is it that the two of you got together to work

12  together in this field?

13  A.   In January of 2008.

14  Q.   Could you just briefly describe your professional

15  background?

16  A.   I was a CPA in a public accounting practice for almost 25

17  years.  Also was in the banking industry right after leaving

18  the public accounting field.

19  Q.   Now, along with Mr. Parker, did the two of you work on a

20  project together?

21  A.   Yes, we did.

22  Q.   What was that project?

23  A.   We worked on several different projects.

24  Q.   Did you have a plan to build something?

25  A.   Yes.  We had a concept we called the agriplex, which was a

1  circle of industry where one of them had a waste stream, and we

2  created another entity that used that waste stream.  It was a

3  circle of waste streams.

4  Q.   And so you would use the waste stream to do what?

5  A.   To produce some type of energy product, either liquid

6  fuels or electrical power.

7  Q.   Now, did the two of you decide that you needed some money

8  for that?

9  A.   Yes, we did.

10  Q.   How much money, ballpark range, were you looking for this

11  agriplex?

12  A.   We could make different size agriplexes.  The one that we

13  wanted to build would be somewhere in the neighborhood of 750

14  million to a billion dollars.

15  Q.   Now, did you set out to find some financing for this

16  agriplex?

17  A.   Yes, we did.

18  Q.   Did you find out about an entity called BBDA or DAC or

19  Dupont Alliance?

20  A.   Yes, we did.

21  Q.   How did you find out about this entity?

22  A.   We had had someone that we had become acquainted with by

23  the name of Anna Church that introduced us to that

24  organization.

25  Q.   Who did you first speak to from this organization?

1  A.   John Condo.

2  Q.   How is it that you first spoke to him?  Was it face to

3  face, over the phone or something else?

4  A.   It was over the telephone.

5  Q.   Now, this entity, how did you first know it?  I mean, what

6  was the name of it when you first started dealing with it?

7  A.   DAC Global was the name that was mentioned most of the

8  time.

9  Q.   Now, when you first started speaking to Mr. Condo, when

10  was that approximately?

11  A.   Would have been around Thanksgiving time in 2008.

12  Q.   Now, did you have occasion to speak to Mr. Condo on more

13  than one occasion over the phone?

14  A.   Yes, I did.

15  Q.   Did those phone calls lead up to a face-to-face meeting?

16  A.   Yes, sir.

17  Q.   Now, I just want to focus on the phone calls first of all.

18  Could you please describe what Mr. Condo said about DAC Global?

19  A.   We got quickly into the way that they funded projects.  He

20  talked about how there was a chance for us to have up to 51

21  percent ownership -- equity ownership in projects.

22  Q.   Did he talk about how much money DAC Global had for

23  projects?

24  A.   He didn't do that until we met face to face.

25  Q.   Did you communicate to him how much financing you were

1  looking for for this agriplex?

2  A.    Yes, we did.

3  Q.    Was it the same amount that you just mentioned?

4  A.    Yes, sir.

5  Q.    Now, did he describe the structure of the financing to

6  you?

7  A.    Yes.

8  Q.    What did he say about the structure?

9  A.    Initially, we were going to be required to put a deposit

10 up and that we would be required to carry our own soft costs in

11 the beginning to where we got the project to the point that we

12 could prove that it would work.  And upon close, financial

13 close, we'd get our deposit back and be refunded for those soft

14 costs that we were at risk for whatever out of pocket we had if

15 they didn't fund the project.

16 Q.    So this representation about the deposit, you're getting

17 this from Condo over the phone?

18 A.    Yes.

19 Q.    Now, did Mr. Condo indicate how much of the financing for

20 this $750 million BBDA would be providing in -- a hundred

21 percent?

22 A.    It was a hundred percent.

23 Q.    80?

24 A.    A hundred percent financing.

25 Q.    Did he talk about what in exchange DAC Global would

1  require?

2  A.   Yes.

3  Q.   What did he say?

4  A.   They would have an ownership interest, and we had to meet

5  certain financial performance milestones, at least in our

6  projections, to show that there was a value there to eventually

7  buy them out at some point in time.

8  Q.   And so DAC Global would have an ownership interest?

9  A.   Yes, sir.

10 Q.   Did Mr. Condo indicate over the phone how large the

11 deposit was going to have to be?

12 A.   We never did actually get to where we determined what our

13 deposit was going to be, not over the phone either.

14 Q.   Did he give you some parameters or some indication on --

15 A.   Yes, he did.

16 Q.   -- how that would be arrived at?

17 A.   It usually was dependent on the size of the project, but

18 there was no grid mentioned.  It appeared to be somewhat

19 arbitrary.

20 Q.   Now, based on your conversations with Condo over the

21 phone, did you have an understanding of how much ownership

22 interest you would be retaining over the agriplex once it was

23 completed?

24 A.   Yes.

25 Q.   What was your understanding based on what Mr. Condo told

1  you?

2  A.   51 percent.

3  Q.   So you would have a controlling interest?

4  A.   Yes.

5  Q.   Now, how appealing did this seem to you of getting 100

6  percent of the financing and retaining 51 percent of the

7  ownership?

8  A.   It was very appealing to us.

9  Q.   Now, when you were having these conversations with Mr.

10  Condo after -- in November -- starting in November 2008, did

11  you have occasion to look at his website?

12  A.   Yes, I did.

13  Q.   Did you review it for some purpose?

14  A.   Yes, yes, I did.

15  Q.   What was the purpose of reviewing the website?

16  A.   Well, just to see if they were for real to begin with, and

17  we were curious who they were and where they were operating out

18  of.

19        MR. GRANT:  May I approach the witness?

20        THE COURT:  Yes.

21        MR. GRANT:  Showing defense counsel what's been

22  previously provided to him as Exhibit 123.

23  Q.   Mr. Kreie, do you recognize Exhibit 123?

24  A.   Yes.

25  Q.   What is it?

1    A.    It looks like screenshots off of their website.

2    Q.    When you say "their website"?

3    A.    Dupont Alliance.

4    Q.    Is there a date at the bottom which it was printed off?

5    A.    November 2, 2009.

6    Q.    Does this -- does Exhibit 123 -- is that a fair and

7    accurate depiction of the website that you viewed around

8    November of 2008?

9    A.    Yes, it is.

10            MR. GRANT:  The government would move the admission of

11    Exhibit 123.

12            THE COURT:  It will be admitted.

13    (Exhibit No. 123 received into evidence.)

14    Q.    Now --

15            MR. GRANT:  May I approach the witness again, your

16    Honor?

17            THE COURT:  Yes.

18            MR. GRANT:  Showing defense counsel what's been marked

19    and previously provided to him as Exhibits 556 and 544.

20    Q.    Turning first to 556, do you recognize it?

21    A.    Yes, I do.

22    Q.    What is it?

23    A.    It looks like another screenshot off of their website.

24    Q.    When you say "their website," who are you talking about?

25    A.    I'm sorry, DAC Global.

1    Q.   As you -- time went on after November of 2008, did you

2    have occasion to look at DAC Global's website periodically?

3    A.   I did but seldom did --

4    Q.   Okay.

5    A.   -- look.

6    Q.   556, is there a date on the bottom of it?

7    A.   March 30 of 2009.

8    Q.   Does 556 -- is that a fair and accurate depiction of what

9    it looked like at about that time?

10   A.   Yes, sir.

11        MR. LEVCHUK:  Objection.  There's no testimony that

12   this witness saw it at about that time.

13        THE COURT:  Sustained.

14        MR. GRANT:  Okay.

15   Q.   Did you have occasion to see that website at about that

16   time, March of 2009?

17   A.   Yes, I did.

18        MR. GRANT:  The government would move for admission of

19   Exhibit 556.

20        MR. LEVCHUK:  Renew my objection.  He can't say that

21   he printed this out and can affirm that it is what he saw in a

22   particular date.

23        MS. GOODWIN:  I believe it's already in evidence, your

24   Honor.

25        THE COURT:  Wait a minute.  One lawyer per side --

1        MS. GOODWIN:  Excuse me.

2        THE COURT:  -- for any one witness.

3        MS. GOODWIN:  Excuse me.

4        THE COURT:  The objection is sustained for foundation

5   grounds at this point.

6        MR. GRANT:  May I inquire further, your Honor?

7        THE COURT:  Yes.

8   Q.   Mr. Kreie, did you have occasion to look at the website of

9   DAC Global in around March of 2009?

10  A.   Yes, I did.

11       MR. LEVCHUK:  Asked and answered, your Honor.

12       THE COURT:  Overruled.

13  Q.   When you observed it, did you have occasion to see what it

14  looked like?

15  A.   Yes, I did.

16  Q.   Showing you 556, is that a fair and accurate depiction of

17  what it looked like at about that time?

18  A.   Yes, it is.

19       MR. LEVCHUK:  May I have a voir dire?

20       THE COURT:  No.

21       MR. GRANT:  The government would move for the

22  admission of 556.

23       THE COURT:  Do you object?

24       MR. LEVCHUK:  I object.

25       THE COURT:  It's admitted over your objection, 556.

1  (Exhibit No. 556 received into evidence.)

2  Q.   Turning next to 544, do you recognize it?

3  A.   I actually don't ever remember seeing a bicycle on a

4  website.

5  Q.   All right.  Now, you testified about these phone calls --

6  actually, I'm going to move on now, your Honor -- I mean, Mr.

7  Kreie.

8       Did you have occasion to actually meet face to face with

9  people at DAC Global?

10 A.   Yes, sir.

11 Q.   When was that?

12 A.   It would have been in January of 2009.

13 Q.   Who was there?

14 A.   Initially, we met with John Condo, and he went over the

15 investment, the way they liked to do the investment, the 51/49

16 and some of that stuff.  And then later Dr. Eric came in, and

17 we got to meet Dr. Eric.

18 Q.   Now, who was there from your side?

19 A.   Frank Parker and myself.

20 Q.   Now, you said that Dr. Eric came in?

21 A.   Yes.

22 Q.   Approximately how much time passed from the time you first

23 got there to the time that Dr. Eric came in?

24 A.   Oh, 20, 30 minutes.

25 Q.   When he came in, did Mr. Condo introduce him to you?

1    A.    Yes, he did.

2    Q.    How did he introduce him to you?

3    A.    He introduced him as his partner in DAC Global.

4    Q.    After that, did Mr. Condo explain what DAC Global was in

5    further detail?

6    A.    Yes, he did.

7    Q.    And what did he say?

8    A.    He talked about how it was a group of investors from

9    Europe, and there were 35 to 45 investors and that him and Dr.

10   Eric had a considerable number of these investors that they

11   were managing assets for and that they had in excess of 25

12   billion euros that they were going to be investing in various

13   projects.

14   Q.    During this period of time where Mr. Condo and Dr. Eric

15   are there together, who's doing most of the talking from the

16   DAC Global side?

17   A.    John's doing all the talking.

18   Q.    Did Mr. Condo indicate where this fund was located?

19   A.    Yes.  It was in Europe.

20   Q.    Now, did Mr. Condo make reference to voting shares?

21   A.    Yes, he did.

22   Q.    What did he say about voting shares?

23   A.    He had told me that they represented enough of the assets

24   in the fund that the fund would pretty much go in whatever

25   direction that they wanted them to go in.  He had told us there

1    was 21 voting shares and that they controlled 14 of those.

2    Q.   When he was talking about "they," who did you understand

3    he was referring to when he said they controlled 14 of the 21

4    shares?

5    A.   Between John and Dr. Eric, that they -- that the fund

6    pretty much did what they wanted them to do.

7    Q.   What, if anything, did Mr. Condo say about Dr. Eric's role

8    in the fund?

9    A.   He told me he was an asset manager in Europe and

10   represented a considerable amount of money.  And, basically, he

11   was in the United States just to help John with the stuff that

12   they were getting ready to invest in in the United States.

13   Q.   Now, when you said that he represented a considerable

14   amount of money, what do you mean by that?

15   A.   Well, from the onset, it appeared to us that John was

16   running the United States operations but that Dr. Eric

17   represented the more significant number of dollars that were in

18   the fund.

19   Q.   Did Mr. Condo say anything about whether he and Dr. Eric

20   actually had money in the fund?

21   A.   We were led to believe that they did have their own money

22   in the fund, too, yes.

23   Q.   Were you led to believe that by what Mr. Condo said to you

24   at this meeting?

25   A.   Yes.

1    Q.    Now, at this meeting, did you get a chance to talk?

2    A.    Yes.

3    Q.    Just what, generally, did you and Mr. Parker get to talk

4    about?

5    A.    We talked about what our technical capabilities were and

6    the various types of energy products that we could bring to the

7    table, that we could couple with what they were already doing

8    to enhance their projects.  And we talked a considerable amount

9    about the agriplex and what it is and what we would do if given

10   the opportunity to do exactly what we wanted to do.

11   Q.    Did Mr. Condo or Dr. Eric have any reaction to your plans?

12   A.    Yeah.  They seemed pretty excited to have access to a

13   group that had a broad spectrum of different capabilities.  It

14   looked like it was going to be a pretty -- when you combine

15   their ability to fund with our ability to look over what they

16   were doing, it appeared that it would be a very workable

17   situation for both of us.

18          THE COURT:  All right.  We're going take the lunch

19   recess.  Mr. Kreie, you may step down for the time being.

20   We'll be in recess for the hour, jurors.  We'll be back here at

21   2:00.

22   (The jury left the room at 1:00 p.m.)

23          THE COURT:  You may step down, Mr. Kreie.  What do I

24   understand for the approximate remainder of his direct, Mr.

25   Grant?

1          MR. GRANT:  Your Honor, I would estimate about one
2     hour.

3          THE COURT:  Okay.  And his cross?

4          MR. LEVCHUK:  Twenty minutes to a half hour but no
5     more than a half hour.

6          THE COURT:  I am -- I have some serious afternoon
7     business that I want to get to.  We may quit before 3:30, but,
8     in any event, I don't believe we'll go beyond Mr. Kreie today.
9     So after Mr. Kreie, I take it, it would be Miss Sweet.  But she
10    will be next Tuesday?

11         MS. GOODWIN:  We're not sure that she will be next
12    Tuesday because we have witnesses coming in from out of town
13    for the beginning of the week.  We will tell defense counsel at
14    the end of the day who will be Tuesday's witnesses.

15         THE COURT:  Okay.  Anything else that needs to come to
16    my attention before we recess for lunch?

17         MR. LEVCHUK:  Minor housekeeping matter.  We're a
18    little crowded here.  I was wondering if we could move the back
19    table back about six to eight inches.

20         THE COURT:  Sure.

21         MR. LEVCHUK:  Thank you.

22         THE COURT:  We're in recess until 2:00.

23    (Luncheon recess taken at 1:02 p.m.)

24    (The Court and jury entered the courtroom at 2:05 p.m.)

25         THE COURT:  Good afternoon once again, jurors.  We're

1    ready to resume.

2           Mr. Kreie will retake the witness stand, please.  You

3    are reminded, Mr. Kreie, you remain under oath.  Please be

4    seated.

5           Mr. Grant, you may continue with direct examination.

6           MR. GRANT:  Thank you, your Honor.

7    Q.   Mr. Kreie, when we broke, you had talked about what it is

8    that the DAC Global side had said during this meeting and what

9    your side had said about the meeting.

10          Now, did you have occasion after this meeting in the

11   office to go somewhere?

12   A.   Yes.

13   Q.   Where did you go?

14   A.   We went to lunch after the meeting.

15   Q.   And who did you go with?

16   A.   It was Frank Parker and Dr. Eric and John Condo and

17   myself.

18   Q.   At lunch, was that business or entirely social?

19   A.   Entirely social.

20   Q.   Did you have occasion to see Dr. Eric and Condo the next

21   day?

22   A.   Yes, we did.

23   Q.   Where did you see them?

24   A.   Back in the DAC Global offices.

25   Q.   What happened at the DAC Global office?

1    A.   Just more meetings, more stories, more talk about what our

2    capabilities were.  We were moving towards forming some type of

3    an association.

4    Q.   During this meeting, was -- were both Mr. Condo and Mr. --

5    and Dr. Eric there?

6    A.   Yes.

7    Q.   You said something about more stories.  Could you explain

8    what you mean by that?

9    A.   Well, John talked a lot.  He always had lots of different

10   stories that he wanted to tell.

11   Q.   What was he talking about during this meeting on the

12   second day?

13   A.   I don't remember if it's the first or second day, but

14   there was a time during those meetings where he talked about

15   where the money was coming from or at least some of the money

16   was coming from.

17   Q.   What did he say?

18   A.   He was talking about a thing called the Blue Brain

19   Project.  It was a project where they were trying to develop a

20   new technology in Europe, and there was going to be a

21   considerable amount of money put into that project.  And they

22   were going to have access to that money to put into projects

23   for a period of time.

24   Q.   Now, did Mr. Condo mention any prior deals?

25   A.   Yeah.  He had talked about real estate projects and things

1  like that that they had done in the past.

2  Q.   When you say "they had done in the past," who are you

3  referring to?  Who's the "they"?

4  A.   The "they" would be DAC, DAC Global.

5  Q.   Was Mr. Condo specific about any deals that he and Dr.

6  Eric had done in the past?

7  A.   He didn't really talk specifically about things that they

8  had done but just that they had been working together for a

9  long time, not necessarily as DAC Global but as business

10 associates.

11 Q.   Now, was the length of the meeting on the second day

12 similar to the length of the meeting on the first day?

13 A.   Yes.

14 Q.   Was the top -- were the topics the same or different?

15 A.   Pretty much the same.  They had questions and asked

16 questions:  Can we do this?  Can we do this?  Can we do this?

17 And it was probably more social the second day.  We just kind

18 of hung around their office all day and met off and on.

19 Q.   At some point were you introduced to somebody else in DAC

20 Global?

21 A.   Yes.

22 Q.   Who were you introduced to?

23 A.   We were introduced to Michael Zanetti.  We met him on this

24 trip also.

25 Q.   How long did you get to speak to Mr. Zanetti?

1    A.   We talked to Michael initially maybe for 30 or 45 minutes

2    and then off and on for the rest of the time that we were there

3    that second day.

4    Q.   Did you speak to Mr. Zanetti more or less time than you

5    spoke to Mr. Condo and Mr. -- and Dr. Eric?

6    A.   Less time.

7    Q.   Do you see Dr. Eric in the courtroom today?

8    A.   Yes, I do.

9    Q.   Could you please point to him and identify an article of

10   clothing he's wearing?

11        MR. LEVCHUK:  We'll stipulate that the witness can

12   identify the defendant.

13        THE COURT:  It has been so stipulated.

14   Q.   Now, after this meeting on the second day, did you and Mr.

15   Parker go home?

16   A.   Yes.

17   Q.   At that time, what was home for you?

18   A.   At that time, I was living in Ulysses, Kansas.

19   Q.   What was home for Mr. Parker?

20   A.   He was living in Asheville, North Carolina.

21   Q.   After going home, did you have occasion to speak to Mr.

22   Condo again?

23   A.   Yes, we did.

24   Q.   Did he have some sort of proposal for you?

25   A.   Yes.  We started working towards signing a memorandum of

1 understanding.

2 Q.   What was the proposal that he made to you?

3 A.   The proposal was that we work together and they get the

4 first right to fund any project that we would come up with.

5 Q.   Was there any other parts of the proposal that involved

6 you working with DAC Global?

7 A.   Yes, yeah.  We were going to also work together on

8 projects that they had brought to us, projects they already had

9 in their queue.

10 Q.   In what capacity were you supposed to be working on

11 projects already in their queue?

12 A.   At first it started off as being the technical arm of DAC

13 Global.  We were supposed to review projects and try to figure

14 out ways to enhance or put some type of an alternative energy

15 aspect to those projects.  And then it eventually evolved into

16 I was going to take a more active role managing the budgeting

17 of projects.

18 Q.   Now, this proposal, is that something you agreed to, to be

19 this technical arm of DAC Global?

20 A.   Yes.  That was initially what we agreed on.

21 Q.   Why did you agree to do that versus the original idea

22 about the agriplex?

23 A.   For us it was risk management.  We were kind of allowed to

24 show what we could do on projects that already had been

25 approved, so we didn't have to deal with the deposit or -- it

1  was strictly risk management.

2  Q.   So, in other words, you wouldn't have to make a deposit?

3  A.   Yes, yes.

4  Q.   Did Mr. Condo indicate what kind of compensation you could

5  get in this role?

6  A.   We had talked about expense reimbursements plus getting a

7  percentage of each deal that we worked on.

8  Q.   Did Mr. Condo indicate how much that would entail?

9  A.   It would have been somewhere between 1 and 2 percent of

10  their projects that they already had in the queue and then up

11  to 10 percent of the projects that we brought to them from

12  other people that they ended up funding.

13  Q.   Did you ever bring any projects to them that they ended up

14  funding?

15  A.   No, sir.

16  Q.   Now, this arrangement that you were just talking about,

17  getting paid as a percentage of these existing projects in

18  queue, was there any written agreement to that effect?

19  A.   No, there was not.

20  Q.   Now, the types of projects that DAC Global had, was that

21  ever communicated to you by Mr. Condo?

22  A.   Yes.

23  Q.   What did he describe?

24  A.   He talked about several different real estate projects

25  that they were working on and also two or three energy projects

1    that they had in their queue.

2    Q.   Now, in this capacity as the technical arm of DAC Global,

3    what were you personally going to do versus Frank Parker?

4    A.   Frank was going to handle the technical part of the

5    relationships with DAC and eventually evolved into where I was

6    going to set up a process for approving invoices and making

7    sure that we were staying on a time budget with the projects

8    after they got started.

9    Q.   What is Mr. Parker's area of expertise?

10   A.   He's a process engineer.

11   Q.   Does he have a particular area where he's worked in more

12   than others?

13   A.   Energy efficiency.

14   Q.   As part of your role in approving invoices, did Mr. Condo

15   or anybody else at DAC Global indicate to you the name Century

16   Bank?

17   A.   Yes.

18   Q.   Who indicated that that was part of what you were going to

19   be involved in?

20   A.   Mr. Condo.

21   Q.   What did Mr. Condo say about the role of Century Bank in

22   the flow of these funds to these projects?

23   A.   Century Bank was going to be the originating bank for

24   paying invoices for the various projects.

25   Q.   Where would you come into play in these invoices and

1  payments?

2  A.   I had worked with a guy to design a system that we could

3  have invoices submitted.  I could approve it, and then they

4  would be forwarded to Mr. Condo to be paid directly to the

5  vendors.

6  Q.   What did Mr. Condo say, if anything, about where Century

7  Bank was located?

8  A.   At some point in time -- I can't remember if he told me.

9  He told me it was an offshore bank.  And when I went onto their

10  website, I saw where they were out of New Zealand, I believe.

11       MR. LEVCHUK:  I'm sorry.  Can we get a time frame on

12  the conversation?

13       THE COURT:  Yes, time frame.

14  Q.   Approximately when did you go on the website to look at

15  the Century website?

16  A.   That would have been probably sometime toward the end of

17  2009.

18  Q.   Now, you've testified earlier about your initial telephone

19  conversation with Mr. Condo taking place in November of 2008.

20  A.   Yes, sir.

21  Q.   Approximately when was the meeting that you described at

22  the DAC Global office?

23  A.   The very first meeting?

24  Q.   Yes.

25  A.   It was in January of 2009.

1  Q.   Now, at some point did you begin working in this role as a

2  technical arm of DAC Global?

3  A.   Yes.

4  Q.   When did that start approximately?

5  A.   March of 2009.

6  Q.   You've testified earlier that home for you at that time

7  was Kansas.

8  A.   Yes.

9  Q.   Is that where you were working from?

10  A.   Spent most of our time in Florida starting in March.

11  Q.   Could you just describe how it was that you went to

12  Florida?

13  A.   Well, you know, we were told that they were going to start

14  funding projects.

15  Q.   Who told you?

16  A.   John Condo told us that by the end of the second quarter

17  of 2009 they were going to be closing on some of the projects.

18  So we felt the need to get there at that point in time.

19  Q.   Did you rent an apartment or find some place of -- way of

20  living down there?

21  A.   Yes, yes.

22  Q.   What did you do?

23  A.   We rented a condo to begin with for a couple months, and

24  then we felt like we could save money renting another condo and

25  signing a 14-month lease.

1  Q.  When you started working for DAC Global, what were you

2  asked to do?

3  A.  Just pretty much organize the process of implementation of

4  the various -- of the various projects.  From a technical

5  standpoint, we were asked to take a look at the business plans

6  of what was submitted to DAC Global to see if there were things

7  that we saw that we might either enhance or have a different

8  way of doing something that might make sense either from an

9  energy efficiency standpoint or something else we might couple

10  with that that might make the overall project a better project.

11  Q.  At what stage did you become involved in these developers'

12  projects?

13  A.  Everyone that we worked with pretty much had already made

14  their initial deposits and had been pretty much approved for

15  financing as we understood it.  And it was literally within a

16  month or two of actual financial close of the project before we

17  were engaged.

18  Q.  Did you have any involvement in the developers' deposit

19  agreement?

20  A.  No.

21  Q.  Did you have any involvement with the developers'

22  Conditional Commitment Letter, or CCL?

23  A.  No.

24  Q.  Did you have any involvement in the developers' Master

25  Investment Agreement?

1   A.   No, sir.

2   Q.   Now, are you aware of a project called Sun Ranch?

3   A.   Yes, I am.

4   Q.   Did you work on that?

5   A.   Yes.

6   Q.   Did Mr. Parker work on it?

7   A.   Yes, he did.

8   Q.   Could you just describe very briefly what type of work you

9   and Mr. Parker were doing on Sun Ranch?

10  A.   That project started off as a real estate project, and we

11  implemented an alternative component to it using the waste

12  stream coming from Los Angeles and put in a cold storage

13  facility into the project.

14  Q.   Did you actually go to where the Sun Ranch project was

15  supposed to be?

16  A.   Yes, we did.

17  Q.   Where was that?

18  A.   It was in Bakersfield, California.

19  Q.   Who did you work with?

20  A.   The Petrini brothers and their engineer.

21  Q.   Approximately how long did you spend out in Bakersfield

22  working with them at that location?

23  A.   We were actually in Bakersfield two or three times for a

24  total of maybe three weeks.

25  Q.   How did you and Mr. Parker get out to Bakersfield,

1  California, from Florida?

2  A.    We drove when we went to California.

3  Q.    Why did you drive such a long distance?

4  A.    We were seeing several people out there.  We just had too

5  many files to take them on an airplane comfortably.

6  Q.    Are you aware of a project named Cosmopolitan Square in

7  San Diego?

8  A.    Yes, I am.

9  Q.    Did you do any work on that project?

10  A.    Yes, we did.

11  Q.    Could you just describe, again briefly, the type of work

12  you and Mr. Parker were doing on that project?

13  A.    That project was a high-rise boutique motel with retail

14  space on the bottom, and what we were working on doing was

15  taking municipal solid waste and using a waste energy plant to

16  power the hotel and perhaps Petco Field if we were able to work

17  something out with the owner of Petco Field.

18  Q.    Now, in this role -- I mean, whose project -- I mean, did

19  you -- did you and Mr. Parker have control over what was going

20  to be in the project?  Were you advisors or were you --

21  A.    We were advisors, yeah.

22  Q.    How much time, approximately, did you spend out there

23  meeting and working with the Cosmopolitan Square people?

24  A.    We were there for maybe a week to ten days altogether.

25  Q.    When you were in the Cosmopolitan Square area and when you

1  were going to Bakersfield, were you having to incur expenses?

2  A.   Yes.

3  Q.   For hotels and meals and that sort of thing?

4  A.   Yes.

5  Q.   Are you familiar with a company called American Ethanol?

6  A.   Yes, I am.

7  Q.   Did they have a project?

8  A.   Yes, they did.

9  Q.   What kind of project did they have?

10  A.   They were taking molasses from South America, and we were

11  going to use it as a feedstock to make ethanol with.

12  Q.   And where was it supposed to be located?

13  A.   That was in Santa Maria, California.

14  Q.   Did you have occasion to go out to Santa Maria,

15  California?

16  A.   Yes.

17  Q.   Did you work with the people at American Ethanol?

18  A.   Not really that much.  They were much more sophisticated

19  from an ethanol fuel standpoint than the other two groups were.

20  Q.   Are you familiar with a company called DFI?

21  A.   Yes, I am.

22  Q.   What's DFI?

23  A.   DFI was a group out of North Carolina that was looking at

24  putting in a biodiesel plant in Arkansas.

25  Q.   Did you go out there?

1  A.    Yes, I did.

2         MR. LEVCHUK:   Time frame, please.

3         THE COURT:   Yes, time frame.

4  Q.    Now, the work that you've been talking about at these

5  different projects -- let's just first start out with what year

6  was that taking place?

7  A.    This would have all been April of 2009 through September,

8  October of 2009.

9         MR. GRANT:   May I approach the witness?

10        THE COURT:   Yes.

11        MR. GRANT:   Showing defense counsel what's been

12  previously provided to him and marked as 923, 924, 925.

13  Q.    I want to start with Exhibit 923 for identification.   Do

14  you recognize it?

15  A.    Yes, I do.

16  Q.    What is it?

17  A.    It's where the site of the biodiesel plant was going to be

18  in Arkansas.

19  Q.    And for -- is this the DFI project?

20  A.    Yes, sir.

21  Q.    Who took that picture?

22  A.    I did.

23  Q.    Does that picture fairly and accurately depict that area

24  of where the biodiesel fuel project was supposed to be?

25  A.    Yes.

1    MR. GRANT:  The government would move for the
2 admission of 923, your Honor.
3    THE COURT:  It will be admitted.
4 (Exhibit No. 923 received into evidence.)
5 Q.   Turning now to Exhibit 924 for identification, do you
6 recognize it?
7 A.   Yes, I do.
8 Q.   What is it?
9 A.   It's the same location, a little different view, and two
10 people talking.
11 Q.   And who are those two people?
12 A.   I don't remember the guy on the right.  He was the local
13 in charge of the facility there.  The guy on the left is Danny
14 Boyce.
15 Q.   Who is he?
16 A.   Danny was going to be the project manager for DFI.
17 Q.   Who took the picture?
18 A.   I did.
19 Q.   Does it fairly and accurately depict those two people in
20 the area that they're sitting at -- standing at?
21 A.   Yes, sir.
22    MR. GRANT:  The government would move for the
23 admission of 924.
24    THE COURT:  It will be admitted.
25 (Exhibit No. 924 received into evidence.)

```
 1              MR. GRANT:  Your Honor, may I publish 924 to the jury?
 2              THE COURT:  Yes.
 3    Q.   May I ask the -- you were just testifying a moment ago
 4    about Danny Boyce.  Could you just indicate which one he is?
 5    A.   Danny is the fellow in the yellow shirt, on the left.
 6    Q.   Turning now to 925.
 7    A.   Yes.
 8    Q.   Do you recognize it?
 9    A.   Yes, I do.
10    Q.   What is it?
11    A.   It's a picture of a port site, oh, probably eight or nine
12    miles away from the location where the biodiesel plant was
13    going to be.
14    Q.   Did you take that picture?
15    A.   Yes, I did.
16    Q.   Does it fairly and accurately depict that site as you saw
17    it?
18    A.   Yes, sir.
19    Q.   What relationship does that site have to the site that's
20    depicted in 923?
21    A.   They were showing if they were short local feedstock that
22    they had the ability to barge in wood chips of some type to
23    supplement the feedstock for making the biodiesel.
24              MR. GRANT:  The government moves for the admission of
25    925.
```

1          THE COURT:  It will be admitted.

2   (Exhibit No. 925 received into evidence.)

3          MR. GRANT:  Permission to publish 925, your Honor?

4          THE COURT:  Yes.

5   Q.   Just one last question on this point, Mr. Kreie.  Why did

6   you think it was important to take a picture like this during

7   your visit out to the DFI project site?

8   A.   Every time we went somewhere, we took pictures just so if

9   at some point in time we needed to refer to anything that we

10  had -- it's easier to point at a picture than it is to describe

11  it in words.

12  Q.   Are you familiar with a company called Cala?

13  A.   Yes, I am.

14  Q.   What's Cala?

15  A.   Cala was a group out of Fresno, which is where the

16  principal was at, that was looking at putting in two NASCAR

17  racetracks, one in Bakersfield, fairly close to where the Sun

18  Ranch location was, and the other was in -- I believe it was

19  Kentwood, Louisiana.

20  Q.   Again, could you just briefly describe the type of work

21  that you were doing with Cala?

22  A.   Cala, our job was going to be to see if we could do some

23  type of alternative energy enhancements with Cala.

24  Q.   Can I just interrupt you for a second?  When you say

25  "alternative energy enhancement," you mean with respect to the

1  racetrack?

2  A.   Yes.  It would have more been with respect to providing

3  electric power to the racetracks.

4  Q.   Approximately how much time did you spend either going out

5  to these sites and working with the people at Cala?

6  A.   Cala, that was actually later.  That was, like, in

7  November, I believe, when I went and looked at that -- the

8  Kentwood site because we had never been to that site before.

9  Q.   And Kentwood is Louisiana?

10 A.   Yes.

11 Q.   Did you also go out to the California, Bakersfield site?

12 A.   Yes.  That was earlier.  That was the time we spent some

13 time out at Sun Ranch and the San Diego people.

14 Q.   Are you familiar with a company or project called Lavaca

15 Energy?

16 A.   Yes, I am.

17 Q.   What's Lavaca Energy?

18 A.   It was a company that was going to grow a large quantity

19 of energy crop.  They had worked with Texas Tech University

20 developing an energy crop that they could harvest and use for

21 biomass to make electrical power that they were going to put

22 into the grid in Victoria, Texas.

23 Q.   Could you just briefly describe the type of work you were

24 doing with Lavaca Energy?

25 A.   Lavaca, they were pretty sophisticated also.  So we just

1   talked about what their project was and how they were going to

2   do it to verify that they had the capability, and we felt like

3   they were using the best technology they possibly could.

4   Q.   Who was the person involved with Lavaca Energy?

5   A.   The main person that we dealt with was a guy named Bud

6   Stacy.

7   Q.   Are you familiar with the term Snowy Pines?

8   A.   Yes.

9   Q.   What's Snowy Pines?

10  A.   I think that's the physical entity that was going to do

11  the Lavaca project.  At one time they called their selves

12  Lavaca, and I think those initials stood for something.

13          MR. GRANT:  May I approach the witness?

14          THE COURT:  Yes.

15          MR. GRANT:  Showing defense counsel what's been marked

16  and previously provided to him as 393 and 392.

17  Q.   Mr. Kreie, I just handed you what's been marked as Exhibit

18  392 and 393.  I want to first direct your attention to 392.  Do

19  you recognize it?

20  A.   Yes, I do.

21  Q.   What is it?

22  A.   It's a write-up on the site visit that I did in Kentwood

23  for Cala.

24  Q.   What was the purpose of doing this write-up?

25  A.   Well, I wanted to get familiar with the property.  And,

1    actually, Cala was on the way home from Florida, so it was not

2    inconvenient at all to stop by there.  So I made arrangements

3    to stop and do a site visit.

4    Q.   And this Kentwood, again, what company are we dealing

5    with?

6    A.   Kentwood is Cala, C-a-l-a, Cala.

7    Q.   What was the date of this report in 392?

8    A.   This was in November, November 30 of 2009.

9    Q.   Did you provide it to anyone?

10   A.   Yes, yes.  This was given to Mr. Condo, and then I would

11   have given it to Frank Parker also.

12   Q.   What was the purpose of preparing this report and giving

13   it to John Condo and Mr. Parker?

14   A.   Just to let them know what we thought of the site.  And

15   they had not visited that site up 'til that point in time, so I

16   gave this to them with pictures of the site so that they could

17   see what the site looked like.

18          MR. GRANT:  The government would move for the

19   admission of Exhibit 392.

20          THE COURT:  It will be admitted.

21   (Exhibit No. 392 received into evidence.)

22   Q.   Now, turning to 393, do you recognize it?

23   A.   Yes, I do.

24   Q.   What is it?

25   A.   It's a write-up of the site visit I did on the Snowy

1  Pines/Lavaca Energy project.

2  Q.    What's the date of it?

3  A.    November 30 of 2009.  That would have been the date that I

4  prepared both reports.

5  Q.    Did you provide it to the same people?

6  A.    Yes, I did.

7  Q.    Again, what was the purpose of preparing that report?

8  A.    Just to give them an understanding of what the site looked

9  like in kind of a hip-shot opinion of how the project would lay

10 out.

11         MR. GRANT:  The government would move for the

12 admission of Exhibit 393.

13         THE COURT:  It will be admitted.

14 (Exhibit No. 393 received into evidence.)

15         MR. GRANT:  May I approach the witness?

16         THE COURT:  Yes.

17         MR. GRANT:  Showing defense counsel what's previously

18 been provided to him as 391.

19 Q.    Mr. Kreie, do you recognize Exhibit 391 for

20 identification?

21 A.    Yes, I do.

22 Q.    What is it?

23 A.    It's an interoffice memo that Mr. Parker did on the

24 Brandon Energy Park project.

25 Q.    Is this memo something that you had input into?

1    A.   He did most -- usually when he would do something like

2    this, I would review it before he handed it out.  So he did the

3    memo and I reviewed it.

4    Q.   Did you receive a copy of it?

5    A.   Yes, I did.

6    Q.   Who's it directed to?

7    A.   Mr. Condo and Michael Zanetti.

8         MR. GRANT:  The government would move for the

9    admission of Exhibit 391.

10        THE COURT:  It will be admitted.

11   (Exhibit No. 391 received into evidence.)

12   Q.   Could you just describe more fully what this Brandon

13   Energy Park project was?

14   A.   The Brandon Energy Park was a piece of ground that there

15   had been a phosphate production on that we were trying to

16   reclaim and use as biomass.  Storm waste is one of the major

17   feedstock components.  We were looking to use solid waste, too.

18   We were also coupling that with some agricultural components.

19   It was basically the agriplex that we had been trying to

20   promote.

21   Q.   Where was this Brandon Energy Park supposed to be built?

22   A.   Close to Brandon, Florida, which is the south and east

23   corner of Tampa.

24   Q.   So how close is it to Tampa?

25   A.   To Tampa?  Fifteen miles.

1    Q.    How close is it to Clearwater?

2    A.    Probably 40 miles.

3    Q.    Who was involved -- who were the principals of the Brandon

4    Energy Park project?

5    A.    We were working with Kyle Mowitz, and he had two other

6    partners.  I can't remember their names off the top of my head.

7    Q.    Did they have a company?

8    A.    Yes.

9    Q.    What was it called?

10   A.    Imperium Energy.

11   Q.    Now, are you familiar with something called PetroAlgae?

12   A.    Yes, I am.

13   Q.    What is PetroAlgae?

14   A.    PetroAlgae is a company close to -- south of Melbourne,

15   Florida, that -- it was developing a duckweed-type feedstock

16   that could be used as an energy crop.

17   Q.    What, if any, relationship was there between Brandon

18   Energy Park and PetroAlgae?

19   A.    We were looking at perhaps using them to supply feedstock

20   if we didn't have enough storm waste or other types of

21   feedstock to do what we wanted to do with our energy

22   production.

23   Q.    Now, was PetroAlgae a different company?

24   A.    Yes.

25   Q.    When you say "we were looking," who was the "we"?

```
 1    A.   Well, Frank and I as technical advisors.  We were working
 2    with the Imperium group.
 3    Q.   Did you have occasion to do a site visit at PetroAlgae?
 4    A.   Yes.
 5    Q.   Who was there?
 6    A.   I was there; Dr. Eric was there; John Condo; Michael
 7    Zanetti; all three principals with Imperium were there; the
 8    governor of --
 9    Q.   Governor?
10    A.   Governor Christie [sic] of the State of Florida was at
11    that site event and then several media people and a whole bunch
12    of the PetroAlgae people.
13    Q.   What was the purpose of this visit at least from your
14    perspective?
15    A.   We had never been on site before, and we were more
16    interested in how they actually did the production of the
17    duckweed product.
18    Q.   Did you have any discussions with Mr. Zanetti or Mr. Condo
19    or anybody else at DAC Global about the purpose of the visit?
20    A.   They knew why we were there, and PetroAlgae was real
21    excited to have the governor there, too.  If the relationship
22    led somewhere, it would have been a great opportunity to kind
23    of show off a new industry in Florida.
24              MR. GRANT:  May I approach the witness?
25              THE COURT:  Yes.
```

1           MR. GRANT:  Showing defense counsel what's been marked

2    and previously provided to him at 926, 927, and 928.

3    Q.   Now, Mr. Kreie, I want to turn first to 926.  Do you

4    recognize it?

5    A.   Yes, I do.

6    Q.   What is it?

7    A.   It's a picture of us standing in front of the offices of

8    PetroAlgae.

9    Q.   Was that during this visit that you've just described for

10   us?

11   A.   Yes.

12   Q.   Who took the picture?

13   A.   I did.

14   Q.   Does the picture fairly and accurately depict the people

15   that were there at the time of that visit?

16   A.   Some of them, yes.

17   Q.   Why do you say "some of them"?

18   A.   Like, Dr. -- I don't think Dr. Eric --

19   Q.   Let's just stay with 926.

20   A.   Okay.

21   Q.   Are some of the people obscured just because somebody is

22   standing in front of other people?

23   A.   Yes, yes.

24   Q.   Other than that, does it --

25   A.   Yes, it does.

1  Q.   -- fairly reflect what it looked like?

2  A.   Yes.

3        MR. GRANT:  The government would move for the

4  admission of Exhibit 926.

5        THE COURT:  It will be admitted.

6  (Exhibit No. 926 received into evidence.)

7        MR. GRANT:  Permission to publish 926 to the jury,

8  your Honor?

9        THE COURT:  Yes.

10  Q.   I'm going to try to point on the screen here.  The person

11  I just put that blue mark next to, put an arrow, who's that?

12  A.   The bigger guy or the guy with the sunglasses?

13  Q.   The guy with the sunglasses.

14  A.   That's Michael Zanetti.

15  Q.   And the bigger guy who I just put the arrow on?

16  A.   That's the friend of mine.  His name is Ed Stahl.

17  Q.   And?

18  A.   That's Kyle Mowitz.

19  Q.   Him, that I just put that arrow on, the guy in the middle?

20  A.   Yes.

21  Q.   The person I just put some blue marks to -- onto the right

22  of this group of people, who's that?

23  A.   That's another Imperium guy.  His name is Mark Roberts.

24  Q.   Now, turning next to 927, do you recognize it?

25  A.   Yes, I do.

1    Q.    What is it?

2    A.    It's another picture taken at that site visit at

3    PetroAlgae that day.

4    Q.    Who's in it?

5    A.    Michael Zanetti is in it; Trent Koutsoubos, John Condo's

6    younger son, is in it; Dr. Eric is in that picture; and John

7    Condo is also in the picture.

8    Q.    Again, did you take this?

9    A.    Yes, I did.

10   Q.    Does it fairly and accurately show what those people

11   looked like at that time during that visit?

12   A.    Yes.

13          MR. GRANT:  The government would move for the

14   admission of 927, your Honor.

15          THE COURT:  It will be admitted.

16   (Exhibit No. 927 received into evidence.)

17          THE COURT:  Do you have a date on this again?

18          MR. GRANT:  I'm sorry.

19   Q.    Approximately when was this PetroAlgae visit?

20   A.    It had to have been sometime in the summer of 2009.

21          MR. GRANT:  Permission to publish, your Honor?

22          THE COURT:  Yes.

23   Q.    Now, the person to the left with the sunglasses, again, is

24   that Mr. Zanetti?

25   A.    That's Mr. Zanetti.

1  Q.  And the person in the middle that's next to Mr. Zanetti,
2  who's that with the glasses?
3  A.  John's son, Trent Koutsoubos.
4  Q.  And the person Mr. Zanetti is facing, who's that?
5  A.  Dr. Eric.
6  Q.  You said something about John Condo.  Where is he located?
7  A.  He's over Dr. Eric's right shoulder, right there.
8  Q.  Where the arrow is, that's Mr. Condo?
9  A.  Yes.
10 Q.  Now, turning to 928, do you recognize it?
11 A.  Afraid so, yeah.
12 Q.  What is it?
13 A.  It's a selfie that Dr. Eric and I took.
14 Q.  Does it -- was it during this visit?
15 A.  Yes, it was.
16 Q.  Does it fairly and accurately depict what the two of you
17 looked like at that visit?
18 A.  Yes, sir.
19        MR. GRANT:  The government would move for the
20 admission of 928.
21        THE COURT:  It will be admitted.
22 (Exhibit No. 928 received into evidence.)
23        MR. GRANT:  Permission to publish 928, your Honor.
24        THE COURT:  Yes.
25 Q.  Now, turning next to California, you've testified a little

1  bit about some of the work that you did in California for

2  different projects.  Did there come a time when Mr. Condo and

3  Dr. Eric went out to California while you were there?

4  A.   Yes.

5  Q.   Were you present for a trip to American Ethanol?

6  A.   Yes, I was.

7  Q.   Were you present for a trip with Dr. Eric and Mr. Condo in

8  California to Cala?

9  A.   Yes, I was.

10  Q.   And just to clarify, you've testified there's actually two

11  Cala sites, is that right?

12  A.   Yes, there is, one in Bakersfield and one in Kentwood,

13  Louisiana.

14  Q.   The site in California, it was what?

15  A.   It was in Bakersfield.

16  Q.   But what was it?

17  A.   It was going to be another NASCAR racetrack.

18  Q.   Could you describe what happened during the visit that you

19  took with Condo and Dr. Eric to Cala?

20  A.   Yeah.  It was pretty much just a show and tell.  We looked

21  at the existing track facility.  It was partially complete.

22  They had rented a BMW, and we went out on the track and got to

23  go around the track.

24          MR. LEVCHUK:  Can I have a time frame on this trip?

25  Q.   Mr. Kreie, approximately when was this trip?

1   A.   That trip probably would have been May, June of 2009.

2   Q.   Aside from going to the track, did you have occasion,

3   during that visit with Mr. Condo and Dr. Eric, to have any

4   further discussions or meetings with the Cala folks?

5   A.   No.  That was really a whole day that day.  It was lots of

6   blowing dirt, and there had been a big accident on the

7   interstate.

8   Q.   Now, did you have occasion after that trip to go to

9   another site in Bakersfield?

10  A.   Yes.  We went and saw Sun Ranch.  I don't remember if it

11  was the same day or the day after or the day before perhaps.

12          MR. GRANT:  May I approach the witness?

13          THE COURT:  Yes.

14          MR. GRANT:  Showing defense counsel 932 and 931.

15  Q.   Starting first with 931, do you recognize it?

16  A.   Yes, I do.

17  Q.   What is it?

18  A.   We had been standing there talking to Jerry Lowrie, and

19  that's where Trent Koutsoubos and Dr. Eric and John Condo drove

20  up.

21  Q.   Where was this picture taken, if you know?

22  A.   It was taken just outside the entrance to the existing

23  racetrack area.

24  Q.   Was the project site supposed to be some sort of

25  improvement on the existing racetrack?

1    A.    Yes.

2    Q.    Who took the picture in 931?

3    A.    I took the picture.

4    Q.    Does it fairly and accurately depict what it is that you

5    were looking at during that visit to the racetrack?

6    A.    Yes.

7          MR. GRANT:  The government would move the admission of

8    931.

9          THE COURT:  It will be admitted.

10   (Exhibit No. 931 received into evidence.)

11         MR. GRANT:  Permission to publish, your Honor?

12         THE COURT:  Yes.

13   Q.    Now, you testified a moment ago about a BMW pulling up?

14   A.    Yes.

15   Q.    Is that the car that's in the middle of the picture?

16   A.    Yes, it is.

17   Q.    Who was in that car?

18   A.    That would be Dr. Eric, Trent Koutsoubos, and John Condo.

19   Q.    And you had testified something about driving around the

20   racetrack?

21   A.    Yes.

22   Q.    Was that the vehicle that was used to ride around on the

23   racetrack?

24   A.    Yes.

25   Q.    Turning next to 932, do you recognize it?

1  A.   Yes.

2  Q.   What is it?

3  A.   It's the racetrack that's existing.

4  Q.   Who took that picture?

5  A.   I did.

6  Q.   Did you take it during this visit?

7  A.   Yes, I did.

8  Q.   And does it fairly and accurately depict what the

9  racetrack looked like at that time?

10 A.   Yes, it does.

11      MR. GRANT:  The government would move for the

12 admission of 932.

13      THE COURT:  It's admitted and may be published.

14 (Exhibit No. 932 received into evidence.)

15 Q.   All right.  Now, were you present during a visit to the

16 Cosmopolitan Square folks while Dr. Eric and Mr. Condo were

17 there?

18 A.   Yes.

19 Q.   Just to be clear, were there ever occasions where you went

20 to go visit the Cosmopolitan Square folks when Dr. Eric and Mr.

21 Condo were not there?

22 A.   Yes.

23 Q.   Were you present during the visit -- during a visit where

24 Dr. Eric and Mr. Condo were there to visit the Sun Ranch folks?

25 A.   Yes.

1      MR. LEVCHUK:  Can we get dates on the prior trip as
2  well as this next one we're moving onto?
3      THE COURT:  Yes.
4  Q.   So these visits that you've been testifying about,
5  American Ethanol, Cala, Cosmopolitan Square, and Sun Ranch,
6  when, in relationship to each other, did they take place?
7  A.   The ones where we worked with them were early, so this
8  would have been maybe April, April-ish.  And the others would
9  have been toward the middle to end of the summer, the ones that
10  we actually met Dr. E and John Condo and his son Trent.
11  Q.   Let's just focus on the visits where Dr. Eric and Mr.
12  Condo were visiting these developers in California that we've
13  just talked about.  Were these all part of one trip?  Were they
14  close in time to each other or were they spread out?
15  A.   Where we met them there, they were pretty close together.
16  Q.   When you say "where we met them," who are you referring
17  to?
18  A.   Dr. Eric and Trent and John Condo.
19      MR. LEVCHUK:  Can we clarify, your Honor?  This is a
20  complete mess timewise.  If we could get dates for each trip.
21      THE COURT:  I don't know when this visit, the second
22  one, was.
23  Q.   Let's just focus on these trips where Dr. Eric was there.
24  Approximately when was that?
25  A.   It would have had to have been later in the summer.

1     THE COURT:  Summer of what year?

2     THE WITNESS:  2009.

3  Q.    Again, the four visits that we've been talking about --

4  Cosmopolitan Square, Cala, American Ethanol, and Sun Ranch --

5  were they all around that same time?

6  A.    Yes.

7  Q.    Summer 2009?

8  A.    That's correct.

9  Q.    Now, you've testified about having to incur hotel expenses

10 and traveling from Florida to California and to Louisiana.  Did

11 you have some sort of arrangement with Mr. Condo about how

12 these out-of-pocket expenses were going to be reimbursed?

13 A.    No.

14 Q.    Did you speak to him about needing some money prior to

15 projects actually being funded?

16 A.    Yes.

17 Q.    What did he say?

18 A.    He actually knew we were having expenses, so he just came

19 up to me one day and handed me a check and said to me, I know

20 you guys need money for expenses.  That would have been in

21 March of 2009.

22 Q.    Did you receive other checks for expenses?

23 A.    Yes, we did.

24 Q.    How much money did you receive from John Condo for

25 expenses?

1  A.   A total of $70,000.

2  Q.   Over what period of time did you receive that money?

3  A.   March was our first check.  We got our last check in

4  December, and there were, like, three months that were skipped,

5  two months that were skipped.

6  Q.   Again, this is all 2009?

7  A.   Yes.

8        MR. GRANT:  May I approach the witness?

9        THE COURT:  Yes.

10       MR. GRANT:  Showing defense counsel what's been marked

11 as 398 and 399.

12 Q.   Now, Mr. Kreie, turning first to 398, do you recognize it?

13 A.   Yes, I do.

14 Q.   What is it?

15 A.   It's a list of projects that were in their queue that Mr.

16 Zanetti gave me.

17 Q.   Approximately when did Mr. Zanetti give you this document?

18 A.   That probably would have been sometime midsummer 2009 when

19 I started working on drawing schedules.

20 Q.   What was the purpose of this document at least for you?

21 A.   For me, it was point of reference.

22 Q.   What do you mean by "point of reference"?

23 A.   It just told me all the projects that they had that they

24 were getting ready to finance.

25 Q.   And you understood that's what that document represented

1  from what Mr. Zanetti told you?

2  A.  Yes.

3      MR. GRANT:  The government would move for the

4  admission of 398.

5      THE COURT:  It may be admitted and may be published.

6  (Exhibit No. 398 received into evidence.)

7      MR. LEVCHUK:  I just have a question on it, your

8  Honor.  There seems to be markings.  There's no explanation.

9      MR. GRANT:  I'm going to get to that, your Honor.

10     THE COURT:  Okay.

11 Q.  Mr. Kreie --

12     MR. GRANT:  If you could focus that a little bit.

13 Q.  Are you familiar with these markings, Mr. Kreie?

14 A.  No, not on this document.

15 Q.  Okay.  Do you -- the yellow markings, does that -- do they

16 mean anything to you?

17 A.  The yellow ones look like maybe ones I was working on draw

18 schedules on.

19 Q.  And the handwriting, is that yours?

20 A.  No.

21 Q.  Now, are you familiar with all of these different projects

22 that are listed under "current projects"?

23 A.  There are some that I had no contact with.

24 Q.  Okay.  Now, turning next to 399, do you recognize it?

25 A.  Yes, I do.

1  Q.   What is it?

2  A.   This was a listing of everybody that had an account with

3  Century Bank.

4  Q.   Who did you obtain the document from?

5  A.   Michael Zanetti.

6  Q.   What did he represent the document represented?

7  A.   It was just another document that showed the projects that

8  they had in their queue.

9  Q.   What was the purpose of this document from your

10 perspective?

11 A.   Just point of reference there again.

12        MR. GRANT:  Government would move for the admission of

13 399.

14        THE COURT:  It will be admitted and may be published.

15 (Exhibit No. 399 received into evidence.)

16        MR. GRANT:  Actually, okay.  There we go.

17 Q.   Mr. Kreie, do you -- do the markings on the first page of

18 399 mean anything to you?

19 A.   Yes, they do.

20 Q.   Could you explain?

21 A.   They were the entities and projects that I did work on.

22 Q.   The ones that are -- well, it looks like there's some

23 yellow highlighting and some green highlighting.  Could you

24 tell us if you know what the significance of the green

25 highlighting is?

1  A.   The yellow projects were projects that Mr. Parker had

2  worked on.

3  Q.   And what about green?

4  A.   The green were projects that I had worked on.

5  Q.   Is this something that you would have obtained from Mr.

6  Zanetti around the same time as the previous document I showed

7  you?

8  A.   Yes.

9       MR. LEVCHUK:  Which would have been again?  I'm sorry.

10      THE WITNESS:  This would have been probably late

11  summer of 2009.

12  Q.   Now, taking a look -- you've already testified about

13  American Ethanol and Cala.  Are you familiar with Charlotte

14  Club Development?

15  A.   Yes.

16  Q.   What kind of project was that?

17  A.   It was a real estate project in Charlotte, North Carolina.

18  Q.   Did you do any work in your technical advisory role on

19  that project?

20  A.   No, we did not.

21  Q.   What about Global Marketplace LLC?

22  A.   I'm familiar with that, and I actually did their draw

23  schedule.

24  Q.   What is Global Marketplace LLC?

25  A.   It's a real estate development in Minneapolis, Minnesota,

1  area.  It was like a shop mart for people to come, buy products

2  from around the world.  It was a wholesale place.

3  Q.   Now, Las Baulas, are you familiar with that one at all?

4  A.   No, sir.

5  Q.   Snowy Pine, is that the same Snowy Pine that you testified

6  about earlier as being associated with Lavaca Energy?

7  A.   Yes, sir.

8  Q.   And the next one down, Springfield Plantation, are you

9  familiar with that project?

10 A.   Yes but not very.

11 Q.   What about TDACR, LLC, are you familiar with that project?

12 A.   No, not at all.

13 Q.   What about Texanol, LLC?

14 A.   Did talk to their principals a couple times but not very

15 often.

16 Q.   Did you talk to the Texanol principals about their

17 project?

18 A.   Yes.  Frank actually spent more time talking to them, Mr.

19 Parker, than I did.

20 Q.   The next one, Westlink Development, again, is that the

21 Cosmopolitan Square folks that you testified about earlier?

22 A.   Yes.

23 Q.   Wall Street Hospitality, are you familiar with that one?

24 A.   No.

25 Q.   And Imperium Energy, is that the same Imperium you

1 referred to earlier?

2 A.   Yes, Brandon Energy Park.

3 Q.   And DFI Group, is that the same DFI you testified about

4 earlier?

5 A.   Yes, sir.

6 Q.   And Premier Land Real Estate, LLC, what's that?

7 A.   That's Sun Ranch in Bakersfield.

8 Q.   Now, you testified earlier about Century Bank as having

9 some relationship to the work you were doing.  Did you ever

10 have occasion to gain access to developers' Century Bank

11 accounts?

12 A.   Yes, I did.

13        MR. GRANT:  May I approach the witness, your Honor?

14        THE COURT:  Yes.

15        MR. GRANT:  Showing defense counsel what's been marked

16 as 394 and 395 for identification.

17 Q.   Mr. Kreie, do you recognize 394?

18 A.   Yes, I do.

19 Q.   What is it?

20 A.   It's a printout of account activity for China World

21 Marketplace, also known as Asian World Marketplace.

22 Q.   For Century?

23 A.   Yes, for Century Bank.

24 Q.   What is the date of that printout?

25 A.   The date of the printout is April 6 of 2009.

1   Q.   Does that printout -- did you have occasion to see the

2   Century Bank account at about that time?

3   A.   Okay.  That's the account creation date.  I'm sorry.

4   Q.   Okay.  So what's the printout?

5   A.   It would have been around June 3rd.  Along the bottom,

6   March 29 of 2010.

7   Q.   Is this something that -- would you sometimes print out

8   the Century screenshots when you'd go look at them?

9   A.   Yes.

10  Q.   Does Exhibit 394 -- is that one of the printouts?

11  A.   Yes, sir.

12          MR. GRANT:  The government would move for the

13  admission of 394.

14          THE COURT:  It will be admitted.

15  (Exhibit No. 394 received into evidence.)

16  Q.   Turning next to 395, do you recognize it?

17  A.   I recognize what it is, but I don't know -- I know that

18  it's an account transaction, but I don't know whose it is.

19  Q.   Again, is this Century?

20  A.   Yes, it is.

21  Q.   Is the date the same as 394?

22  A.   Yes, it is.

23  Q.   3/29/10?

24  A.   Yes.

25  Q.   Is this something that you had printed out?

1   A.   Must have been, yes.

2   Q.   But you're not able to identify which developer it is?

3   A.   No.

4   Q.   But would it have been one of the ones that you had been

5   given access to?

6   A.   Yes, yes.

7            MR. GRANT:  The government would move the admission of

8   395.

9            THE COURT:  It will be admitted.

10  (Exhibit No. 395 received into evidence.)

11           MR. GRANT:  May I approach the witness?

12           THE COURT:  Yes.

13           MR. GRANT:  Showing defense counsel what's been marked

14  as 135.

15  Q.   Mr. Kreie, I just handed you Exhibit 135 already in

16  evidence.  Do you recognize it?

17  A.   Yes.

18  Q.   What is it?

19  A.   It's a screenshot of the Century Bank's website.

20  Q.   Is this different from the screenshots that we've been --

21  that you've been testifying about earlier?

22  A.   Yes.

23  Q.   What's different about 135?

24  A.   Well, it would be the portal that you go into to get into

25  your client, into your client area.

1    Q.   Did you have occasion over the time that you worked with

2    DAC Global to look at the portal of Century Bank?

3    A.   Yes, I did.

4    Q.   When you looked at the Century Bank website, how did it

5    appear to you?

6    A.   It looked like a normal bank site.

7    Q.   Now, at some point in 2010, did you have occasion to speak

8    to Michael Zanetti or to receive communications from Michael

9    Zanetti about a deposit return?

10   A.   Yes.

11   Q.   What deposit return did he communicate to you about?

12   A.   We talked about DFI, their deposit return.

13   Q.   What did he say?

14   A.   We had recommended they not do that project.

15   Q.   Why had you recommended that?

16   A.   Well, their principal had fallen down a flight of stairs,

17   and he appeared to be an integral part of the project.  Plus,

18   we felt like it was a little thin on margin to be a project

19   that was approved.

20   Q.   What did Mr. Zanetti say about the deposit then?

21   A.   That they were in the process of getting their deposit

22   returned.

23   Q.   Do you know whether DFI ever got their deposit back?

24   A.   Not the last that I had heard, no.

25   Q.   Now, you testified that the principal had somehow been

1    incapacitated, is that right?

2    A.    Yes.

3    Q.    Is that the same person that you identified early in the

4    photograph as Danny Boyce, or is that somebody else?

5    A.    No, no.  It would be somebody else.

6    Q.    Now, Mr. Kreie, at some point did you stop working at the

7    DAC Global office in Florida, or did your time there decrease

8    at some point?

9    A.    Yes, it did.

10    Q.    Approximately when did it start decreasing?

11    A.    Probably toward the summer of 2010.

12    Q.    Why did it start decreasing at that point?

13    A.    There wasn't anything that I couldn't do from Kansas that

14    I needed to be in Florida for.  And Dr. Eric and John Condo had

15    moved their offices to St. Petersburg, and we were still up

16    north.

17    Q.    In Clearwater?

18    A.    In Clearwater.  So the separation wasn't really any

19    greater by me being in Kansas with my family.

20    Q.    And at that point were you receiving any more payment for

21    expenses?

22    A.    No.  We got our last one in December of 2009.

23    Q.    And so from 2009 till summer, you were having to pay your

24    own expenses for the work you were doing?

25    A.    Yes, sir.

1  Q.  Now, the $70,000 that you testified about receiving, was

2  that for you personally, or was that for you and Mr. Parker

3  together?

4  A.  It was for Mr. Parker and I together.  It went into Great

5  Plains Biosciences Group.

6  Q.  Now, during the time that you were working at the DAC

7  Global offices from the early part of 2009 to mid-2010, did you

8  have occasion to see who was there on a regular basis?

9  A.  Yes.

10  Q.  Who was there on a regular basis?

11  A.  The people that were there the most would have been Dina

12  Howard.

13  Q.  Who was that?

14  A.  John Condo's sister.  And Jimmy Koutsoubos would be John

15  Condo's brother.

16  Q.  Let me just stop you on Jimmy.  Let's say -- Dina Howard,

17  what did she do?

18  A.  She was John's personal secretary.

19  Q.  And what about Jimmy Koutsoubos?

20  A.  He was -- he pretty much just ran errands and did stuff

21  for John.

22  Q.  Did you -- when you observed him in the office, what did

23  you observe him doing most of the time?

24  A.  Well, pretty much every time you'd walk into Jimmy's

25  office, he was on Facebook.

1  Q.   Now, did you have occasion to attend meetings with

2  developers at the DAC Global offices?

3  A.   Yes.

4  Q.   During that time, did Jimmy ever attend those meetings?

5  A.   No.

6  Q.   Now, who else was there regularly besides Dina and Jimmy?

7  A.   John was there a considerable amount of the time, and Dr.

8  Eric was there a lot, too.

9  Q.   When you say "a considerable amount of time," let's just

10  start with Condo.  If you were to say a month is 20 working

11  days, how many of those working days would Mr. Condo be there?

12  A.   Sixteen or seventeen.

13  Q.   What about Dr. Eric?

14  A.   About the same.

15  Q.   What about Mr. Zanetti, was he ever there?

16  A.   He actually lived on the East Coast, so he would come over

17  almost every week for sometimes a day, sometimes two days,

18  sometimes three days.

19  Q.   Aside from the people you've just talked about and

20  yourself and Mr. Parker, was there anybody else in this office

21  that you saw there regularly?

22  A.   I don't remember the time frame, but at some point in time

23  Trent came back, and he had an office in the DAC offices.

24  Q.   Now, in addition to working at these offices with Dr.

25  Eric, did you have occasion to socialize with him?

```
 1   A.   Yes, yes, I did.

 2   Q.   On what occasions would you socialize with him?

 3   A.   Mostly birthdays.  They would have birthday parties for

 4   people that had birthdays.  And then we went out for dinner

 5   several times over a period of time.

 6   Q.   How was your -- how did you consider your relationship

 7   with Dr. Eric?

 8   A.   We really enjoyed being around Dr. Eric.

 9   Q.   Were you Facebook friends with Dr. Eric?

10   A.   Yes, I was.

11   Q.   During your interactions with Dr. Eric, both

12   professionally and socially, did you have occasion to speak to

13   him?

14   A.   Yes.

15   Q.   What language did you speak to him in?

16   A.   In English.

17   Q.   Do you speak any Greek?

18   A.   No.

19   Q.   Did you have any trouble understanding Dr. Eric when you

20   would talk to him?

21   A.   Some trouble, but we managed.

22        MR. GRANT:  May I approach the witness?

23        THE COURT:  Yes.

24        MR. GRANT:  Showing defense counsel 397 for

25   identification, previously provided to him.
```

1  Q.   Now, Mr. Kreie, before we get to 397, I just want to ask

2  you a little bit more about the timing.  Now, you testified

3  that your time at the office was beginning to tail off in

4  mid-2010, is that right?

5  A.   Yes.

6  Q.   Going to the fall of 2010, were you beginning to have some

7  concerns about this DAC Global fund based on your conversations

8  with Mr. Zanetti or Mr. Condo?

9  A.   Yes, I was.

10 Q.   What concerns did you have based on those conversations?

11 A.   Well, nothing had been funded, and people had spent a

12 considerable amount of their own money to keep their projects

13 alive under the promise that their projects were going to be

14 funded.  It was getting to the point where something bad was

15 going to happen.

16 Q.   What do you mean by that?

17 A.   Well, the developers' deposits weren't being returned and

18 their -- they had had draw zeros, which is the very first draw

19 on these projects, that weren't paid when promised.  And people

20 were starting to get hurt.

21 Q.   As a result of that, did you draft a communication to Mr.

22 Condo?

23 A.   Yes, I did.

24 Q.   Without -- could you just briefly describe what it is that

25 you told him?

1  A.   Well --

2  Q.   Again, I don't want you to read.  I just want you to tell

3  me generally what it was you were trying to communicate.

4  A.   I was trying to communicate to him that if he didn't act

5  in some fashion that was positive quickly that things were

6  going to completely unravel.

7         MR. LEVCHUK:  Judge, counsel said communication with

8  Mr. Condo.

9         MR. GRANT:  I haven't referred to the exhibit yet.  If

10  I could just continue my questioning, your Honor?

11  Q.   After that communication with Mr. Condo, did you have --

12  did you get any response?

13  A.   No.

14  Q.   Not having a response to Mr. Condo, did you attempt to

15  communicate with Dr. Eric?

16  A.   Just by email.

17  Q.   Why did you attempt to communicate with Dr. Eric after

18  your communication with Mr. Condo had failed?

19  A.   I just felt compelled to let him know what I thought was

20  getting ready to happen.  So I wanted him to receive the same

21  message that John Condo had received.

22  Q.   Why did you think it was important that Dr. Eric know?

23  A.   I was just afraid, you know, if something didn't happen

24  and everybody got really hurt because of the lack of funding

25  that he needed to know if it wasn't being conveyed to him by

1 Mr. Condo how serious the matter was.

2 Q.   Now, at this point did you still believe, in the fall of

3 2010, that there was a fund that had money?

4 A.   Yes, I did.

5 Q.   How, if at all, did you think Dr. Eric could remedy the

6 situation with this lack of funding?

7 A.   Well, since we felt like he had clients that had money in

8 the fund that he communicated directly with, we felt like he

9 might have the ability to push things forward quickly if need

10 be.

11 Q.   Did you speak to Mr. Zanetti about your concerns?

12 A.   Yes.

13 Q.   What, if anything, did Mr. Zanetti say in response?

14 A.   Well, he was John's mouthpiece at that point in time.  We

15 had absolutely no contact with Dr. Eric or John.  So at that

16 time Zanetti indicated that he was still talking to them and

17 that there was a chance that at least three of the projects

18 were going to be funded right away and as many as seven

19 projects altogether.

20        MR. LEVCHUK:  Could we have a time frame with the

21 conversation with Mr. Zanetti?

22 Q.   Again, is this the same period of time, the fall of 2010?

23 A.   Yes.  That conversation would have been in September of

24 2010 with Zanetti.

25 Q.   When you wanted to go to Dr. Eric with your concerns, did

1    you have a way of getting ahold of him?

2    A.    No.

3    Q.    Did you speak to Mr. Zanetti about a way of getting ahold

4    of him?

5    A.    I contacted Mr. Zanetti to see if he had another email

6    address that I could send this to.

7    Q.    What did he provide?

8    A.    He provided me --

9           MR. LEVCHUK:  Objection, hearsay.

10          THE COURT:  Are we talking about Mr. Zanetti?

11          MR. GRANT:  Zanetti.

12   A.    He gave me an email address.

13          THE COURT:  The objection is overruled.

14   Q.    What was that email address?

15   A.    It was austriacom@gmail.com.

16   Q.    Turning now to 397, what is it?

17   A.    This was a copy of the email with the attachments that I

18   sent to this email address.

19   Q.    To Dr. Eric?

20   A.    Yes.

21   Q.    To this austriacom@gmail.com?

22   A.    Yes.

23   Q.    What are the attachments?

24   A.    The attachments -- we had talked with one of the

25   principals of the Blue Brain project.

```
1    Q.   I don't want to get into the substance.  Can you just tell
2    us, is it a letter?  Is it a communication?  And who is it to
3    or from?
4    A.   It's a communication to Dr. Eric.
5    Q.   What's the date of that communication to Dr. Eric?
6    A.   October 29 of 2010.
7    Q.   What are the attachments to that email to
8    austriacom@gmail.com?
9    A.   A copy of the letter that I had delivered to John and a
10   copy of the letter from the Blue Brain people.  Yes.
11              MR. GRANT:  No more questions.
12              THE COURT:  Can I see counsel at sidebar.
13   (SIDEBAR CONFERENCE AS FOLLOWS:
14              THE COURT:  I take it your cross is going to be longer
15   than ten minutes?
16              MR. LEVCHUK:  It will be 35 to 40 now.
17              THE COURT:  All right.  I'm going to break now.  We'll
18   do the cross on Tuesday.
19              MR. LEVCHUK:  Thank you, your Honor.
20              THE COURT:  Thank you.
21   .  .  .  END OF SIDEBAR CONFERENCE.)
22              THE COURT:  Mr. Kreie, you may step down for the time
23   being.  We're going to be in recess today.  As you know,
24   jurors, we're going to be in recess also on Monday.  There's
25   going to be no trial.  So we're going to go off now until
```

1  Tuesday, which is April 29th.

2  I want to reemphasize to you once more with more

3  emphasis that you're not to talk about this case, not to try to

4  do any independent research on it.  That would be entirely

5  improper because you're going to decide this case solely on the

6  basis of the evidence that comes into this courtroom and not on

7  the basis of whatever independent research or conversations you

8  might have with anybody who is interested in this case or has

9  any knowledge about similar cases.

10  So I will see you back here -- not tomorrow -- on

11  Tuesday, April 29th, and we will resume.  As far as I know,

12  we'll have full days for the rest of the week, Tuesday through

13  Friday next week.  But I will give you forewarning in case we

14  don't have a session on some afternoon.  So have a pleasant

15  weekend, and I'll see you then Tuesday morning.

16  Please leave the notebooks in the jury room.

17  (The jury left the courtroom at 3:20 p.m.)

18  THE COURT:  All right.  Be seated, counsel.  Give me

19  an outline of Tuesday's witnesses.

20  MR. GRANT:  Your Honor, we expect to call Gino

21  Laitano, L-a-i-t-a-n-o; a woman by the name of Kelly Photos.

22  Oh, Norman Miller, who's actually very important because he's

23  coming from New Zealand, so he's our top priority in terms of

24  getting him on and off.

25  THE COURT:  Why don't we start with Laitano for direct

1  examination, approximate.

2          MR. GRANT:  That could be two and a half hours, your

3  Honor.  He's very important.

4          THE COURT:  Okay.  And then what would his cross be,

5  approximately?

6          MR. LEVCHUK:  A long time, your Honor, maybe about an

7  hour.

8          THE COURT:  Okay.  Mr. Miller?

9          MR. GRANT:  About half hour to -- probably 45 minutes,

10  your Honor.

11          THE COURT:  And his cross?

12          MR. LEVCHUK:  I would say 20 minutes.

13          THE COURT:  And after Miller if we get that far?

14          MR. GRANT:  Photos.  And I would expect about an hour

15  and a half, your Honor.

16          THE COURT:  Okay.  And cross-examination of her?

17          MS. KAMM:  I'm sorry, your Honor?

18          THE COURT:  Cross-examination of Miss Photos?

19          MS. KAMM:  Half an hour.

20          THE COURT:  Well, that will certainly get us through

21  Tuesday.

22          Is there anything else that needs to come to my

23  attention before we adjourn for the weekend?

24          MR. GRANT:  Just one clarification.  We will probably

25  put Mr. Miller on first so he can -- doesn't get left over.

1          THE COURT:  Fine.  Anything else?  All right.  We're

2      in recess until Tuesday at 9 a.m., Tuesday morning.

3          MR. LEVCHUK:  Thank you, your Honor.

4      (Whereupon, at 3:24 p.m. the trial recessed.)

5

6                        *  *  *

7

8               C E R T I F I C A T E

9

10

11          We certify that the foregoing is a correct transcript

12      of the record of proceedings in the above-entitled matter to

13      the best of our skill and ability.

14

15

16

17

18      /s/Marcia G. Patrisso

19      Marcia G. Patrisso, RMR, CRR

20

21      /s/Cheryl Dahlstrom                  December 29, 2014

22      Cheryl Dahlstrom, RMR, CRR           Dated

23      Official Court Reporter

24

25